**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

JEFFREY LICHTENSTEIN, et al.,

        *Plaintiffs*,

    v.

TRE HARGETT, et al.,

        *Defendants*.

Civil No. 3:20-cv-0736

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

Tennessee makes it a felony for anyone other than an employee of an election commission to distribute an application for an absentee ballot to any person, solicited or unsolicited. Tenn. Code § 2-6-202(c)(3) ("the Law"). Defendant Goins has affirmed that this provision covers the absentee request form that Tennessee makes freely available on its website, as well as the various versions of this form promulgated by specific counties. Thus, if a representative of Plaintiff Memphis Central Labor Council, such as Plaintiff Jeffrey Lichtenstein, provides a copy of such a form to a union member *who requests it*, he has committed a felony, triggering the loss of voting rights, a sentence of at least one and up to six years in prison, and a fine of up to $3,000. Tenn. Code §2-19-143; *id.* § 40-35-112. In essence, if you have a printer and internet access, you can have an absentee ballot application without requesting one from the election commission. And if you make a mistake, you can print yourself another, and another. But if you lack access to a printer or the internet, you would induce a felony by asking for an application from a neighbor. Not only does the Law impede voters' access to applications to vote absentee during a period when mail-in voting is a critical lifeline for many voters; not only does it threaten to catch honest citizens unaware that they are committing a felony;[1] it is an unconstitutional restriction of core political speech.

The window to apply to vote absentee in the November 3 election opened August 5, 2020, and closes October 27, 2020. But, as a practical matter, voters will want to submit their requests before October 27 to be sure they can both receive and timely cast their mail-in ballots. This is particularly true since Tennessee *prohibits* returning absentee ballots by any other means than

---

[1] Nothing in these applications or forms provides citizens with a warning that distributing them—despite their availability on the internet—is a felony.

mail, while also requiring election officials *receive* the ballot by the close of polls on Election Day to count. Tenn. Code §§ 2-6-202, 2-6-303(b). Organizational Plaintiffs are heading into peak get-out-the-vote season at a time when an unprecedented number of Tennesseans plan to vote by mail and the State has chosen to criminalize Plaintiffs' distribution of the very materials voters need to apply to vote absentee. This restriction cuts off Organizational Plaintiffs' ability to encourage absentee voting at its knees. No other State has a law anything like Tennessee Code § 2-6-202(c)(3), and for good reason: it is unconstitutional. Plaintiffs respectfully request that this Court issue immediate relief to allow Organizational Plaintiffs to engage in their desired, nonpartisan speech promoting civic participation.

## FACTUAL BACKGROUND[2]

This November, Tennessee anticipates unprecedented levels of absentee voting. In the August 6 primary, more than 116,000 Tennesseans cast absentee ballots—compared to between 11,000 and 18,000 absentee ballots in the past four August primaries—shattering the prior record for a presidential election year by approximately 52,000 absentee ballots.[3] The Tennessee Supreme Court's decision in *Fisher v. Hargett* and *Lay v. Goins* establishes that the pool of eligible absentee

---

[2] Plaintiffs here summarize the facts most relevant to their preliminary injunction motion. The facts are further presented in detail in the Declarations of Danielle Lang ("Lang Decl."); Jeffrey Lichtenstein on his own behalf ("Lichtenstein Decl."), Jeffrey Lichtenstein, on behalf of the Memphis Central Labor Council ("MCLC Decl."); Kermit Moore, on behalf of the Memphis A. Philip Randolph Institute ("APRI Decl."), Charlane Oliver, on behalf of The Equity Alliance ("Equity Alliance Decl."), Gloria Jean Sweet-Love, on behalf of the Tennessee State Conference of the NAACP ("Tennessee NAACP Decl."); Dawn Harrington, on behalf of Free Hearts ("Free Hearts Decl."), which are each attached to Plaintiffs' Motion for Preliminary Injunction as Exhibits A–G, respectively. Where reference is made to numbered exhibits, e.g. "Ex. 1," such documents are attached as exhibits to the Lang Declaration.

[3] Joel Ebert, *Tennessee shatters record for absentee ballots, with more than 100,000 people voting by mail*, Tennessean (Aug. 9, 2020),
https://www.tennessean.com/story/news/politics/2020/08/06/tennessee-shatters-absentee-ballot-record-more-than-100000-vote-mail/3313905001/.

voters this year is broad, encompassing all those who "have underlying medical or health conditions which render them more susceptible to contracting COVID-19 or at greater risk should they contract it ('person with special vulnerability to COVID-19'), as well as those who are caretakers for persons with special vulnerability to COVID-19." *Fisher v. Hargett*, No. M2020-00831-SC-RDM-CV, slip op. at 2 (Tenn. July 30, 2020).[4] Even before the Tennessee Supreme Court expanded the pool of eligible absentee voters, Defendants were preparing for "a significant increase in absentee by-mail ballots," increasing the normal supply of 80,000 absentee ballot envelopes to four million each of mailing envelopes, return envelopes, and ballot envelopes. Ex. 1 at 49, 55 (Tennessee Election COVID-19 Contingency Plan). Thus, based on the State's own estimates, Tennessee can expect a dramatic increase in the number of Tennesseans choosing to vote by mail for the upcoming general election.

Absentee voters must navigate a different set of election rules than in-person voters. For most Tennesseans voting absentee this November, these rules and processes will be new. *See id* at 49 ("Less than 2.5% of Tennessee voters historically voted absentee by-mail."). The first step in this process is applying for an absentee ballot.[5] For this upcoming election, the window to apply to vote absentee opened on August 5, 2020 and closes on October 27, 2020. *See* Tenn. Code § 2-6-202(a)(1). However, voters must apply in time to receive their ballots, complete them, and mail them back in time so that they will be *received* by Election Day. *See* Tenn. Code §§ 2-6-202, 2-

---

[4] *See also* Tenn. Sec'y of State, *Absentee By-Mail Ballot Information, Frequently Asked Questions*, https://sos.tn.gov/products/elections/absentee-voting (last visited Aug. 31, 2020) (listing the *Fisher* categories as eligibility criteria).

[5] Voters can do this by three means: (1) completing and submitting an application to vote absentee obtained online or at an election commission office; (2) submitting a request for an application to vote by mail, receiving said application, and submitting it; or (3) submitting a request for an application to vote by mail that contains the requisite information to be treated as an application for a ballot. *See* Tenn. Code § 2-6-202; Ex. 2 (Goins Decl.) at ¶¶ 2–4. This case focuses on the first option, which is the easiest and most straightforward.

6-303(b). Applications to vote absentee are available at county election commission offices and online on both the Secretary of State's website and on various county election commission websites.[6] Ex. 2 (Goins Decl.) at ¶¶ 7, 11; *see also* Ex. 3 (current web-based version of absentee ballot application promulgated by Defendant Goins). While the forms are largely similar, there are a number of different variations of the web-based applications tailored either to specific counties or to specific elections. *See, e.g.,* Ex. 4 (web-based version used by the Secretary of State's office for the August 2020 primary); Ex. 5 (web-based applications promulgated by the Davidson County Election Commission).[7]

---

[6] Plaintiffs previously understood these forms to be governed by § 2-6-202(c)(4), which governs requests for applications for absentee ballots because these online forms are not tightly restricted to one per voter, *see* Tenn. Code § 2-6-202(c)(2), the forms are labeled "request for absentee ballot," and an Attorney General opinion limited (c)(3) and opined that "[t]he use of a prepared form as a 'request for absentee ballot' is consistent with Tenn. Code § 2-6-202(c)(3)." However, the State has now made clear that it believes these forms are governed by § 2-6-202(c)(3), *see* Ex. 2, and the court deferred to that interpretation in the related case. As a result, Plaintiffs filed this new action challenging § 2-6-202(c)(3) rather than § 2-6-202(c)(4).

[7] *See also* Blount County Election Commission Form, www.blounttn.org/DocumentCenter/View/23438/Nov-2020-Request-to-Vote-Absentee-By-Mail.pdf (last visited August 31, 2020); Bradley County Election Commission Form, http://bradleyelections.com/wp-content/uploads/2020/08/By-Mail-Ballot-Request-081820.pdf (last visited August 31, 2020); Cumberland County Election Commission Form, https://cumberlandcountytn.gov/wp-content/uploads/2019/07/November-2020-Absentee-Ballot.pdf (last visited August 31, 2020); Davidson County Election Commission Form, https://www.nashville.gov/Portals/0/SiteContent/ElectionCommission/docs/main/abrequest-201103.pdf (last visited August 31, 2020); Gibson County Election Commission Form, https://irp-cdn.multiscreensite.com/f769257e/files/uploaded/absrequest.pdf (last visited August 31, 2020); Hardeman County Election Commission Form, https://drive.google.com/file/d/1A7FYuYtyBILhKBbw3byp4hbTWmwuNn56/view (last visited August 31, 2020); Putnam County Election Commission Form, https://putnamcountytn.gov/sites/default/files/downloadable/November%20Absentee%20Ballot%20Request%20-8-31-2020_0.pdf (last visited August 31, 2020); Shelby County Election Commission Form, https://www.shelbyvote.com/sites/default/files/documents/elections/2020/November/Absentee%20Request%20General.pdf (last visited August 31, 2020); Sullivan County Election Commission Form, http://www.scelect.org/nov2020absenteeapplication.pdf (last visited August 31, 2020); Washington County Form, http://wcecoffice.com/wp-content/uploads/2020/08/NOV-ABSENTEE-FORM-2.pdf (last visited August 31, 2020); Wilson County Election Commission

Despite their broad availability, Tennessee Code § 2-6-202(c)(3) prohibits anyone other than election commission employees from "giv[ing] an application for an absentee ballot to any person," solicited or unsolicited, under penalty of a Class E felony. The State has confirmed that it interprets these web-based applications to be subject to this absolute prohibition. *See MAPRI v. Hargett*, No. 3:20-cv-00374, Doc. 71, at 4, 9 n.6 (Aug. 19, 2020). Thus, Plaintiffs are prohibited, under penalty of felony, from providing their members or other members of the public with copies of the absentee ballot applications that the State makes available online, even when a citizen so requests.

Organizational Plaintiffs are each community-based and membership organizations that devote significant resources towards engaging, educating, and mobilizing voters. In past election cycles, they have run voter registration drives, education events, and organized efforts to drive voters to the polls in-person on Election Day. *See* Tennessee NAACP Decl. ¶¶ 5–14; MCLC Decl. ¶¶ 4–9; APRI Decl. ¶¶ 3, 8; Equity Alliance Decl. ¶¶ 2–12; Free Hearts Decl. ¶¶ 9, 13. Plaintiffs recognize that the outbreak of COVID-19 and the concomitant shift toward absentee voting requires them to employ new civic participation strategies to be effective. They will need to engage voters with less person-to-person contact and engage and mobilize absentee voters. *See* Tennessee NAACP Decl. ¶¶ 15–16; MCLC Decl. ¶ 16; APRI Decl. ¶ 12–13; Equity Alliance Decl. ¶¶ 17–19; 32–33; Free Hearts Decl. ¶ 14. Plaintiffs recognize that, in light of COVID-19, members of their constituencies will not vote unless they vote absentee, and that many such members have not previously voted absentee and need assistance navigating the process. *See* Tennessee NAACP

---

Form, https://www.wilsonelections.com/uploads/files/4e7245e96b71182ea37778ea278a28e6512f01de.pdf (last visited August 31, 2020).

Decl. ¶ 33; MCLC Decl. ¶ 16; APRI Decl. ¶ 13; Equity Alliance Decl. ¶¶ 32–33, 35; Free Hearts Decl. ¶ 21.

Plaintiff Jeffrey Lichtenstein wants to help eligible Tennesseans vote by mail because he understands that many voters will not want to risk contracting COVID-19 by voting in person. Jeffrey Lichtenstein Decl. ¶ 8. Leading up to the November election, Plaintiff plans to describe the benefits of voting by mail to eligible voters and wants to be able to provide them with the absentee ballot application necessary to vote by mail, especially if they affirmatively ask him for the application. Lichtenstein Decl. ¶ 9. Plaintiff wishes to engage in this civic engagement activity as part of his work—helping to engage union members and their families—as well as in his personal capacity. Lichtenstein Decl. ¶ 3, 8; MCLC Decl. ¶¶ 2–3. However, Plaintiff will not risk felony criminal prosecution in order to do so and believes the risk of prosecution constrains his ability to effectively encourage voters to actually vote by mail. Lichtenstein Decl. ¶ 13.

Providing Tennesseans with the materials they need to vote by mail—including absentee applications—is critical to Plaintiffs' civic participation efforts. Each Plaintiff seeks to inform eligible voters of their right to vote absentee, encourage them to do so, and provide them with the information and materials needed to do so effectively. Tennessee NAACP Decl. ¶¶ 15, 19, 26; MCLC Decl. ¶¶ 18–19; APRI Decl. ¶ 8; Equity Alliance Decl. ¶ 34; Free Hearts Decl. ¶ 14. As such, they wish to include blank absentee application forms in educational materials they send by mail and email, post these materials on their websites, distribute these materials in their offices or at events, and provide copies of applications upon request by members or other citizens. Tennessee NAACP Decl. ¶ 26; MCLC Decl. ¶ 19; APRI Decl. ¶ 15; Equity Alliance Decl. ¶¶ 22, 29, 35; Free Hearts Decl. ¶ 23. Voter education mailings are particularly critical to reach the broadest swath of

the electorate possible, without engaging in person-to-person contact. All of these activities—even merely printing an application for a member that requests one—are prohibited by § 2-6-203(c)(3).

The Law inhibits Plaintiffs' speech. In Plaintiffs' experience, civic participation efforts are most successful where such efforts make participation easy and seamless. Tennessee NAACP Decl. ¶ 34; MCLC Decl. ¶ 28; APRI Decl. ¶ 25; Equity Alliance Decl. ¶ 34; Free Hearts Decl. ¶ 31. Directly providing a potential voter with an application to complete and submit is much more effective than referring a potential voter to a website to print an application for herself. *Id*. Plaintiffs wish to provide voters with everything they need: absentee ballot applications, instructions on how to apply and vote absentee, an explanation of what's on the ballot, and other critical voter education information. Tennessee NAACP Decl. ¶ 15, 34; MCLC Decl. ¶¶ 27–28; APRI Decl. ¶ 23, 25; Equity Alliance Decl. ¶¶ 13, 17, 22; Free Hearts Decl. ¶¶ 14, 24, 31. The inability to provide voters with the actual materials to vote absentee dilutes Organizational Plaintiffs' get-out-the-vote message and makes this message less effective. This is particularly so since some voters will not have the means to obtain absentee ballot request forms themselves (for example, because they lack reliable access to computers or printers). *See* Tennessee NAACP Decl. ¶ 25; MCLC Decl. ¶ 22; APRI Decl. ¶ 18; Equity Alliance Decl. ¶¶ 25, 29; Free Hearts Decl. ¶¶ 22, 29; *see also* Ex. 2 (Goins Decl.) at ¶ 10 (recognizing that "some voters do not own computers, or do not otherwise have access to the internet").[8] The only way Plaintiff Free Hearts in particular can effectively carry out its civic engagement efforts in jails—and effectively associate with those voters—is to give

---

[8] According to U.S. Census Bureau, over 400,000 households in Tennessee lack *any* internet subscription, including cellular data plans. *2018: ACS 1-Year Estimates: Internet Subscription in Household in Tennessee*, https://data.census.gov/cedsci/table?q=tennessee%20internet&tid=ACSDT1Y2018.B28011&hidePreview=false (last visited Aug. 31, 2020). Plainly, the number of households that lack the ability to *print* from the internet is much higher.

eligible pretrial electors absentee ballot applications because these electors do not have any way to access printers or internet. Free Hearts Decl. ¶ 29.

## LEGAL STANDARD

Courts consider four factors in deciding whether to issue a preliminary injunction: whether (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable harm without the injunction; (3) issuance of the injunction would cause substantial harms to others; and (4) the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). No single factor is a prerequisite to prevailing, and the Court should balance all four factors. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted* (*OFA*), 697 F.3d 423, 436 (6th Cir. 2012) (internal quotation omitted).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CHALLENGE.

Tennessee's criminal prohibition on the dissemination of absentee ballot applications obstructs Plaintiffs' voter engagement efforts, limiting their political expression and core political speech activity. The Law is therefore "subject to exacting scrutiny," and may be upheld only if it is shown to be narrowly tailored to serve a compelling government interest. *See Meyer v. Grant*, 486 U.S. 414, 420 (1988) (applying "exacting scrutiny" to a challenged statute "involv[ing] a limitation on political expression"); *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 204 (1999); *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008) (applying

9

*Meyer* to a law limiting compensation of signature gatherers to payment by time worked).[9]
Tennessee's criminalization of *any* distribution of absentee ballot applications outside employees
of election commissions serves no government interest, and neither is it narrowly tailored to serve
a compelling interest were one to be found. The Law violates the First Amendment.

A. **The Law Restricts Organizational Plaintiffs' Expressive Speech Activities.**

Plaintiffs engage in year-round First Amendment-protected civic engagement activity
including voter registration, education, and engagement. They conduct in-person voter registration
drives, hold events to help mobilize voters, and provide voters with educational materials to help
them make informed choices when voting. *See* Tennessee NAACP Decl. ¶ 14; MCLC Decl. ¶¶ 5,
7–8; APRI Decl. ¶ 8; Equity Alliance Decl. ¶¶ 7–12; Free Hearts Decl. ¶¶ 9–13. In light of the
outbreak of the COVID-19 pandemic, Plaintiffs will focus much of their civic participation
activities on encouraging and helping eligible voters request mail-in ballots so that they can vote
safely from their homes. *See* Tennessee NAACP Decl. ¶ 15; MCLC Decl. ¶ 16; APRI Decl. ¶¶ 12–
16; Equity Alliance Decl. ¶¶ 17–19; Free Hearts Decl. ¶¶ 14–15. Organizational Plaintiffs will
undertake these activities, in part, because they understand that unless voters can vote by mail,
some may not vote at all and, in part, because they believe individuals should not have to risk their
health to vote. *See* Tennessee NAACP Decl. ¶¶ 16–19; MCLC Decl. ¶ 29; APRI Decl. ¶¶ 18–20;
Equity Alliance Decl. ¶ 35; Free Hearts Decl. ¶¶ 15, 30.

Particularly considering that *most* Tennessee voters who vote absentee in this election will
be doing so for the first time, *see supra* Factual Background, Organizational Plaintiffs seek to

---

[9] Like *Citizens for Tax Reform,* the penalty at issue here is a felony, not a misdemeanor. 518 F.3d
at 386. In *Citizens for Tax Reform*, petition circulation was not banned—not even paid petition
circulation was banned; rather, *one form* of payment of petition circulators was banned. *Id.* at 377.
If exacting scrutiny applied in that case, it certainly applies here where the speech activity proposed
has been outright prohibited by penalty of felony.

engage eligible absentee voters by providing them with everything they need to vote absentee, including both detailed instructions and blank absentee ballot applications. *See* Tennessee NAACP Decl. ¶ 26; MCLC Decl. ¶ 28; APRI Decl. ¶ 25; Equity Alliance Decl. ¶ 34; Free Hearts Decl. ¶ 31. To reach the greatest number of voters, Plaintiffs' efforts will include both solicited and unsolicited distribution of absentee ballot applications to voters and engaged community members, along with information about voting by mail. *See* Tennessee NAACP Decl. ¶ 32; MCLC Decl. ¶ 21; APRI Decl. ¶ 18; Equity Alliance Decl. ¶¶ 24, 36; Free Hearts Decl. ¶ 29. Plaintiffs wish to use all the tools at their disposal—distribution in-person, by mail, by email—to ensure that eligible absentee voters can easily access to applications. Tennessee NAACP Decl. ¶¶ 25–26, 32, 35; MCLC Decl. ¶¶ 19, 28; APRI Decl. ¶ 25; Equity Alliance Decl. ¶¶ 26, 32–35; Free Hearts Decl. ¶¶ 30-32.

Organizational Plaintiffs' planned absentee voter engagement activities—including the distribution of absentee applications banned by Tennessee Code § 2-6-202(c)(3)—are "core political speech" for which First Amendment protection is "at its zenith." *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988). Whether a voter should cast an absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id.* at 421. When Organizational Plaintiffs encourage Tennessee citizens to vote by mail, including by providing them with absentee ballot applications, Organizational Plaintiffs necessarily engage those citizens in conversations about the importance of voting and civic engagement, the need for political reform, and other issues of organizational importance. *See* Tennessee NAACP Decl. ¶¶ 7, 18; MCLC Decl. ¶ 8; APRI Decl. ¶ 8; Equity Alliance Decl. ¶ 7; Free Hearts Decl. ¶ 13.

In encouraging voters to vote by mail, Organizational Plaintiffs necessarily encourage voters to vote. This is particularly so in an election year during which many voters fear the health

risks of voting in person because of an ongoing public health crisis. Indeed, absent knowledge of

their ability to vote by mail in an election held during a pandemic, and easy access to the materials

needed to do so, some voters may just not vote *See* Tennessee NAACP Decl. ¶ 33; MCLC Decl. ¶

29; APRI Decl. ¶ 20; Equity Alliance Decl. ¶ 35; Free Hearts Decl. ¶¶ 15, 30. As this district has

already held, such voter engagement is—like the petition signature gathering at issue in *Meyer* and

*Buckley*—core political speech:

> the creation of a new voter *is* a political change—no less so than the inauguration
> of a new mayor or the swearing-in of a new Senator. The often-repeated premise
> that voting is the "political right ... preservative of all rights," is not just a
> comforting aphorism; it reflects an acknowledgment that, in the American system
> of governance, every decision to grant, preserve, or take away a right can be traced,
> in at least some partial way, back to an election. If anything, a person's decision to
> sign up to vote is more central to shared political life than his decision to sign an
> initiative petition. A petition in support of a ballot initiative might lead to a change
> in one law or a few laws, but a change in the composition of the electorate can lead
> to the change of *any* law.

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 723–24 (M.D. Tenn. 2019) (citation

omitted) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).[10] Moreover, Plaintiffs' planned

---

[10] *See also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006) (striking down restrictions on voter registration activity and noting "[t]he interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society"); *League of Women Voters of Fla. v. Browning* (*Browning II),* 863 F. Supp. 2d 1155, 1158–59 (N.D. Fla. 2012) (holding laws regulating voter registration drives affect "core First Amendment Activity"); *League of Women Voters of Fla. v. Browning* (*Browning I*), 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008) (stating "[u]ndoubtedly, Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity"); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332–33 (S.D. Fla. 2006) (noting laws restricting third-party voter engagement activity "reduce[] the total quantum of speech" because through that activity, civic organizations like Plaintiffs "persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions"). Get-out-the vote drives, including drives to turn out absentee voters, ensure that *registrants* become *voters*. They embody precisely the same messages of civic participation as voter registration drives, and are core First Amendment activity.

voter engagement activity is also protected "political association that is, itself, protected under the First Amendment." *Id.* at 720; *see also Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [engaging absentee voters] impair their ability effectively to organize and make their voices heard.").

It is of no consequence that the Law allows Plaintiffs to engage in alternative speech *related to* absentee voting while prohibiting Plaintiffs' dissemination of the materials actually required to vote absentee. Indeed, *Meyer* directly refutes any attempt to diffuse the burdens of the Law merely because other avenues of speech are available to Plaintiffs: "That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection." 487 U.S. at 424. Just as Plaintiffs in *Meyer* sought to engage in petition circulation because it was, in their view, "the most effective, fundamental, and perhaps economical avenue," *id.*, Plaintiffs here seek to disseminate absentee ballot applications because doing so is the most effective and economical avenue to engage eligible absentee voters.

That Tennessee "leaves open 'more burdensome' avenues of expression, does not relieve its burden on First Amendment expression." *Id.* (internal quotation omitted). Directing eligible absentee voters to another source to find applications is more burdensome to voters than providing one directly. Without being able to help voters vote by mail by providing them with absentee ballot applications, Plaintiffs' voter education and outreach communications lose their force. *See* Tennessee NAACP Decl. ¶ 25; MCLC Decl. ¶¶ 21–24; APRI Decl. ¶¶ 18–20; Equity Alliance Decl. ¶¶ 24–26; Free Hearts Decl. ¶¶ 29–30. The First Amendment protects Plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for

so doing."*Meyer*, 486 U.S. at 424; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 386 (6th Cir. 2008) (same); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332 (S.D. Fla. 2006); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1215–16 (D.N.M. 2010) (finding the Plaintiffs' "public endeavors to assist people with voter registration" involve protected political expression), *on reconsideration in part*, WL 3834049 (D.N.M. July 28, 2010).

Under Tennessee Code § 2-6-202(c)(3), by engaging in this core political speech, Plaintiffs must expose themselves and their employees and volunteers to felony convictions, loss of voting rights, sentences between one and six years, and fines up to $3,000. The prohibition directly and severely burdens Plaintiffs' speech and as such is subject to exacting scrutiny. *See Deters*, 518 F.3d at 383, 388 (citing *Meyer* and *Buckley* for the proposition that scrutiny of restrictions on speech is subject to a sliding scale, and that a severe burden merits exacting scrutiny).

### B.  The Law Does Not Serve Any Compelling Government Interest.

Because Tennessee Code § 2-6-202(c)(3) burdens core political speech, the burden the State "must overcome to justify this criminal law is well-nigh insurmountable." *Meyer*, 486 U.S. at 425. The restriction is "subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d at 730. Here, because the Law's provisions are not meaningfully designed to serve any legitimate government interest, let alone a compelling one, its enforcement must be enjoined.

At its core, the purpose and effect of Plaintiffs' distribution of absentee ballot applications is to engage the Tennessee electorate and to encourage eligible voters to vote by mail. *See* Tennessee NAACP Decl. ¶¶ 13–14; MCLC Decl. ¶ 26; APRI Decl. ¶ 23; Equity Alliance Decl.

¶¶ 9, 19, 26–28; Free Hearts Decl. ¶ 31. This is *exactly* the interest the State itself seeks to serve in the lead up to the general election. Indeed, the State is actively encouraging all absentee eligible voters to vote by mail, and Defendant Hargett has even suggested that *all* Tennesseans should engage in such an effort. *See* Hargett Interview[11] at 32:55 – 33:06 (stating that with respect to voting by mail, "[i]t's not just important we advertise to [voters] over 60, . . . [but] that we talk to their children and their grandchildren to make sure that they know and they might be encouragers to get people to vote absentee"). But at the same time, Tennessee Code § 2-6-202(c)(3) prohibits the most obvious step to encourage absentee eligible voters: distribution of the necessary applications. As such, such restrictions chilling Plaintiffs' core First Amendment rights will almost certainly preclude eligible voters from voting by mail, simply because they lack the opportunity or means to obtain and submit an application. *See, e.g.,* Tennessee NAACP Decl. ¶ 25; MCLC Decl. ¶¶ 21–24; APRI Decl. ¶¶ 18–20; Equity Alliance Decl. ¶¶ 24–26; Free Hearts Decl. ¶¶ 29–30 (explaining that some members lack the computer and printer access needed to obtain their own absentee ballot applications).

As a general matter, "the procedural safeguards that the Legislature has included in the elections laws [are] designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) insure that only those who meet the statutory requirements for eligibility to vote, cast ballots." *Foust v. May*, 660 S.W.2d 487, 489 (Tenn. 1983) (internal quotation omitted). The Law serves neither purpose.

There is nothing about providing *blank* absentee ballot applications to eligible absentee voters—including those who *request* one—that seriously poses a risk of undue influence on or

---

[11] Jim Shulman & Tre Hargett, *A Convo w SOS Tre Hargett*, YouTube (May 24, 2020) ("Hargett Interview"), https://www.youtube.com/watch?v=AsfH1NlmUt8.

intimidation of voters. Indeed, if this was the purpose of the Law, it is passing strange to allow Plaintiffs to "write out [a] voter's absentee voting by mail application," Tenn. Code § 2-6-203, but make it a felony for Plaintiffs to provide said voter with a blank absentee ballot application that has been approved by the Secretary of State. Thus, nothing about Plaintiffs' activity will disrupt the establishment of "uniform forms for each county election commission for an application for . . . absentee voting." Tenn. Code § 2-6-308.

Nor is there any antifraud or electoral integrity interest in prohibiting the physical distribution of publicly available forms. Once Organizational Plaintiffs provide an application to a voter, the voter would still need to complete the form under penalty of perjury, *see* Tenn. Code §§ 2-19-105, 2-19-107, 2-19-109, and then submit it to election officials, who must verify the voter's identity and eligibility to vote by mail before sending the voter an absentee ballot, *id.* § 2-6-202(b). *See Meyer*, 486 U.S. at 426–27 (holding that the state failed to show that challenged procedures were necessary where other preexisting procedures were "adequate to the task of minimizing the risk of improper conduct"); *see also Deters,* 518 F.3d at 387–88 (holding criminal penalties for fraudulent signatures adequate to protecting state interest without state regulating methods for paying signature collectors).

Finally, it appears that the statute may have been motivated by the State's desire to track and control the official absentee voter applications. Tenn. Code § 2-6-202(c)(2) ("The election commission shall furnish only one (1) application for absentee voting . . . to any voter . . . ."). It is doubtful that this interest—seemingly untethered to any broader state interest—would justify the Law. But, in any event, the State's choice to make the forms available online vitiates any such interest. As this Court noted elsewhere, "[w]ith the application available online, one may reasonably wonder why it is still a felony (even absent nefarious surrounding circumstances) for

16

persons not with an election commission to give an application to someone else." *MAPRI v. Hargett*, 3:20-cv-00374, Doc. 66 at 9 n.9 (Aug. 11, 2020).

The State's draconian penalties on those individuals and organizations that provide absentee ballot applications to voters is not narrowly tailored to serve any compelling government interest. Rather, these penalties serve no purpose other than to make it prohibitively difficult for civic organizations, like Organizational Plaintiffs, to encourage and assist legitimate, qualified, eligible citizens to apply to vote absentee. Furthermore, these penalties will fall more harshly upon voters who cannot afford Internet, printers, scanners, or fax machines and are more likely to ask someone to print their application for them. Thus, Plaintiffs are likely to succeed on their First Amendment speech and association claims.[12]

## II.     PLAINTIFFS ARE AT IMMINENT RISK OF IRREPARABLE HARM.

Tennessee Code Section 2-6-202(c)(3) denies Plaintiffs the right to engage in protected First Amendment activity.[13] "[A] violation of First Amendment rights, even for a short time, causes

---

[12] Even if the Court reviews this statute under the *Anderson-Burdick* framework for regulations of the election process, there is little difference between the exacting scrutiny the Court employed in *Meyer* and the close scrutiny the Court applied under *Anderson-Burdick* when considering regulations on core political speech, which are necessarily severe. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring); *see id.* at 192 n.12 (majority opinion). Moreover, even under a lower level of scrutiny, the Law fails because it is not meaningfully tethered to any cognizable government interest.

[13] Plaintiffs have standing to bring this pre-enforcement challenge to the Law because the Law is injuring them right now since they are not willing to risk felony prosecution and a potential loss of their members' and volunteers' voting rights to distribute absentee applications as part of civic engagement activity. *See Steffel v. Thompson,* 415 U.S. 452, 459 (1974) (holding that a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [a criminal] statute"). "To establish standing for a free-speech claim, the Plaintiffs generally must show that 'the rule, policy of law in question has explicitly prohibited or proscribed conduct on the[ir] part.'" *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016) (quoting *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015)). This is not a case where it is unclear whether Plaintiffs' proposed activities are covered by the statute; rather, Plaintiffs' proposed course of conduct is *precisely* what is prohibited by the Law. Plaintiffs' allegations are much more than "subjective chill"; they have been objectively chilled by a Law that directly criminalizes the speech they wish

irreparable harm." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002);

*see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *N.Y. Times Co. v. United States*, 403

U.S. 713 (1971)). Indeed, "[e]ven minimal infringement upon First Amendment values constitutes

irreparable injury sufficient to justify injunctive relief." *Chabad of S. Ohio & Congregation*

*Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (alteration in original) (quoting

*Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989)). And, there are no legal remedies available

to Plaintiffs that will cure the deprivation of their First Amendment rights. *See, e.g., Brinkman v.*

*Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010).

 Furthermore, "[t]he nature of elections . . . is that time is of the essence." *League of Women*

*Voters v. Hargett*, 400 F. Supp. 3d at 733. Although voters may "have multiple opportunities to go

to the polls" each year, "when each chance is gone, it is gone." *Id.* Denying Plaintiffs the

opportunity to encourage their members and communities to apply for and vote by mail constitutes

an irreparable harm because each opportunity lost is one that is "gone forever." *Browning II*, 863

F. Supp. 2d at 1167 (finding in the registration context that "when a plaintiff loses an opportunity

---

to engage in. *Id.* at 417. That is what criminal laws are intended to do. *See Bauer v. Shepard*, 620
F.3d 704, 708 (7th Cir. 2010) ("[T]he existence of a statute implies a threat to prosecute . . . .").
 Moreover, the threat of enforcement is real. Defendants have had several opportunities to
disavow the enforcement of the Law and its companion prohibition in § 2-6-202(c)(4). Instead,
they defended them. *See MAPRI*, 3:20-cv-00374, Doc. 46, Doc. 71 (noting Plaintiffs' proposed
conduct is prohibited by the Law); *see also Babbit v. United Farm Workers Nat. Union*, 442 U.S.
289, 302 (1979) (finding standing where "the State has not disavowed any intention of invoking
the criminal penalty"). In 2002, Defendant Secretary of State's office lobbied for the *addition* of
the criminal prohibition in (c)(4) because the office had monitored civic participation groups'
activity and objected. And Tennessee Code § 2-6-202(c)(3) is a strict liability statute, making its
violation easier to enforce, particularly given Plaintiffs' intention to engage in this activity in
public. *See Plunderbund Media LLC v. DeWine*, 753 F. App'x. 362, 366–67 (6th Cir. 2018)
(considering whether an attribute of the challenged statute makes its enforcement easier or more
likely in assessing threat of enforcement).

to register a voter, the opportunity is gone forever."); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018); *Action NC v. Strach*, 216 F. Supp. 3d 597, 642–43 (M.D.N.C. 2016); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *N.C. State Conf. of the NAACP v. N.C. State Bd. Of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016).

Just like registering to vote is a prerequisite to voting generally, so too is applying for an absentee ballot a prerequisite to voting by mail in Tennessee. And given the ongoing pandemic, faced with the choice between risking their health and voting, applying for absentee ballots will be a prerequisite to voting at all for many Tennesseans in this year's upcoming election. Thus, "[f]orcing the plaintiffs to wait . . . through litigation would mean taking away chances to participate in democracy that will never come back." *League of Women Voters v. Hargett*, 400 F. Supp. 3d at 733. This factor therefore weighs in Plaintiffs' favor.

### III.    A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

"Generally speaking, 'the public interest is served by preventing the violation of constitutional rights.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d at 733 (quoting *Chabad of S. Ohio*, 363 F.3d at 436). Because the Law violates Plaintiffs' First Amendment rights, the public interest is served by its injunction.

Even beyond this general interest in vindicating constitutional rights, courts routinely have held that granting a preliminary injunction serves the public interest when it helps permit "as many qualified voters to vote as possible." *OFA*, 697 F.3d at 437; *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Enjoining the Law does just that by allowing

Plaintiffs to conduct their voter engagement activity uninhibited. Moreover, by expanding the number of voters who will vote safely by casting vote-by-mail ballots, an injunction of these challenged provisions also reduces public health risks and eases burdens and costs of election administration during a pandemic that has caused thousands of deaths in the State and hundreds of thousands in the country. Indeed, for these same reasons Defendant Hargett is encouraging all currently eligible voters to vote by mail. *See* Hargett Interview, *supra* note 11, at 32:30–33:40. Plaintiffs' proposed activity furthers that goal.

## IV. THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS.

Because Plaintiffs are likely to succeed on the merits of their claims, are at imminent risk of irreparable harm, and because the injunction will serve the public interest, the balance of the equities favors Plaintiffs. The State has no valid interest in enforcing the unconstitutional restrictions challenged herein. *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987). And while the usual inquiry on a motion for preliminary injunction "calls for assessing the harm to the opposing party and weighing the public interest," "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## <u>CONCLUSION</u>

For the reasons articulated herein, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: August 31, 2020

Respectfully Submitted,

_/s William L. Harbison_

Danielle Lang*
Ravi Doshi*
Molly Danahy*
Jonathan Diaz*
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel.: (202) 736-2200
dlang@campaignlegalcenter.org
rdoshi@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org

William L. Harbison (No. 7012)
Lisa K. Helton (No. 23684)
Christopher C. Sabis (No. 30032)
Christina R.B. López (No. 37282)
Sherrard, Roe, Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Phone: (615) 742-4200
Fax: (615) 742-4539
bharbison@srvhlaw.com
lhelton@srvhlaw.com
csabis@srvhlaw.com
clopez@srvhlaw.com


Ezra Rosenberg*
Pooja Chaudhuri*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org


* Pro Hac Vice Admission Pending

21

## Certificate of Service

I, Bill Harbison, certify, pursuant to Local Rule 5.01, as follows:

That on this 31st day of August, 2020, the foregoing Motion for Expedited Briefing was served via electronic and first-class mail on the following:

> Janet Kleinfelter
> Andrew B. Campbell
> Alexander Rieger
> Matthew D. Cloutier
> Office of the Tennessee Attorney General
> 301 6th Ave. N.
> Nashville, Tennessee 37243
> janet.kleinfelter@ag.tn.gov
> andrew.campbell@ag.tn.gov
> alex.rieger@ag.tn.gov
> matt.cloutier@ag.tn.gov
>
> *Counsel for Defendants*

That the foregoing Motion for Expedited Briefing will be served with the Summons and Complaint, in accordance with Rule 4(j)(2) of the Federal Rules of Civil Procedure and Rule 4.04 of the Tennessee Rules of Civil Procedure, via Certified United States Mail on the following:

> Amy Weirich, in her official capacity as
> District Attorney General for Shelby County, Tennessee
> 201 Poplar Avenue, #301
> Memphis, TN 38103

*/s William L. Harbison*