## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

JEFFREY LICHTENSTEIN, THE   )
MEMPHIS AND WEST TENNESSEE  )
AFL-CIO CENTRAL LABOR COUNCIL, )
THE TENNESSEE STATE CONFERENCE )
OF THE NAACP, THE EQUITY   )
ALLIANCE, MEMPHIS A. PHILLIP  )
RANDOPLH INSTITUTE, FREE HEARST, )
             )  No.  3:20-cv-00736
  Plaintiffs,       )
             )
TRE HARGETT, in his official capacity as )
Secretary of State of the State of Tennessee, )
MARK GOINS, in his official capacity as )
Coordinator of Elections for the State of )
Tennessee, and AMY WEIRICH, in her official )
Capacity as the District Attorney General for )
Shelby County, Tennessee,    )
             )
  Defendants.      )

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

---

The Attorney General, on behalf of the above-captioned defendants, in their official capacities only, hereby submits this Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (DE 11).

### INTRODUCTION AND PROCEDURAL BACKGROUND

The United States Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Supreme Court, therefore, has recognized that States retain the power to regulate their own elections. *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973); *Tashjian v. Republican Party of Connecticut*,

479 U.S. 208, 217 (1986). Thus, States have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959). Like all states, Tennessee balances its compelling interest in protecting the integrity of the election process with its citizens' right to vote. Indeed, "[a] State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989), and confidence in the integrity of a state's electoral processes is vital to the functioning of a participatory democracy. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

On May 1, 2020, Plaintiffs Memphis and West Tennessee AFL-CIO Central Labor Council, the Tennessee State Conference of the NAACP, the Equity Alliance, Memphis A. Phillip Randolph Institute and Free Hearts, (the "organizational Plaintiffs") filed a complaint in this Court in which they alleged, among other things, that Tenn. Code Ann. § 2-6-202(c)(4)'s prohibition against providing unsolicited requests for applications for absentee ballots violates their rights to free speech and association. (*Memphis A. Phillip Randolph Institute v. Hargett*, Complaint, DE 1 ("*MPRI v. Hargett*").) On June 12, 2020, six weeks after filing their complaint, Plaintiffs moved for a preliminary injunction, *see generally* Motion for Preliminary Injunction, (*Id*. DE 40, ID#160–62), seeking injunctive relief including enjoining the defendants from enforcing Tenn. Code Ann. § 2-6-202(c)(4). (*Id*. Proposed Order, DE 40-1, Page ID# 163 – 66.) This Court subsequently entered an order denying Plaintiffs' motion finding that they had challenged the wrong statute based upon their allegations, i.e., that Plaintiffs sought to distribute applications for absentee ballots, which is prohibited under Tenn. Code Ann. § 2-6-202(c)(3), and not unsolicited requests for applications for absentee ballots prohibited by § 2-6-202(c)(4). (*Id*. Order Op. DE 66.)

Now, once again, Plaintiffs seek this Court's intervention on the eve of an election to correct their own error and to alter Tennessee's rules for the election. But the Supreme Court has repeatedly emphasized that "'lower courts should ordinarily not alter the election rules on the eve of an election.'" *Kishore v. Whitmer*, -- F.3d. --, 2020 WL 4932749, *4 (6th Cir. Aug. 24, 2020) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (per curiam)). This Court, then, should decline Plaintiffs' invitation to do so and deny Plaintiffs' motion for a preliminary injunction.

## APPLICABLE LAW

From their inception, the laws authorizing absentee voting by-mail in Tennessee have included various procedural safeguards to protect the freedom and purity of elections. The Tennessee legislature first authorized absentee-by mail voting in 1917 and required an eligible voter to submit a written request to election officials either by personal delivery or by registered mail and to include a sufficient amount of postage for the ballot to be sent by mail to the voter. *See* Chapter 8, § 2, Public Acts of 1917. In 1945, the legislature re-wrote the laws authorizing absentee voting, but still required the voter to request an absentee by-mail ballot in writing and to enclose "a sufficient amount of postage for the ballot to be sent by mail." *See* Chapter 63, Public Acts of 1945. Additionally, for any voter seeking to vote absentee by-mail due to illness or physical disability, the voter was required to include a certified physician's statement. *Id.* And in 1961, the legislature added the requirement that any voter seeking to vote absentee by-mail due to absence from the county had to include a certificate of "non-registration", i.e., a statement by the registrar or other official in charge of voter registration in the county where a voter was temporarily staying certifying that such person was not a registered voter in that county. *See* Chapter 305, § 1, Public Acts of 1961.

In 1963, the General Assembly once again re-stated the absentee voting laws. *See* Chapter 380, Public Acts of 1963. Under the new provisions, a voter seeking to vote absentee by-mail was required to submit a signed written *request*. If the county election officials determined that the person was a registered voter and had apparently signed the request, they would then send the voter the "Official Absentee Voting by Mail Application." *Id*. at § 4. The voter was required to complete the Application and submit it along with either the certified physician's statement or certificate of non-registration. *Id*. The Act required the Secretary of State to prepare and furnish all applications and other official forms for use under the Act and provided that no other forms could be used. *Id*. at § 9.

In 1972, the entire election code was repealed and replaced by Chapter 740, Public Acts of 1972. The purpose of the Act was "in order to establish a uniform law of elections protecting the freedom and purity of elections" in Tennessee. *See* Chapter 740, § 1, Public Acts of 1972. The new Act did not change the process that a voter desiring to vote by absentee mail had to follow, except that it eliminated the requirement of a certified physician's statement. *Id*. at part 611.

In 1979, the Legislature repealed and replaced the provisions governing voting absentee by-mail. *See* Chapter 316, § 4, Public Acts of 1979. The new provisions continued to require the voter to request in writing an application for an absentee ballot, but also provided that "[a]ny request for an absentee ballot shall be treated as a request for an application for absentee ballot." *Id*. at § 4(a). The Act further provided that *applications* for ballots "shall be only on forms supplied to county election commissions by the coordinator of elections" and that applications "shall be supplied by the county election commission only to the voter wishing to vote absentee". *Id*. at § 4(c). Finally, the Act provided that it "shall be a felony for any private person to supply an application for absentee ballot to any person by any means whatsoever." *Id*.

In 1994, the Legislature once again substantially revised the provisions for absentee by-mail voting. *See* Chapter 859, § 2, Public Acts of 1994. Among other things, the Legislature simplified the process by eliminating the provision mandating that a voter *request* an application for an absentee ballot. (*Id.*) It further provided that if a voter did submit a *request for an application* for an absentee ballot, that request could serve as an application for a ballot if the request contained the requisite information. (*Id.*) Finally, the Act provided that a "person who is not an employee of an election commission commits a Class E felony if such person gives an application for an absentee ballot any person." *Id.* This provision, currently codified at Tenn. Code Ann. § 2-6-202(c)(3), has remained unchanged since 1994.

## STANDARD OF REVIEW

When evaluating a request for preliminary injunction, a court must evaluate four factors:

> (1) Whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.

*Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998). When a party seeks a preliminary injunction on the basis of the basis of a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) (internal quotations marks and citations omitted).

The purpose of a prohibitory preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). Here, all four factors counsel against granting Plaintiffs' requested relief—especially where such relief is sought on the eve of the November state and federal elections.

## ARGUMENT

### I. Plaintiffs are unlikely to succeed on the merits.

Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their claims: First, because Plaintiffs' claims are barred by the doctrine of laches, and second, because the Plaintiffs cannot show that the challenged law violates their First and Fourteenth Amendment rights.

### A. Plaintiffs' claims are barred by laches.

The Sixth Circuit has recognized that, in the injunction context, "[t]iming is everything." *Crookston v. Johnson*, 841 F.3d. 396, 398 (6th Cir. 2016). Thus, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S.Ct. 1942, 1944 (2018). Here, Plaintiffs have failed to show such "reasonable diligence" and this Court should decline to accept Plaintiffs' invitation to eliminate one of Tennessee's absentee voting procedural safeguards—particularly when absentee voting has been ongoing for over a month—and the deadline for requesting an absentee ballot is fast approaching.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941). And "in election-related matters, extreme diligence and promptness are required. When a party fails to exercise diligence in seeking extraordinary relief in an election-related matter, laches may bar the claim."

*McClafferty v. Portage Cty. Bd. of Elections*, 661 F.Supp.2d 826, 839 (N.D. Ohio 2009) (internal citations and quotation marks omitted). Indeed, the federal courts of appeal have long cautioned that "any claim against a state electoral procedure must be expressed expeditiously," *see Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citing *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968)), and the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter election rules on the eve of an election." *See, e.g., Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897, at *2 (U.S. July 30, 2020) (staying injunction where plaintiff " 'delayed unnecessarily' its pursuit of relief"); *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam) (vacating an injunction where an election was "imminen[t]"); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief. . . ."); *see also Husted v. Ohio State Conference of the NAACP*, 573 U.S. 988 (2014) (staying a district court order issued two months prior to November 2014 election that required Ohio to restore portion of early voting period); *North Carolina v. League of Women Voters*, 574 U.S. 927 (2014) (staying preliminary injunction issued a month before the November 2014 election that enjoined portions of a North Carolina statute concerning early voting and counting ballots cast in the wrong precinct ); *Frank v. Walker*, 574 U.S. 929 (2014) (vacating Seventh Circuit's stay issued two months before the November 2014 election thereby permitting enforcement of Wisconsin's voter identification statute); *Veasey v. Perry*, 135 S.Ct. 9 (2014) (affirming Fifth Circuit's stay of district court injunction issued two weeks prior to start of early voting that enjoined Texas's voter identification law);

Moreover, federal intervention when an election is imminent risks "a disruption in the state electoral process [which] is not to be taken lightly" as "[t]his important equitable consideration goes to the heart of our notions of federalism." *Republican Party of Penn. v. Cortes*, 218 F.Supp.3d 396, 405 (E.D. Pa. 2016) (quoting *Page v. Bartels*, 248 F.3d 175, 195–96 (3rd Cir. 2001)); *see also Perry v. Judd*, 840 F.Supp.2d 945, 950 (E.D. Va. 2012) ("The doctrine applies with particular force in the context of preliminary injunctions against governmental action where litigants try to block imminent steps by the government."). Finally, as the Sixth Circuit has explained, as an election grows closer, "the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the [plaintiff's] claim to be a serious [plaintiff] who has received a serious injury becomes less credible by his having slept on his rights." *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (barring challenge to state election-law statute filed less than two months prior to election because plaintiff had known of injury for more than two weeks prior to filing suit).

An action may be barred by laches if: (1) the plaintiff delayed unreasonably in asserting its rights and (2) the defendant is prejudiced by this delay. *United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (citation omitted); *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). Both criteria are met here, thus laches should bar preliminary injunctive relief.

First, Plaintiffs did not seasonably assert their entitlement to injunctive relief. As discussed *supra*, Tennessee's absentee ballot statutes are not new. Since 1979, it has been a felony for "any private person to supply an application for absentee ballot to any person by any means whatsoever", *see* Chap. 316, § 4(c), Public Acts of 1979, and since 1994, it has been a felony for a person who is not an employee of an election commission to give an application for an absentee

ballot to any person. *See* Chap. 859, § 2, Public Acts of 1994. Plaintiffs allege that that they engage in "year-round First Amendment-protected civic engagement activity including voter registration, education, and engagement" and that this statute unconstitutionally burdens this "core political speech." (Memorandum DE 12 PageID# 203-204.) Yet despite this alleged year-round core political activity, Plaintiffs waited until only weeks before the November election absentee ballot application period to seek preliminary injunctive relief to enjoin a law that has been on the books for decades.

COVID-19 is Plaintiff's first explanation for the delay. But while COVID-19 has spawned any number of challenges to state election laws and procedures in state and federal court, most have been timely filed and expeditiously pursued. For example, the plaintiffs challenging Texas's absentee voting statutes in state court filed their complaint on March 7, 2020—only three days after the first case of coronavirus was reported in that state and six days before the Texas Governor declared a state of emergency. *See In re State of Texas*, No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020). And the plaintiffs in *Texas Democratic Party v. Abbott* filed suit in federal court challenging Texas's absentee voting statutes on April 7—the day after the Supreme Court issued its decision in *Republican Nat'l Comm. v. Democratic Nat'l Comm.* staying a preliminary injunction issued on the eve of the Wisconsin primary election. *See Texas Democratic Party v. Abbott*, No. SA-20-CA-438-FB, 2020 WL 2541971, at *2 (W.D. Tex., May 19, 2020).

But here, Plaintiffs have repeatedly been less than diligent in pursing their challenges to Tennessee's election laws  Plaintiffs filed their first lawsuit on May 1 but waited until June 12— approximately six weeks before the August 2020 primary election—to seek preliminary injunctive relief. (*MPRI v. Hargett*, Amended Compl., DE 39, Memorandum, DE 43.) This time, Plaintiffs were only slightly less dilatory. While they only waited three days after filing their complaint to

seek preliminary injunctive relief—they still waited to seek such relief until two months before the November 2020 general election—and less than two months before the deadline to request an absentee ballot. *See* Compl. DE 1, Motion, DE 11.

Second, Plaintiffs attempt to attribute their delay to the State, arguing that the State (and this Court) have only recently clarified that the online application form Plaintiffs seek to distributed are governed by Tenn. Code Ann. § 2-6-202(c)(3) rather than (c)(4). *See* Memo DE 12, PageID# 198, n.6. But any mistake here is Plaintiffs'—not the State's. Indeed, Plaintiffs should have been on notice that they were challenging the wrong statute in *MPRI v. Hargett* long before this Court issued its ruling. The legislative history of subsection (c)(4)—which Plaintiffs filed in *MPRI v. Hargett* over two months ago—makes clear the distinction between an *application for absentee ballot* and a *request for an application for absentee ballot*. As repeatedly explained by the then State Election Coordinator Brook Thompson:

> What we're doing is *outlawing preprinted requests. It's something that somebody else makes up*. The election commission doesn't have any. Candidates and campaign have made up requests. They have made up a form that is not an official form, that is printed at someone else's expense and set to the voters, and the voters think it's an official form and fill it out and send it in. A request is something that a voter makes of the election commission. They can do it on a piece of paper. But that's not an official form. The preprinted form is the application itself.
> . . .
>
> And so, what's happened is *candidates have printed up these forms that have all the requisite information* on there, sent them out to voters that typically are over 65, The voter sees it, thinks, "I need to sign this to vote," fills it out. It has all the requisite information and it gets sent in. It gets treated like an application for an absentee ballot because it has all the requisite information, and the ballot immediately gets sent out without the second step.
> …
> The *problem is the preprinted forms, the request for applications done by the candidates*, have enough information, they necessarily are going to serve as an application for an absentee ballot. So the

gets those in the mail, they around and send those in, there's not going to be that second step because candidates who have had these printed are savvy enough to put all the information on there, and there is not need for that second step. Therefore, you are in the absentee ballot queue because the second step has been eliminated. (emphasis added.)

(*MPRI v. Hargett*, Legislative History, DE 44-1, PageID # 1723, 1728-29.)

These statements in the legislative history establish that Tenn. Code Ann. § 2-6-202(c)(4) was intended to outlaw forms "that somebody else makes up" and not the online application form that was created by the State Election Coordinator. And to the extent the legislative history did not provide sufficient elucidation, it was incumbent on Plaintiffs to seek further clarification from the State and not vice versa. But not only did Plaintiffs *not* seek clarification from State election officials[1], Plaintiffs continued to insist that they had challenged the correct statute—Tenn. Code Ann. § 2-6-202(c)(4)—relying on an Attorney General's opinion issued seven years before that statute was enacted. (*MPRI v. Hargett*, Motion to Reconsider, DE 69 PageID# 2394.)

And even after this Court affirmed its ruling that Plaintiffs had challenged the wrong statute, Plaintiffs waited a week to file this action challenging Tenn. Code Ann. § 2-6-202(c)(3) and an additional three days to seek preliminary injunctive relief—even though the deadline to request an absentee ballot was less than two months away. In short, Plaintiffs simply have not pursued their claim with any semblance of diligence. *See, e.g.*, *Kay*, 621 F.2d at 813; *Gelineau v. Johnson*, 896 F. Supp. 2d 680, 683–86 (W.D. Mich. 2012) *aff'd* (6th Cir. Sept. 19, 2012) (barring challenge to state election-law statute filed less than two months prior to election because plaintiffs had known of injury for more than four months prior to filing suit); *Simkins v. Gressette*, 631 F.2d

---

[1] Plaintiffs did finally seek "clarification" from the State, but only after this Court had correctly ruled that Plaintiffs had challenged the wrong statute. *See MPRI v. Hargett*, Motion to Reconsider, DE 69, PageID# 2393, n.2.

287, 295–96 (4th Cir. 1980) (refusing to enjoin election when suit was filed two days before filing deadline and preliminary hearing could not be held until 5 ½ weeks before election); *Arizona Pub. Integrity Alliance Inc. v. Bennett*, 2014 WL 3715130, at *2–3 (D. Ariz. June 23, 2014) (barring challenge to state election-law statute filed more than two months prior to election because (1) the statute was not new and (2) the plaintiffs had been considering its constitutionality for more than six months before filing suit).

Second, Plaintiffs' lack of diligence has prejudiced the Secretary of State and State Election Coordinator. Prejudice can be inferred simply as a result of the Plaintiffs' delay, and the greater the delay, the less the prejudice required to show laches. *Perry*, 840 F. Supp. 2d at 954; *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996). By waiting until the last minute, Plaintiffs have unjustifiably forced the parties and the Court to address their claims on an expedited basis and has prejudiced Defendants' ability to fully prepare and defend against Plaintiffs' claims, including the development of facts for the Court to assess in ruling on whether to grant Plaintiffs' request for preliminary injunctive relief. In particular, Defendants have been unable to obtain and prepare the legislative history for the 1979 and 1994 Acts where the Tennessee legislative determined to make it a felony for anyone other than an election official to provide an application for absentee ballot. Indeed, this inability to obtain the legislative history of the 1979 Act is significantly prejudicial as Defendants believe—but cannot confirm without reviewing that legislative history—that the Act was in response to the events that occurred in the August 1978 county general elections in Robertson County that resulted in the voiding of that election.[2] *See Emery v. The Robertson County Election Commission*, 586 S.W.2d 103 (Tenn. 1979).

---

[2] Defendants would note that the legislative history of Tenn. Code Ann. § 2-6-202(c)(4) was particularly helpful in identifying not only the context, but the legislative intent and purpose of that provision.

Plaintiffs had every opportunity to challenge Tenn. Code Ann. § 2-6-202(c)(3) at a time when the challenge would not create the disruption that this last-minute request for injunction relief has. Given that Plaintiffs' legal challenge to this statute exists regardless of whether there is an ongoing public health emergency, Plaintiffs could have filed suit well before the arrival of COVID-19. But to the extent COVID-19 is the catalyst for Plaintiffs' action, then Plaintiffs could have filed suit in March when the Governor declared a state of emergency. Alternatively, Plaintiffs could have sought clarification from the State as to whether Tenn. Code Ann. § 2-6-202(c)(3) or (c)(4) applied to the online application form before filing suit in *MPRI v. Hargett*, or Plaintiffs have simply challenged both section and requested injunctive relief at the same time. At the very least, Plaintiffs could have sought clarification when they filed the legislative history for § 2-6-202(c)(4) in late June. Indeed, Plaintiffs had multiple opportunities to file this action challenging Tenn. Code Ann. § 2-6-202(c)(3), but instead, they have waited until less than eight weeks before the election to request injunctive relief.

As the Sixth Circuit has stated,

> [a]ll of this should impress on … other would-be challengers to election protocols, the need to bring as applied (and for that matter facial) challenges sooner rather than later—first to give election officials an opportunity to make corrections where corrections are due and second to give district and appellate courts ample time to resolve the merits of the dispute long before the election. A manufactured emergency does not warrant emergency relief.

*Crookston v. Johnson*, 841 F.3d at 399. Plaintiffs' unreasonable delay has caused prejudice to the Defendants and the County Elections Commissions. Laches therefore applies and should bar Plaintiffs' request for injunctive relief.

### B. Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of Their Challenge to the Absentee Ballot Application Provisions.

Tennessee Code Ann. § 2-6-202(c)(3) provides that a "person who is not an employee of an election commission commits a Class E felony if such person gives an application for an absentee ballot to any person." Plaintiffs maintain that Tenn. Code Ann. § 2-6-202(c)(3) will severely hamper their ability to assist their members and engage other voters with applying for absentee ballots that they need to exercise their right to vote by mail in the upcoming November election. Complaint, DE 1, PageID# 1-4, 9-10, ¶¶ 2, 7, 9, 26-27. Specifically, Plaintiffs claim that the traditional tactics that they use to engage voters, like in-person voter turnout activities, may not be available to them due to the ongoing COVID-19 pandemic. *Id*. at PageID# 8-9, ¶¶ 23-24, 26. Thus, they plan to focus additional resources on organizing their members and communities by mail:

> This will necessarily include discussing with voters the benefits of voting by mail, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were both cast and counted. And, as a key part of this absentee voter engagement, Plaintiffs will, if permitted, provide potential absentee voters with blank absentee ballot applications that are available online from the state and county election commissions, so that the prospective voter may then complete and return to be added to the absentee voter rolls for the November 2020 election.

*Id*. at PageID# 9, ¶ 26. Plaintiffs claim that they intend to send unsolicited, as well as solicited, applications for absentee ballots. *Id*. at PageID# 2-6, ¶¶ 6-7, 9-12. To the extent that Plaintiffs complain they are prohibited from posting the application for absentee ballot on their organizational websites, Plaintiffs have not demonstrated that the same information would not be equally accessible to voters on the governments' websites, or as many other organizations have done, simply post a link to the Tennessee Secretary of State's website. Plaintiffs' Memo Supporting PI Motion, D.E. 12, PageID# 200.

Notably, Plaintiffs' own allegations tacitly admit that Tenn. Code Ann. § 2-6-202(c)(3), by its terms, does not prevent them from sending literature about absentee voting to its target audience

nor does it prevent them from offering their services to those desiring help with the absentee voter application process—the very things in the block quote above that Plaintiffs say that they wish to do.[3]  Tennessee Code Ann. § 2-6-202(c)(3) *only* restricts them from distributing "application[s] for . . . absentee ballot[s]."

Nevertheless, Plaintiffs allege that the restriction on the distribution of absentee ballot applications unconstitutionally burdens their right to engage in core political speech and activity in violation of the First and Fourteenth Amendments.  *See* Complaint, D.E.1 at PageID# 11-12, ¶¶ 35-37.

### 1. Providing an Application for an Absentee Ballot is Not Expressive Conduct Protected by the First Amendment.

Plaintiffs assert that Tenn. Code Ann. § 2-6-202(c)(3) violates the First Amendment to the United States Constitution by treading upon protected speech.  Not so.  The challenged statute, which prohibits a non-election commission employee from providing an application for an absentee ballot to another person, does not criminalize expressive conduct, and thus does not violate the guarantees of speech and association protected by the First Amendment.

The Supreme Court has long recognized that the protection afforded by the First Amendment "does not end at the spoken or written word."  *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  Conduct, as opposed to pure speech, may be 'sufficiently imbued with elements of communication to fall within the scope of the First [Amendment]."  *Spence v. Washington*, 418 U.S. 405 (1974).  However, in order for conduct to be subject to the guarantees provided by the

---

[3] In fact, Tenn. Code Ann. § 2-6-203 specifically provides that "[t]he voter may have anyone the voter chooses write the voter's request for an absentee ballot or for an absentee voting by mail application or write out the voter's absentee voting by mail application except for the voter's signature or mark."

First Amendment, it must be sufficiently communicative—otherwise, "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 409.

For conduct to be communicative enough to implicate the First Amendment, the Supreme Court has set forth the following factors:  1) "whether [a]n intent to convey a particularized message was present," and 2) "whether the likelihood was great that the message would be understood by those who viewed it."  *Johnson*, 491 U.S. at 404.  Examples of sufficiently communicative conduct include political donations, *see Buckley v. Valeo*, 424 U.S. 1 (1976), and wearing specific clothing to express disapproval, *see Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969).

In the voting rights arena, federal courts of appeal have determined that collecting ballots does not qualify as expressive conduct protected by the First Amendment.  *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018); *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 372 (9th Cir. 2016) ("[e]ven if ballot collectors intend to communicate that voting is important," collecting ballots is not sufficiently expressive); *Voting for Am. Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) (collection and delivery of voter registration applications are not expressive).

The same is true with regard to delivering an application—that conduct simply does not itself convey an expressive message.  *See, e.g., Democracy N. Carolina v. N. Carolina State Bd. of Elections*, No. 1:20-cv-457, ---F.Supp.3d----, 2020 WL 4484063, at *51 (M.D. N.C. Aug. 4, 2020) ("delivering absentee ballot requests is not expressive conduct"); *New Georgia Project v. Raffensperger*, No. 1:20-cv-1986-ELR, ---F.Supp.3d---, 2020 WL 5200930, at *21 (N.D. Georgia, Aug 31, 2020) (same).

Here, while Plaintiffs may intend to convey a message by sending an application for an absentee ballot, that message is certainly not a particularized one, as the ballot is simply a straightforward government form. Nor is there any indication from their pleadings that sending the promulgated application carries a great "likelihood. . .that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404.

And even if provision of the absentee ballot application is done alongside protected activities and speech, that is insufficient to save the deficient conduct. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 66 (2006) ("combining speech and conduct" is not enough to create expressive conduct); *see also Voting for Am. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("non-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech.")

Accordingly, because delivering an application for an absentee ballot is not sufficiently expressive to qualify as protected speech, Tenn. Code Ann. § 2-6-202(c)(3) is reviewed only for a rational basis, which it easily satisfies, as discussed *infra*. *See Johnson v. Robison*, 415 U.S. 361, 375 n. 14 (1974) ("[s]ince we hold. . . that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test."); *see also Voting for Am.,* 732 F.3d at 392 ("Because the Non-Resident and County provisions regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate.").

## 2. Tenn. Code Ann. § 2-6-202(c)(3) is rationally related to the State's interest in preventing voter confusion and protecting the integrity of its elections.

The Tennessee Supreme Court has expressly recognized that the integrity of the ballot is jeopardized upon violation of any of the "procedural safeguards" that the General Assembly has included in the election laws, which are obviously designed to (1) prevent undue influence or

intimidation of the free and fair expression of the will of the electors or (2) to insure that only those who meet the statutory requirements for eligibility to vote cast ballots. *Foust v. May*, 660 S.W.2d 487, 489 (Tenn. 1983) (citing *Emery v. Robertson Cty. Election Comm'n*, 586 S.W.2d 103, 109 (Tenn. 1979)). As demonstrated by the Declaration of Coordinator of Elections Mark Goins, Tennessee's law advances the state's interests in preventing voter confusion and preserving the integrity of the ballot box. *See, e.g,* Goins Dec., ¶¶ 14, 21.

The procedural safeguards that the General Assembly has put in place for absentee voting have particular significance because voting by mail constitutes a special privilege that is granted in derogation of the common law. *See Emery*, 586 S.W.2d at 108; *cf. Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (recognizing that "there is no constitutional right to an absentee ballot"). Further, legislative conditions imposed upon those voting by mail are necessary because "the purity of the ballot is more difficult to preserve when voting absent than when voting in person." *Emery*, 586 S.W.2d at 108; *see Foust*, 660 S.W.2d at 490. Violations of statutory safeguards in the absentee voting statutes "present[] the opportunity for fraud, whether committed or intended." *See Foust*, 660 S.W.2d at 490. *See also* Commission on Fed. Election Reform, *Building Confidence in U.S. Elections*, 46 (2005), http://www.1.american.edu/ia/cfer/report_full.pdf ("Absentee ballots remain the largest source of potential voter fraud.").

A review of Tennessee's absentee voting provisions reveals that many procedural safeguards have been enacted by the General Assembly toward the goal of securing the freedom and the purity of the ballot. These provisions address the forms that are to be approved by the State's election coordinator, the procedure for a voter to apply to vote absentee and to receive the relevant forms, the procedure for distribution of the process by which a county election commission is to determine if the voter may vote absentee, how the ballot is to be mailed to an

absentee voter, the manner in which the absentee voter is to complete and return the ballot, the requirements for absentee ballot boxes, and the process by which a county election commission is to determine whether an absentee voter's ballot may be properly cast. *See* Tenn. Code Ann. §§ 2-6-201 to -207; 2-6-301 to -312.

Especially pertinent here, the General Assembly has determined that the State's election coordinator "shall adopt uniform forms for each county election commission for an application for . . . absentee voting." Tenn. Code Ann. § 2-6-308; *see* Tenn. Code Ann. § 2-6-202(c)(1) ("The coordinator of elections shall either supply to a county election commission the forms for applications for ballots or approve the usage of a county's forms."). A voter desiring to vote absentee may complete the sanctioned application form and submit it to the county election commission or request an application from the county election commission. Tenn. Code Ann. § 2-6-202(a)(3).

If the request for an application contains all the requisite information and is signed by the voter, then the county election commission will treat it is an application for an absentee ballot and send the absentee ballot to the voter. Tenn. Code Ann. § 2-6-202(b). If the request does not contain all of the required information, then the county election "shall send the voter by mail or facsimile an application for a ballot." *Id.* A county commission may furnish only one application for absentee voting to a voter unless the voter notifies the commission that the voter has spoiled the application. Tenn. Code Ann. § 2-6-202(c)(2). In that case, the commission may furnish the voter with another application, but the commission must note on the records that a subsequent application was sent. *Id.* Further recognizing the gravity of the absentee voter application process, the General Assembly has provided that "[a] person who is not an employee of an election

commission commits a Class E felony if such person gives an application for an absentee ballot to any person," Tenn. Code Ann. § 2-6-202(c)(3).

In sum, the application process is designed so that only two entities are involved so that the "freedom and purity of the ballot" to be secured: the voter who desires to vote absentee and the Coordinator of Elections or the county election commission that is authorized to provide the sanctioned application form to the voter. While the voter is permitted to ask others for help with the application process,[4] the decision to ask for that help must be the voter's decision, not another's.

Since 1994, Tenn. Code Ann. § 2-6-202(c)(3) has provided (as it currently does) that "[a] person who is not an employee of an election commission commits a Class E felony if such person *gives an application* for an absentee ballot to any person." *See* Tenn. Code Ann. § 2-6-202(c)(3) (Supp. 1994) (emphasis added). This current version originated in 1979 by providing that it "shall be a felony for any private person to supply an application for absentee ballot to any person by any means whatsoever." *Id*.

It appears that this 1979 legislation was prompted, in part, by the substantial irregularities regarding a candidate for sheriff and one of his apparent supporters unlawfully obtaining numerous applications for absentee ballots from the county election commission and distributing them to different voters.[5] The irregularities in that election resulted in the courts declaring the elections void. *Emery*, 586 S.W.2d at 109-10. Although the Supreme Court agreed there was no evidence to justify a finding of fraudulent intent, it found:

---

[4] *See* note 4, *supra*.

[5] As discussed *supra*, Defendants have not had sufficient time to obtain the legislative history of the 1979 to confirm this presumption.

The first purpose declared by the Legislature in enacting our present election laws was that "(t)he freedom and purity of the ballot is secured." T.C.A. s 2-102(a). The integrity of the ballot is jeopardized upon violation of any of the procedural safeguards that the Legislature has included in the election laws, which are obviously designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) insure that only those who meet the statutory requirements for eligibility to vote, cast ballots. A ballot cast in violation of statutory safeguards falling within those categories affects the freedom and purity of the ballot to exactly the same extent as a ballot tainted with actual fraud . . . . Violations of those statutes, such as the absentee voting statutes, present the opportunity for fraud, whether committed or intended. Thus, whether there is proof of actual fraud only, or violations of statutory safeguards only, or a combination of the two, the issue is whether or not those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters.

*Id.* at 109.

In sum, Tenn. Code Ann. § 2-6-202(c)(3) is rationally related to the State's compelling interests of preventing voter confusion and protecting the integrity of the electoral process. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (recognizing that safeguarding voter confidence is part of the compelling interest that a State has in protecting the integrity and reliability of the electoral process); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (observing that State has a compelling interest in protecting voters from confusion and undue influence); *Eu*, 489 U.S. at 231 (noting that the State indisputably has a compelling interest in preserving the integrity of its election process); *See* Goins Dec., ¶¶ 4, 14, 21.

### 3. Tennessee Code Ann. § 2-6-202(c)(3) Satisfies the "Exacting Scrutiny" Test.

Plaintiffs' argue that the distribution of applications for absentee ballots constitutes "expressive speech" protected under the First Amendment and that Tenn. Code Ann. § 2-6-202(c)(4) is unconstitutional because it cannot withstand the "exacting scrutiny" test set forth in

*Meyer v. Grant*, 486 U.S. 414 (1988). *Id.* at 204. But even exacting scrutiny applied instead of rational basis review, the challenged statute meets the test.

Plaintiffs claim that a law subject to exacting scrutiny "may be upheld *only if* it is shown to be narrowly tailored to serve a compelling interest." *Id.* (emphasis added). Plaintiffs' description of the "exacting scrutiny" test is incomplete.

The Sixth Circuit Court of Appeals has explained the "exacting scrutiny" test as follows:

> 'Exacting scrutiny,' despite the name, does not necessarily require that kind of searching analysis that is normally called strict judicial scrutiny; although it may. To withstand 'exacting scrutiny,' the Supreme Court has explained, 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 414 (6th Cir. 2014) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (internal quotation marks omitted).

Accordingly, a statutory provision that imposes a severe burden on speech is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. *Id.* at 414 (citing *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 192 n.12, 206 (1999)). A statutory provision that does not impose a severe burden on speech, however, is subject to lesser scrutiny. *Id.* (citing *Reed*, 561 U.S. at 199 n.2). In short, "the level of scrutiny to be applied depends on the severity of the burden." *Id.*

Hence, courts are to use a "sliding-scale" analysis when deciding whether a state election law violates First Amendment associational rights. *See Citizens for Tax Reform*, 518 F.3d at 383 (recognizing "the question is fact-intensive, given the 'sliding-scale' analysis outlined by the Supreme Court in *Meyer*, *Buckley* and other decisions"); *Libertarian Party*, 751 F.3d at 414 (noting its prior decision recognizing sliding-scale analysis); *see also*, *e.g.*, *Burson*, 504 U.S. at 209 (finding that when the exercise of a First Amendment right threatens to interfere with the act of

voting itself, a State's response that is reasonable and does not significantly impinge on constitutionally protected rights will be upheld).

The Sixth Circuit's decision in *Citizens for Tax Reform* provides a practical example of how the sliding-scale analysis is to be employed. In that case, the court considered an Ohio statute that made it a felony to pay anyone for gathering signatures on election-related petitions on any basis other than time worked. *See Citizens for Tax Reform*, 518 F.3d at 377. In considering where the statute fit on the sliding scale, the court observed that the Supreme Court's *Meyer* decision lay at one end of the spectrum. *Id*. at 385. In *Meyer*, the State of Colorado had banned proponents of petitions from paying circulators, among other restrictions. *Id*. at 380–81 (citing *Meyer*, 496 U.S. at 420). On the other end of the spectrum were statutes enacted in North Dakota, Oregon, and New York that banned payments made on a per-signature basis; courts had found these types of statutes were constitutional. The court found the Ohio statute more restrictive than these latter statutes because it banned all remuneration except on a per-time basis. The less-restrictive statutes left open various other means of payment besides one based solely on the time worked. *Id*. at 385. The court also found the Ohio statute to be more restrictive because the violation for violating the North Dakota, Oregon, and New York statutes was a misdemeanor, while the penalty for violating the Ohio statute was a felony. *Id*. at 386. For these reasons, the court found that the Ohio provision created a significant burden on the petitioners' core political speech rights because it lay closer the complete ban in *Meyer* than the partial-ban statutes. *Id*. Consequently, the State had to justify the Ohio statute with a compelling interest and narrowly tailored means. The court found that the State failed to satisfy this standard. *Id*. at 388.

Tennessee Code Ann. § 2-6-202(c)(3) is like the North Dakota, Oregon, New York statutes examined in *Citizens for Tax Reform*. The statute leaves all but one discrete avenue for Plaintiffs

to execute their absentee vote engagement strategy. Moreover, the one prohibited avenue serves the State's compelling interest in preventing voter confusion and protecting the integrity of the election process. (See generally Goins Dec., ¶¶ 14 - 21).

Similarly, the *Burson* decision guides the inquiry in our case. In this case, the United States Supreme Court applied exacting scrutiny to an election law that forbid campaign-related speech within 100 feet of the entrance to a polling place. The Court recognized two compelling interests for buffer zones around polling places: (1) the State's duty to protect the right to vote freely for the candidate of one's choice; and (2) the State's interest in preserving the integrity and reliability of the electoral process itself. *Burson*, 504 U.S. at 198–99 (citations omitted). Put more pointedly, the Court recognized the State's interest in protecting voters from "confusion and undue influence" and "ensuring that an individual's right to vote in not undermined by fraud." *Id*. at 199.

The *Burson* Court then determined that a 100-foot buffer did not constitute a significant impingement on political speech. *Id*. at 210. In so finding, the Court stated that the only way to preserve the secrecy of the ballot is to limit access to the area around the voter. *Id*. at 208–209. Thus, "*some* restricted zone around the voting area is necessary to secure the State's compelling interest." *Id*. at 208 (emphasis in original).

Like the law examined in *Burson*, Tenn. Code Ann. § 2-6-202(c)(3) was enacted to serve the State's compelling interest in protecting voters from confusion and undue influence and ensuring that an individual's right to vote in not undermined by fraud. Tennessee Code Ann. § 2-6-202(c)(3) only restricts Plaintiffs from giving an "application for absentee ballot to any person." This lone, modest prohibition is equivalent to the 100-foot buffer that the *Burson* Court found was reasonable to serve the State's compelling interests in preserving the integrity of the electoral process and protecting its citizens' autonomy to vote freely in the manner that they desire.

## II.    Plaintiffs are unlikely to suffer irreparable injury absent an injunction.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is *likely* in the absence of the requested injunction.  *City of Los Angeles v.* Lyons, 461 U.S. 95, 103 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  Indeed, a specific finding of immediate and irreparable injury to the movant is considered the most important prerequisite that a court must examine and find when ruling upon a motion for a preliminary injunctive relief.  *See* 11A C. Wright, A. Miller, & M. Kane, *Fed. Practice and Procedure* § 2948.1 (3d ed.).  As a result, the absence of irreparable injury must end the court's inquiry.  *See Lyons*, 461 U.S. at 111–12, 103 (1983); *Warner v. Central Trust Co.*, *N.S.*, 715 F.2d 112, 123–24 (6th Cir. 1983); *Aluminum Workers Int'l Union v. Consolidated Aluminum Corp.*, 969 F.2d 437, 444 (6th Cir. 1982).

To demonstrate irreparable harm, each and every plaintiff must show that they "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  A preliminary injunction, then, will not be issued simply to prevent the possibility of some remote future injury—a presently existing threat must be shown.  *Id.*  As the Supreme Court has explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Plaintiffs here cannot make this "clear showing."

Plaintiffs claim that they want to "engage citizens in conversations about the importance of voting, civic engagement, the need for political reform, and other issues of organizational importance."  (Memorandum, DE 12 PageID# 204.)  They claim that the distribution of absentee ballot applications is part of these absentee voter engagement activities and, thus, the basis of their

constitutional injury is the inability to engage in that conduct that they allege is part of their "core political speech." *Id.*

But Tennessee Code Ann. § 2-6-202(c)(3) restricts one thing and one thing only: "*giv[ing]* an application for an absentee ballot to any person." Thus, by its terms, this statute does not prevent Plaintiffs from sending any and all literature that they wish to send to their target audience and in any manner, nor does it prevent them from sending letters or otherwise contacting their target audience to inquire whether assistance is needed with the absentee ballot application process. If assistance is desired by members of their audience, they are free to help them with the process, including helping them obtain an application, or helping them write their request for an absentee ballot or fill out the application except for the voter's signature. In fact, Tenn. Code Ann. § 2-6-203 expressly permits that.

And indeed, Plaintiffs are already engaging in all these activities and more. For example, MCLC states that for the November election, it will call hundreds of its members through its phone banking program, provide them with vote by mail information, and use its text campaign to direct voters to its online portal, which includes a link to the absentee ballot application on the State's website. *See* Lichenstein Declaration, DE 11-4, PageID# 157-8. Similarly, APRI states that it plans to send emails and call voters in advance of the November election; help community members write their own requests, and provide links to Tennessee's online absentee ballot request form on their website, social media pages such as Facebook, and in text message to their followers and other members of the Public. *See* Moore Declaration, DE 11-5, PageID# 163-64. The Equity Alliance states that it has done everything from distributing thousands of copies of its voter guide either in print or digitally to canvassing public housing projects in Nashville prior to the August

election and hosting a "Stop Vote and Roll" voter engagement event in Nashville. *See* Oliver Declaration, DE 11-6, PageID# 172-173.

The only activity prohibited is the ministerial conduct of physically providing an application for absentee ballot and such conduct simply does not rise to the level of expressive conduct—whether standing alone or in conjunction with speech—that is protected under the First Amendment. As such, Plaintiffs have failed to allege the necessary injury to obtain a preliminary injunction.

### III.     Plaintiffs' Requested Relief Will Cause Substantial Harm to the State and Will Not Further the Public Interest.

Both the Supreme Court and the Sixth Circuit have recognized that while the preliminary-injunction analysis usually entails consideration of the harm to the opposing party and a weighing the public interest, these two factors "merge when the Government is the opposing party." *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *11 (6th Cir. June 9, 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Tennessee's Supreme Court has recognized that the State and its citizens have an interest in the "validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense." *See Taylor v. Armentrout*, 632 S.W.2d 107, 114 (Tenn. 1981). Similarly, the Sixth Circuit has observed that there is a "strong public interest" in "permitting legitimate statutory processes to operate to preclude voting by those who are not entitled to vote" and in the "smooth and effective administration of the voting laws that militates against changing the rules in the hours immediately preceding the election." *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Plaintiffs' requested relief would thwart these interests.

Plaintiffs requested relief will undermine the State's interest in the validity of its elections. Both the United States and Tennessee Supreme Courts have consistently observed that there is a

compelling interest in the integrity of the election. *See, e.g.*, *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (noting that a State "indisputably has a compelling interest in preserving the integrity of its election process"); *City of Memphis v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013) ("[t]his Court has previously recognized the compelling nature of the state's interest in the integrity of the election process."). The "integrity of the ballot is jeopardized" by removal of the "procedural safeguards" that the General Assembly has included in the election laws. *See Foust v. May*, 660 S.W.2d 487, 489 (Tenn. 1983) (citing *Emery.*, 586 S.W.2d at 109). These "procedural safeguards" are designed to "(1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) to insure that only those who meet the statutory requirements for eligibility to vote cast ballots." *Id.*

Additionally, Plaintiffs' requested relief will add to the already intense administrative burden felt by State and county election officials and generate voter confusion and even disenfranchisement. (Examples of these problems in Tennessee and other states are set forth in Goins Dec. ¶¶ 14-20). Plaintiffs dismiss these concerns and argue that there can be no harm to the State from the mass distribution of *blank* application for absentee ballot forms. But this argument misses the mark. While Plaintiffs may propose to distribute blank forms, presumably under their names, others may not as recently demonstrated here in the August primary election, and in North Carolina, Virginia, and Georgia. *See* Goins Dec. ¶¶ 14-20. Plaintiffs do not specify the format for their mailings nor demonstrate that in context the accompanying information provided may not create voter confusion. Even when it is done with good intentions, such mass distributions can result in voter confusion and disenfranchisement and increase administrative burden for State and county election officials. *See* Goins Declaration, *Id.*

At bottom, Plaintiffs allege only a minor inconvenience—the inability to mass distribute applications for absentee ballots—which is neither a prohibition on their expressive speech or conduct nor the loss of access to the right to vote. And there can be no doubt that the State's interests in the integrity of its election process are more than sufficient to outweigh any inconvenience to Plaintiffs. In other words, the harm to the State and the public interest both militate against granting Plaintiffs' requested relief.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court deny Plaintiffs' request for preliminary injunctive relief in its entirety.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER (BPR #13889)
Deputy Attorney General
Janet.kleinfelter@ag.tn.gov

ANDREW B. CAMPBELL (BPR #14258)
Senior Assistant Attorney General
Andrew.campbell@ag.tn.gov

ALEXANDER S. RIEGER (BPR 029362)
Assistant Attorney General
Alex.rieger@ag.tn.gov
Office of the Tennessee Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing documents have been forwarded electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties named below. Parties may access this filing through the Court's electronic filing system.

William L. Harbison
Lisa K. Helton
Christopher C. Sabis
Christina R.B. López
Sherrard, Roe, Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201

Danielle Lang
Ravi Doshi
Molly Danahy
Jonathan Diaz
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

Ezra Rosenberg
Pooja Chaudhuri
Jacob Conarck
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005

Date: September 8, 2020

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General