IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JEFFREY LICHTENSTEIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 3:20-cv-00736 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| TRE HARGETT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 46, "Motion"), supported by an accompanying Memorandum of Law (Doc. No. 47). Plaintiffs filed a response in opposition to the Motion (Doc. No. 50, "Response"), and Defendants filed a reply (Doc. No. 51, "Reply"). Additionally, after the Court invited the parties to file supplementals briefs due to an influx of recent circuit court and Supreme Court opinions involving election law, the parties both filed short supplemental briefs in support of their positions (Doc. Nos. 54, 55).

## **BACKGROUND[1]**

Via this lawsuit, Plaintiffs challenge the constitutionality of Tenn. Code Ann. § 2-6-203(c)(3) (hereinafter "the Law"). The Law provides that "[a] person who is not an employee of an election commission commits a Class E felony if such person gives an application for an absentee ballot to any person." Tenn. Code Ann. § 2-6-203(c)(3).

In pertinent part, Plaintiffs allege in their Complaint:

---

[1] A more fulsome examination of the procedural background of this case, and its companion case (Case No. 3:20-cv-000372), is laid out in this Court's Memorandum Opinion denying Plaintiff's Motion for a Preliminary Injunction, *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), which, for reasons discussed below, is attached as an appendix hereto.

16. This November, in light of the ongoing COVID-19 pandemic, a record number of Tennesseans are expected to vote absentee in the presidential election.

17. In order to do so, absentee-eligible voters will first need to apply for an absentee ballot from their county election commission, and return the completed form on or before October 5, 2020.

18. The application to vote by mail is made publicly-available online to download and print. One version of the application is available from the Secretary of State's website, and other versions, created by the State's various county election commissions and approved by the Secretary of State, are similarly available from the respective county election commissions' websites.

19. Once the voter has obtained a printed copy of the application, the voter "may have anyone the voter chooses . . . write out the voter's absentee voting by mail application except for the voter's signature or mark." Tenn. Code § 2-6-203.

(Doc. No. 1 at 7). After noting the criminal prohibition prescribed by the Law, Plaintiffs allege that "this criminal prohibition on the distribution of absentee ballot applications is an extraordinarily burdensome constraint on their ability to fully engage with voters and to encourage them to vote this Fall." (*Id*. at 8). Then, after describing the importance—in particular with respect to the then-upcoming November 3, 2020 general election—(i) to (the organizational) Plaintiffs of voter engagement efforts, and (ii) to voters of the option to vote absentee during the COVID-19 pandemic, Plaintiffs allege:

In light of the COVID-19 pandemic and the shifting voter preference towards voting absentee, Plaintiffs will focus significant time and resources on organizing their members and communities, where they are eligible, to vote absentee. This will necessarily include discussing with voters the benefits of voting by mail, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were received, cast and counted. And, as a key part of this absentee voter engagement, Plaintiffs will, if permitted, provide potential absentee voters with the blank absentee ballot applications that are available online from the state and county election commissions, so that the prospective voter may then complete and return to be added to the absentee voter rolls for the November 2020 election.

(*Id*. at 9). Plaintiffs then allege essentially that they are prohibited from doing exactly this by the Law, which, they claim, chills their protected free speech and associational activities in violation of the First Amendment. (*Id*. at 10-12).

On August 31, 2020, Plaintiffs filed their Motion for a Preliminary Injunction (Doc. No. 11) seeking to enjoin Defendants from enforcing the Law. On September 23, 2020, the Court, in a thorough 66-page Memorandum Opinion and Order, denied Plaintiffs' Motion for a Preliminary Injunction. *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020) (hereinafter "Preliminary Injunction Opinion"). To summarize, the Court first noted that the First Amendment protects only expressive conduct, *id*. at 765-66, then held that the Law likely did not violate the First Amendment because "the conduct prohibited by the Law is not 'speech' and thus is not within the scope of the First Amendment." *Id.* at 773.

But the Court did not stop there. Instead, conducting an alternative analysis, it assumed *arguendo* that such conduct was in fact speech and asked whether the Law would violate the First Amendment under that hypothetical scenario. *Id*. at 774-78. The Court found that, "even if the Law is (contrary to the Court's conclusion above) properly viewed as imposing a restriction on speech, it is marginal and not particularly close to the 'core' of political expression." *Id*. at 775. Thus, the Court rejected application of the so-called *Meyer-Buckley* standard of automatic exacting scrutiny (meaning, as the Court explained, automatic "strict scrutiny"), which applies only to core political speech. *Id*. at 777. The Court then asked what standard would apply to the Law if (as the Court had found) *Meyer-Buckley* did not. *Id*. The Court concluded that either: (1) the *Anderson-Burdick* framework applied, either because the law is an "election law" or because the law burden

speech but not "core" political speech; or (2) rational-basis review applied automatically[2] because neither *Meyer-Buckley* nor *Anderson-Burdick* applied.[3] *Id.* The Court then conducted an analysis under the *Anderson-Burdick* framework, holding that the framework dictated application of "rational basis plus" scrutiny and that the Law survived such scrutiny. *Id.* at 777-86. The Court then alternatively analyzed whether the Law survived rational-basis review, which would apply if the *Anderson-Burdick* framework did not apply and found that the Law passed scrutiny under rational-basis review. *Id.* at 786-87.

## LEGAL STANDARD

For purposes of a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all the factual allegations in the complaint as true, as it has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should

---

[2] The word "automatically" is a significant qualifier here. As indicated, at this point in its analysis the Court was distinguishing between the possible applicability of *Anderson-Burdick* and the possible applicability of *automatic* rational-basis review. *Anderson-Burdick*, unlike rational-basis review, is not a test (or "standard") for the constitutionality of a statute; instead, it is a *framework* for *selecting* a test. *See Lichtenstein*, 489 F. Supp. 3d at 758 n.19. Under that framework, the test selected in a given case could be rational-basis review. *See id.* at 779-780. So the application of *Anderson-Burdick is not necessarily inconsistent* with the application of rational-basis review; instead, it is inconsistent with *automatic* rational-basis review—*i.e.,* with the decision to apply rational-basis review without working through the *Anderson-Burdick* framework to see whether the standard should be rational-basis review or something else.

[3] In one place in the opinion, the Court indicated that this would be the case—that rational-basis review rather than *Anderson-Burdick* would apply automatically—if the Law did not implicate the expressive conduct that is protected by the First Amendment. *See* 489 F. Supp. 3d at 787. This indication was, regrettably, inexact. Elsewhere, the Court made clear that rational-basis review, rather than *Anderson-Burdick*, would apply automatically only if the Law: (a) did not implicate the First Amendment (because it did not implicate expressive conduct); *and* (b) was not an "election law" for purposes of the applicability of *Anderson-Burdick*. *See id.* at 778-79.

assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one

for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). That is not to say that the movant has some evidentiary burden; as should be clear from the discussion above, evidence (as opposed to allegations as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of explanation; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

### I. *The Applicable Test or Framework*

In the Court's Preliminary Injunction Opinion, the Court identified the four options for the applicable test or framework to be applied to Plaintiffs' claim: strict scrutiny pursuant to *Meyer-Buckley*; somewhat lesser scrutiny pursuant to *Meyer-Buckley*; rational-basis review; and the *Anderson-Burdick* framework (whereby the Court would in turn have to determine the applicable standard of scrutiny based on the degree of burden the Law places on Plaintiffs). *Lichtenstein*, 489 F. Supp. 3d at 757-59. The Court then conducted a fulsome analysis regarding which test or framework was applicable. For the reasons discussed in that Opinion and summarized above, which will not be repeated here for reasons of judicial efficiency, the Court found that either: (1) the *Anderson-Burdick* framework applied (either because the Law is an "election law" or, less likely, because the Law is properly deemed to burden expressive conduct but not "core" political expression) and in turn required application of rational basis "plus" review of the Law; or,

alternatively, if the *Anderson-Burdick* framework did not apply for either or both of these reasons, (2) rational-basis review applied automatically because the Law did not implicate the First Amendment at all, since it did not restrict any activity that could be considered expressive conduct.

Defendants argue in their Motion that the Court correctly identified that rational-basis review applied to Plaintiffs' claim because the act of providing an application for an absentee ballot is not expressive conduct nor core political speech protected by the First Amendment. (Doc. No. 47 at 12). Defendants maintain that Plaintiffs' asserted claim does not survive rational-basis review, and thus, should be dismissed.

In their Response, Plaintiffs assert that they have pled facts to allege that the Law unlawfully infringes on their expressive conduct, core political speech, and associational activities, and therefore, strict scrutiny should be applied and their claim should survive Defendant's Motion. (Doc. No. 50 at 6). Plaintiffs argue that the Court cannot apply rational-basis review at this juncture because whether the conduct prohibited by the Law is "expressive" is a fact-sensitive inquiry and the "Court would benefit from a full record before making this important judgment about whether voter engagement conduct falls within or outside the scope of the Fourteenth Amendment." (*Id.*).[4]

The Court disagrees with Plaintiffs that it cannot decide at this stage of the case (*i.e.*, on Defendant's Rule 12(b)(6) motion) whether the conduct prohibited by the Law is expressive conduct that is subject to rational-basis review. First, whether an activity is considered expressive conduct is a question of law for the Court to decide and therefore, a question that may be decided

---

[4] Plaintiffs also argue in their Response that even if the Court determines that a more exacting scrutiny (meaning strict scrutiny pursuant to *Meyer-Buckley*) is not to be applied to the Law, "the appropriate framework for adjudicating Plaintiffs' claims would not be rational basis . . . [i]nstead, the *Anderson-Burdick* framework would apply." (*Id.* at 9). However, even if *Anderson-Burdick* applies, that does not necessarily mean that rational-basis review does not apply; instead it would mean that the Court would have to separately determine the standard of review under the *Anderson-Burdick* framework.

at the motion-to-dismiss stage. *See Knight v. Montgomery Cty., Tenn.*, 470 F. Supp. 3d 760, 768 n.5 (M.D. Tenn. 2020) (Richardson, J.) ("Whether activity qualifies as expressive conduct is a question of law." (citing *Ruff v. Long*, 111 F. Supp. 3d 639, 645 (E.D. Pa. 2015) ("Ruff's behavior is only afforded First Amendment protection if we construe it as expressive conduct. This is a threshold question of law."))); *Scicchitano v. Mt. Carmel Area Sch. Dist.*, No. 4:09CV638, 2011 WL 4498842, at *9 (M.D. Pa. Sept. 27, 2011) (explaining that the determination of whether an activity is "expressive conduct" is "plainly not one for the jury" and is a question for the court to decide); *Kohlman v. Vill. of Midlothian*, 833 F. Supp. 2d 922, 935 (N.D. Ill. 2011) ("Determining whether speech is constitutionally protected is a question of law that the court must decide."); *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1110–11 (7th Cir. 1997) ("the application of the First Amendment to the facts of a particular case is not an issue for a jury to resolve, but is a legal question for the court to decide").

Second, although the Court agrees with Plaintiffs that whether conduct is considered expressive is "a fact-sensitive, context-dependent inquiry," *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002), the factually sensitive nature of such an inquiry does not shield First Amendment claims alleging expressive conduct from dismissal on a Rule 12(b)(6) motion. *See Lawrence v. Chabot*, 182 F. App'x 442, 453 (6th Cir. 2006) (affirming district court's dismissal of First Amendment claim on a Rule 12(b)(6) motion and explaining that the challenged Michigan law did not regulate expressive activity); *see also Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 53 (2d Cir. 2016) (affirming district court's application of rational basis to a First Amendment claim on a motion to dismiss after finding that an activity was not expressive conduct); *Calvary Christian Ctr. v. City of Fredericksburg, Va.*, 832 F. Supp. 2d 635, 643 (E.D. Va. 2011) (granting the defendant's motion to dismiss the plaintiff's First Amendment claim and

finding that the Complaint did not allege expressive conduct). After all, the construction of a statute—is quintessentially one of law. *See In re Palmer*, 219 F.3d 580, 583 (6th Cir. 2000) (statutory interpretation is a question of law). So what a statute covers—meaning, in the case of a criminal statute like the Law, the question of what conduct is prohibited—is one of law, not fact. Thus, at this stage, the Court is free to determine whether the conduct placed in issue by Plaintiffs' Complaint—the conduct in which Plaintiffs wish to engage but is prohibited by the Law—falls within the scope of the First Amendment (*i.e.*, is expressive conduct), and this Court will proceed to do so.

Things might be different if the Complaint left some room for interpretation as to what conduct Plaintiffs proposed to engage in but were afraid might violate the Law. In that case, perhaps factual development would be required to determine, for particular purposes (including, for example, standing), the precise contours of the conduct that Plaintiffs were talking about in the Complaint. But even if a complaint is sufficiently ambiguous to prevent a clear picture of the full nature of the conduct in which the plaintiff(s) wish to engage, and even if such ambiguity necessitated further factual development as to the nature of the plaintiff's proposed conduct before a court could decide as a matter of law on a 12(b)(6) motion whether a statute was unconstitutional as applied to the plaintiff's conduct, that would not help Plaintiffs here. Based on the Complaint, there is no question as to the nature of their desired conduct in which they would engage but for their fear of running afoul of the Law; quite clear, that conduct is precisely what the Law prohibits: providing persons with applications for absentee ballots. (*See* Doc. No. 1 at ¶ 35) (complaining about the Law "criminalizing the simple act of providing to a voter an absentee ballot application" and the corresponding "threat of criminal sanctions for participating in such common voter engagement activity," and claiming that such criminalization "severely burdens the Plaintiffs' and

their members' First Amendment rights"). No further factual development is required for the Court to determine the nature or scope of Plaintiffs' proposed conduct at issue or whether (as a matter of law) the Law unconstitutionally prevents Plaintiffs from engaging in such conduct.

Plaintiffs contend that the following allegations present in their Complaint demonstrate that the law at issue prohibits expressive conduct:

> 22. For Plaintiffs, who are Tennessee-based individuals and community organizations that are committed to engaging and organizing Tennesseans around making their voices heard through voting, this criminal prohibition on the distribution of absentee ballot applications is an extraordinarily burdensome constraint on their ability to fully engage with voters and to encourage them to vote this Fall.

> 23. In election after election, Plaintiffs have run or participated in voter engagement programs involving voter registration activities, voter education, and voter turnout. Such efforts are at the core of Plaintiffs' political speech and advocacy activities. Plaintiffs plan to continue this outreach in the lead up to the November 2020 election. [law doesn't affect these activities]

> 24. In advance of the November 2020 election, outreach to eligible absentee voters will play a central role in Plaintiffs' voter engagement strategy. In light of the ongoing COVID-19 pandemic more Tennesseans are expected to want to vote by mail to protect themselves and their family members from exposure to the virus at in-person voting locations. Indeed, in the August 2020 election, more than 116,000 Tennessee voters cast absentee ballots, which is over five times more than had done so in the prior four August elections.

> . . .

> 26. In light of the COVID-19 pandemic and the shifting voter preference towards voting absentee, Plaintiffs will focus significant time and resources on organizing their members and communities, where they are eligible, to vote absentee. This will necessarily include discussing with voters the benefits of voting by mail, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were received, cast and counted. And, as a key part of this absentee voter engagement, Plaintiffs will, if permitted, provide potential absentee voters with the blank absentee ballot applications that are available online from the state and county election commissions, so that the prospective voter may then complete and return to be added to the absentee voter rolls for the November 2020 election.

27. Having the ability to provide voters with the absentee ballot application is necessary because Plaintiffs have found that their voter engagement efforts are significantly more effective when they are able to provide voters with all of the information and requisite forms they might need to register to vote, or to request to vote absentee. For example, in Plaintiffs' experience, providing a voter registration application to a person is a much more effective way to ensure they register to vote than simply encouraging the person to register. Similarly, Plaintiffs believe, based on their experience, that providing an absentee ballot application to a voter will be a much more effective way to encourage eligible voters to vote absentee than directing the voter to a website they may not be able to access, or to a form they may not be able to print.

28. This election cycle, voters have specifically asked Plaintiffs to provide them with voting materials, including absentee ballot applications, including because some such voters lack reliable access to a computer, a printer, or the Internet. Unless provided with such materials, some of Plaintiffs' members and engaged community members will simply elect to not request an absentee ballot, or vote altogether.

29. But under Tennessee Code § 2-6-202(c)(3), Plaintiffs cannot even provide absentee ballot applications to members or other eligible voters who affirmatively request them. As such, Plaintiffs are forbidden from leveraging their resources— including the ability to download and print an application for an organizational member or community member who lacks access to the Internet or a printer—to ensure that voters who need and want to apply for an absentee ballot can do so.

30. Moreover, because of the law, Organizational Plaintiffs like Tennessee NAACP, MCLC, APRI, Equity Alliance, and Free Hearts, are not able to send mailings to their members and other engaged voters including literature about the benefits of absentee voting along with a blank absentee ballot application, which the voter can then complete and return to county election officials. For groups like Organizational Plaintiff MCLC and Tennessee NAACP, which boast memberships of approximately 20,000 affiliate union members and 10,000 statewide members, respectively, including an absentee ballot application in such mass mailings is crucial to effectively reaching and encouraging as many of their eligible members as possible to vote absentee.

(Doc. No. 1 at ¶¶ 22-24, 26-27).

Specifically, Plaintiffs contend that these allegations show that "Plaintiffs have plausibly alleged that the Law prohibits Plaintiffs from engaging in expressive conduct" because the allegations show that "this prohibition burdens Plaintiffs' ability to engage fully with eligible absentee voters who are unlikely or unable to vote in person and deprives them of their chosen

method to convey a particularized message encouraging them to vote absentee." (Doc. No. 50 at 3). Plaintiffs assert that "Plaintiffs' chosen means of conveying this particularized message—by including the means of voting absentee in their voter engagement materials—is not only inherently expressive but substantially more effective than other methods of conveying the same message." (*Id.* (citing Doc. No. 1 at ¶¶ 26–27)).

Plaintiffs' allegations regarding the Law's prohibitions, and whether the prohibited activities are considered expressive conduct, are legal conclusions that will not be taken as true for purposes of ruling on Defendants' Motion. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (explaining that on a Rule 12(b)(6) motion, a court "need not accept as true legal conclusions or unwarranted factual inferences . . . and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice."). The Court must decide for itself what the Law does and does not prohibit. And as the Court explained at considerable length in its Preliminary Injunction Opinion, the Law simply does not prohibit any conduct that is expressive. *Lichtenstein*, 489 F. Supp. 3d at 764-73 (". . . however one slices it, the Law prohibits no spoken or written expression whatsoever and also leaves open a very wide swath of conduct, prohibiting just one very discrete kind of act."). For reasons of judicial efficiency, the Court will not repeat those reasons here, but fully incorporates those reasons in this Opinion.[5] Accordingly, the Court concludes that the Law does not restrict expressive conduct and thus is not within the scope of the First Amendment. And even if it is within scope of the First Amendment, it is not "core" political speech, so *Meyer-Buckley* (with its strict scrutiny standard) does not apply. Instead,

---

[5] The Court's Preliminary Injunction Opinion is appended to this Opinion and made a part hereof. The WestLaw version of the Preliminary Injunction Opinion is appended for ease of reference, but the Court notes (as counsel no doubt fully understand) that some of the material in the WestLaw version (such as the headnotes) is not original content of this Court.

either the *Anderson-Burdick* framework applies (and in turn prescribes rational basis "plus" review), or rational-basis review applies automatically.

II. *The Law Survives Anderson-Burdick and Rational-Basis Review*

Defendants argue that Plaintiffs' Complaint should be dismissed whether rational-basis review is applied automatically or whether instead the *Anderson-Burdick* framework is applied and in turn subjects the Law to a somewhat higher "rational-basis plus" standard of review. (*Id*). Defendants argue that the "court has already found that the statute's restriction is 'quite narrow, leaving open every possible avenue of oral or written expression and every possible action save one.' –the distribution of applications for absentee ballots." (Doc. No. 47 at 14). Defendants then assert that "there is clearly a rational relationship between Tenn. Code Ann. § 2-6-202(c)(3) and the State's interest in preventing voter confusion and protecting the integrity of its elections[.]" (Doc. No. 47 at 15).

Plaintiffs argue in their Response that at a minimum, the *Anderson-Burdick* framework applies to Plaintiffs' claims and is not amenable to resolution at this stage in the litigation because "[t]his inquiry is necessarily fact-intensive and not ripe for disposition at the motion to dismiss stage." (Doc. No. 50 at 10). Plaintiffs assert that "the Court cannot identify state interests and the weighing of their necessity in light of Plaintiffs' burdens at this stage without the benefit of a more factual record." (*Id.*).

The Sixth Circuit has explicitly rejected the argument that *Anderson-Burdick* cannot be applied at the motion-to-dismiss stage.

> Although Plaintiffs argue that we should disregard *Daunt* I and our *Anderson-Burdick* analysis therein because it rested upon an underdeveloped factual record, we fail to see how further factual development could change our prior reasoning. True, *Anderson-Burdick* can, in many if not most cases, be a fact-intensive inquiry, *see Tennessee State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683, 700–01 (M.D. Tenn. 2019), **but we have not shied away from disposing of *Anderson-**

***Burdick*** **claims at the motion-to-dismiss stage where a plaintiff's allegations "failed as a matter of law."** *Comm. to Impose Term Limits on Ohio Supreme Ct. & to Preclude Special Legal Status for Members & Emps. of Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018) (collecting cases); *see also Hawkins v. DeWine*, 968 F.3d 603, 607 (6th Cir. 2020). Where, as here, the alleged severity of the burdens imposed can be gleaned from the face of the challenged law and they can be weighed against the asserted state interests, dismissal on the pleadings is warranted. *See Ohio Ballot Bd.,* 885 F.3d at 448.

*Daunt v. Benson*, 999 F.3d 299, 313-14 (6th Cir. 2021) (emphasis added).

In its Preliminary Injunction Opinion, the Court (concerning itself with what was "likely," as is appropriate on motions for preliminary injunctions), found that *Anderson-Burdick* dictated the application of what the Court called rational-basis "plus" (as opposed to mere rational-basis) scrutiny.[6] *Lichtenstein*, 489 F. Supp. 3d at 780. The Court further found that the Law survived rational basis "plus" scrutiny. *Id.* at 780-86. While the Court's discussion in the Preliminary Injunction Opinion involved a review of materials outside of the four corners of the Complaint (*i.e.*, Defendant Goins' declaration as to an asserted state interest), those same burdens and state interests that the Court discussed in the Preliminary Injunction Opinion can easily "be gleaned from the face of the challenged law[.]" *Daunt*, 999 F.3d at 314.[7] Thus, for the same reasons articulated in the Preliminary Injunction Opinion, the Court finds that dismissal at the pleadings stage is warranted upon application of the *Anderson-Burdick* framework, because the Law survives rational basis "plus" scrutiny.

---

[6] As the Court explained, the difference in the two is that what it called rational-basis "plus" review requires the state-official defendants to shown that a challenged state restriction is rationally related to an "important" state interest, whereas garden-variety rational-basis scrutiny requires the defendants to show that the restriction is rationally related to a merely "legitimate" state interest. *See Lichtenstein*, 489 F. Supp. 3d at 780. The distinction between an "important" state interest and a "legitimate" state difference is one with a difference and one that the Court felt it should observe in light of certain extant Sixth Circuit opinions. *See id.*

[7] In fact, in the Preliminary Injunction Opinion, the Court hypothesized possible state interests (*i.e.*, unscrupulous distributors) protected by the Law that were not asserted by Defendants. *See Lichtenstein*, 489 F. Supp. 3d at 784. Such an interest can obviously be "gleaned from the face of the challenged law," *Daunt*, 999 F.3d at 413, by the Court as the Court already did so in its prior Opinion.

Also in the Court's Preliminary Injunction Opinion, after finding that the Law survived rational basis "plus" scrutiny, the Court found that the Law accordingly survived the somewhat less demanding rational-basis scrutiny that would be applicable assuming that *Anderson-Burdick* (like *Meyer-Buckley*) did not apply to the Law. *Lichtenstein*, 489 F. Supp. 3d at 786-87. Laws that are reviewed under rational-basis scrutiny are particularly vulnerable to dismissal on a Rule 12(b)(6) motion, because, as the Sixth Circuit has explained, "under rational basis review, . . . a purported rational basis may be based on 'rational speculation unsupported by evidence or empirical data' and need not have a foundation in the record." *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). Further, "[u]nder rational basis review, official decisions are afforded a strong presumption of validity." *In re Flint Water Cases*, 384 F. Supp. 3d 802, 844 (E.D. Mich. 2019) (citing *Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001)). "And even at the motion to dismiss stage, this presents a formidable bar for plaintiffs to surmount." *Id.* (citing *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018)). Thus, for the same reasons articulated in the Preliminary Injunction Opinion, the Court finds that upon rational-basis review, dismissal on the pleadings is warranted.

The Court sees nothing in the parties' briefing to change the Court's analysis or above-summarized conclusions in the Court's Preliminary Injunction Opinion.[8] Of course, a different standard of review now applies; at the (current) motion-to-dismiss stage, the Court must take as true all factual allegations in Plaintiffs' Complaint. Nevertheless, the Court concludes that,

---

[8] As noted above, the Court invited the parties to file supplemental briefing addressing whether the "numerous appellate court opinions involving election law" associated with the November 2020 elections bear on the instant case and the pending motion to dismiss. (Doc. No. 53). In Plaintiffs' supplemental briefing, they discuss two recently decided United States Supreme Court opinions (*Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021) and *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)) and assert that those opinions do not impact Plaintiffs' claim. (Doc. No. 54 at 3-4). Plaintiffs therein concerned themselves only with showing that these recent cases did not hurt their claim; Plaintiffs did not point to any recent cases that they assert affirmatively *strengthen* their claim. Thus, Plaintiffs' supplemental briefing does nothing to change the Court's conclusion.

consistent with its previously expressed view that Plaintiffs were unlikely to succeed on the merits of their claim, Plaintiffs as a matter of law cannot succeed on their claim, even accepting as true everything in the Complaint that the Court is required on this Motion to accept as true. Accordingly, the Motion will be granted, and this action will be dismissed.

An appropriate order will be entered.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

Jeffrey LICHTENSTEIN,
et al., Plaintiffs,

v.

Tre HARGETT, et al., Defendants.

NO. 3:20-cv-00736

United States District Court,
M.D. Tennessee, Nashville Division.

Filed 09/23/2020

**Background:** Plaintiffs filed motion for preliminary injunction seeking to prevent state election officials from enforcing Tennessee law prohibiting non-employees of election commission from giving to any person application for absentee ballot, on grounds that the law was violative of their First Amendment rights to free speech and association.

**Holdings:** The District Court, Eli J. Richardson, J., held that:

(1) insufficient time to obtain legislative history of statute did not constitute prejudice to state election officials so as to bar plaintiffs' claim under doctrine of laches;

(2) *Meyer-Buckley* "exacting scrutiny" standard, *Meyer v. Grant*, 108 S.Ct. 1886, and *Buckley v. Am. Const. Law Found., Inc.*, 119 S.Ct. 636, contemplates strict scrutiny only;

(3) law did not restrict expressive conduct;

(4) law did not restrict core political speech so as to be subject to the *Meyer-Buckley* "exacting scrutiny" standard;

(5) rational relationship existed between law and State's important interests of preventing voter confusion and protecting the integrity of elections; and

(6) factors for determining whether to grant preliminary injunction weighed against granting injunction.

Motion denied.

**1. Injunction ⟲1072, 1075**

Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits and are considered extraordinary relief.

**2. Injunction ⟲1572**

A preliminary injunction should be granted only if the movant carries his burden of proving that the circumstances clearly demand it.

**3. Injunction ⟲1092**

District court must consider and balance four factors in determining whether to grant preliminary injunction: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest.

**4. Injunction ⟲1093**

Although the four factors in determining whether to grant preliminary injunction are factors to be balanced, not prerequisites that must be met, they do not carry equal weight.

**5. Injunction ⟲1093, 1106**

In determining whether to grant preliminary injunction, even the strongest showing on the other factors cannot eliminate the irreparable harm requirement.

**6. Injunction ⟲1096**

A finding that there is simply no likelihood of success on the merits is usually fatal to a motion for preliminary injunction.

**7. Injunction ⟲1514**

Insufficient time to obtain legislative history of statute did not constitute preju-

dice to state election officials so as to bar plaintiffs' claim under doctrine of laches, in plaintiffs' motion for preliminary injunction to prohibit state election officials from enforcing Tennessee law prohibiting non-employees of election commission from giving to any person application for absentee ballot; district court would not need to know, and state election officials would not need to rely on evidence of, actual legislative purpose behind statute, and, if injunction were granted, state election officials would be not be required to scramble to change election procedures, they would only be required to not do something, i.e., not do anything to enforce statute. Tenn. Code Ann. § 2-6-202(c)(3).

**8. Equity** ⚪84

"Laches" is a negligent and unintentional failure to protect one's rights.

> See publication Words and Phrases for other judicial constructions and definitions.

**9. Equity** ⚪84

Laches is applicable when a court rules that laches bars the particular equitable relief at issue; by contrast, laches is only potentially applicable when the court is not prohibited ab initio from applying laches by threshold considerations—such as laches being entirely supplanted by a particular statute of limitation or the fact that the kind of requested relief at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches.

**10. Equity** ⚪84

Even where laches is potentially applicable as the district court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds the existence of the two elements required by the Sixth Circuit.

**11. Equity** ⚪84

**Injunction** ⚪1514

Laches generally is potentially applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions.

**12. Equity** ⚪67

Laches is an equitable doctrine.

**13. Equity** ⚪67

Claims in equity invite equitable defenses, including laches.

**14. Equity** ⚪67

Sixth Circuit prescribes required elements of laches.

**15. Equity** ⚪69, 72(1)

Assuming that laches is potentially applicable, the party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.

**16. Equity** ⚪84

**Federal Civil Procedure** ⚪1754

Even if a party can show both of the required elements of laches (lack of diligence by the party against whom the defense is asserted and prejudice to the party asserting it), the district court is not required to apply laches; dismissal under the laches doctrine is not mandatory and is appropriate only in the sound discretion of the court.

**17. Equity** ⚪84

**Federal Courts** ⚪3588

Where laches is potentially applicable, the decision whether to apply it is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews a district court's resolution of a laches question for an abuse of discretion.

**18. Equity ⟘84**

   **Federal Courts ⟘3588**

   Insofar as whether the required elements of laches exist is a question of fact, to say that the district court is vested with discretion as to this question is to say that the district court's answer will be upheld unless found on appeal to be clearly erroneous.

**19. Equity ⟘84**

   Laches is potentially applicable to requests for equitable relief.

**20. Equity ⟘72(1)**

   A valid laches defense requires that plaintiff's unreasonable delay results in prejudice to the defendant.

**21. Equity ⟘72(1), 73**

   There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.

**22. Statutes ⟘1511**

   A court is not limited to considering the actual purpose behind a statute being challenged; rather, it may consider any plausible state interest.

**23. Constitutional Law ⟘2487**

   Whenever there exist plausible reasons for enacting a statute-whether or not those are the legislature's actual reasons for adopting the law—a court's inquiry is at an end.

**24. Election Law ⟘560(1)**

   The *Purcell* doctrine, 127 S.Ct. 5, cautions courts to consider the practical effects on election administration in cases seeking relief close to an election such as

strains on electoral administration and the possibility of voter confusion.

**25. Injunction ⟘1100, 1514**

   The *Purcell* doctrine, 127 S.Ct. 5, bears on whether a preliminary injunction should be issued under the factors for issuing a preliminary injunction, including the impact that the requested preliminary injunction would have on the public (which appears to be what the doctrine is most concerned with); the doctrine does not bear, at least not directly, on whether laches should be applied so as to defeat the motion for a preliminary injunction even before the preliminary injunction factors are reached.

**26. Statutes ⟘1511**

   Plaintiffs asserting a facial challenge ultimately bear a heavy burden of persuasion, a factor to which the district court is constrained to give appropriate weight.

**27. Constitutional Law ⟘655**

   Most constitutional analyses of a statute begin with an examination of the degree of scrutiny a statute will receive.

**28. Constitutional Law ⟘1053**

   The *Meyer-Buckley* "exacting scrutiny" standard, *Meyer v. Grant*, 108 S.Ct. 1886, and *Buckley v. Am. Const. Law Found., Inc.*, 119 S.Ct. 636, for analyzing constitutionality of a statute contemplates strict scrutiny only.

**29. Constitutional Law ⟘1461**

   The *Anderson-Burdick* framework for determining whether a State's regulation imposes on a plaintiff's First Amendment rights is broadly applicable to challenges to election laws.   U.S. Const. Amend. 1.

**30. Constitutional Law ⟘1461**

   There are three steps to a court's analysis under the *Anderson-Burdick* framework for determining whether a State's election regulation imposes on a

plaintiff's First Amendment rights: First, the court must determine the burden at issue, the next step is to consider the State's justifications for the restrictions, and, at the third step, the court assesses whether the State's restrictions are constitutionally valid given the strength of its proffered. U.S. Const. Amend. 1.

**31. Constitutional Law ⟊1688**

**Election Law ⟊402**

Tennessee law prohibiting non-employees of election commission from giving to any person application for absentee ballot did not restrict expressive conduct, and therefore the law was not within scope of First Amendment; act of distributing absentee-ballot applications was not expressive conduct. U.S. Const. Amends. 1, 14; Tenn. Code Ann. § 2-6-202(c)(3).

**32. Constitutional Law ⟊1497**

Laws that directly regulate only action or conduct—even if only to a very specific and narrow extent—could properly be deemed to restrict speech and thus be subject to review for being potentially violative of the First Amendment. U.S. Const. Amend. 1.

**33. Constitutional Law ⟊1497**

Conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments. U.S. Const. Amends. 1, 14.

**34. Constitutional Law ⟊1497**

Conduct and speech can often be separated only in the eyes of the beholder and therefore First Amendment doctrines turning on the true essence of an expressive event can provide no very certain guide to judicial decision. U.S. Const. Amend. 1.

**35. Constitutional Law ⟊1497**

It is not appropriate merely to label a restriction as one on conduct and for that reason reflexively deem it outside the scope of First Amendment scrutiny. U.S. Const. Amend. 1.

**36. Constitutional Law ⟊1497**

Plaintiffs do not establish First Amendment protection merely by labeling their conduct as "speech." U.S. Const. Amend. 1.

**37. Constitutional Law ⟊1497**

Merely combining speech and conduct is not enough to create expressive conduct for First Amendment purposes. U.S. Const. Amend. 1.

**38. Constitutional Law ⟊1497**

In reviewing a challenge to a statute on First Amendment grounds, the district court must first determine whether the prohibited conduct at issue constitutes expressive conduct, permitting plaintiffs to invoke the First Amendment in challenging the restriction. U.S. Const. Amend. 1.

**39. Constitutional Law ⟊1545**

Act of handing something out in particular, even though conduct, can qualify as protected speech under the First Amendment; but whether such distribution actually is speech in a particular situation depends on what is being distributed, why it is being distributed, and how such distribution would reasonably be perceived. U.S. Const. Amend. 1.

**40. Constitutional Law ⟊1683**

For First Amendment purposes, the act of presenting a petition to be signed is inherently expressive, and expressive in a political way. U.S. Const. Amend. 1.

**41. Constitutional Law ⟊1688**

Not every procedural limit on election-related conduct automatically runs afoul of the First Amendment; the chal-

lenged law must restrict political discussion or burden the exchange of ideas. U.S. Const. Amend. 1.

**42. Constitutional Law ⚖1498**

First Amendment does not entail a right to achieve the speaker's goals (no matter how laudable) or to seek to achieve them in any way the speaker desires. U.S. Const. Amend. 1.

**43. Constitutional Law ⚖1053, 1506**

Simply labeling a challenge as one under constitutional guarantee such as free speech does not make strict scrutiny applicable. U.S. Const. Amend. 1.

**44. Constitutional Law ⚖1694**

Even if Tennessee law prohibiting non-employees of election commission from distributing applications for absentee ballots constituted a restriction of speech to some extent, it did not restrict core political speech so as to be subject to the *Meyer-Buckley* "exacting scrutiny" standard, *Meyer v. Grant*, 108 S.Ct. 1886, and *Buckley v. Am. Const. Law Found., Inc.*, 119 S.Ct. 636, for analyzing the constitutionality of a statute, and therefore the law was not automatically subject to strict scrutiny by virtue of the *Meyer-Buckley* standard; law did not in any way, shape or form hinder the ability to discuss candidates or issues—including any issue relating in any way to voting generally, voting absentee, or applying to vote absentee. U.S. Const. Amends. 1, 14; Tenn. Code Ann. § 2-6-202(c)(3).

**45. Constitutional Law ⚖1681**

*Meyer-Buckley* "exacting scrutiny" standard, *Meyer v. Grant*, 108 S.Ct. 1886, and *Buckley v. Am. Const. Law Found., Inc.*, 119 S.Ct. 636, for analyzing constitutionality of a statute, applies specifically to restrictions on core political speech or expression. U.S. Const. Amend. 1.

**46. Constitutional Law ⚖1681**

Sixth Circuit automatically applies strict scrutiny to burdens on core political speech, requiring that a burdensome provision be narrowly tailored to serve the overriding state interest. U.S. Const. Amend. 1.

**47. Constitutional Law ⚖1681**

*Meyer-Buckley* "exacting scrutiny" standard, *Meyer v. Grant*, 108 S.Ct. 1886, and *Buckley v. Am. Const. Law Found., Inc.*, 119 S.Ct. 636, for analyzing constitutionality of a statute, automatically and necessarily requires strict scrutiny when it is applicable, but it is applicable only to regulation of core political speech and not just any political expression. U.S. Const. Amend. 1.

**48. Constitutional Law ⚖1681**

Certain restrictions on political expression lie closer to the edges than to the core of political expression. U.S. Const. Amend. 1.

**49. Constitutional Law ⚖1467**

**Election Law ⚖402**

Rational relationship, i.e., plausible connection, existed between Tennessee law prohibiting non-employees of election commission from giving to any person application for absentee ballot and State's important First and Fourteenth Amendment interests of preventing voter confusion and protecting the integrity of elections; it was plausible that there would be—or already had been—instances of distribution of absentee ballot applications in violation of law, or of distribution that would have occurred in violation of law absent deterrence provided by law, fostering voter confusion and/or impairing integrity of election. U.S. Const. Amends. 1, 14; Tenn. Code Ann. § 2-6-202(c)(3).

**50. Constitutional Law ⟨⟩1150**

Burden imposed by a law upon a plaintiff's First Amendment rights is considered light if the plaintiffs' rights are subjected only to reasonable, nondiscriminatory restrictions. U.S. Const. Amend. 1.

**51. Constitutional Law ⟨⟩1150**

If a burden to First Amendment rights is minimal, then rational-basis review is appropriate. U.S. Const. Amend. 1.

**52. Constitutional Law ⟨⟩1150**

In considering whether a burden to First Amendment rights is minimal, as opposed to modest, the district court should consider whether the activity restricted by the challenged law can otherwise be broadly engaged in. U.S. Const. Amend. 1.

**53. Election Law ⟨⟩52**

In the election context, there is no need for an elaborate, empirical verification of the weightiness of the State's asserted justifications in enacting an election law.

**54. Election Law ⟨⟩47**

Legislatures should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively; requiring that a state's political system sustain some level of damage before the legislature could take corrective action is neither practical, nor constitutionally compelled.

**55. Constitutional Law ⟨⟩1160, 4505**

Constitutional issues regarding fair notice of the criminality of proscribed conduct are cognizable not under the First Amendment, but rather under the Due Process Clause. U.S. Const. Amends. 1, 14.

**56. Injunction ⟨⟩1346**

Factors for determining whether to grant plaintiffs' preliminary injunction, seeking to prevent state election officials, on First Amendment grounds, from enforcing Tennessee law prohibiting non-employees of election commission from giving to any person application for absentee ballot, weighed against granting injunction; plaintiffs were not likely to succeed on merits, law was constitutional and would thus cause state irreparable harm if it were blocked from enforcing it, it would be inequitable to change rules on the state so late, and it was in public interest to give effect to will of people by enforcing laws they and their representatives enacted. U.S. Const. Amends. 1, 14; Tenn. Code Ann. § 2-6-202(c)(3).

**57. Equity ⟨⟩72(1), 73**

Laches is concerned with a particular kind of evidence-based or expectations-based prejudice.

———————

Christina R. Lopez, Christopher C. Sabis, Lisa K. Helton, William L. Harbison, Sherrard Roe Voight & Harbison, PLC, Nashville, TN, Danielle M. Lang, Ezra D. Rosenberg, Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Jonathan Diaz, Molly Danahy, Ravi Doshi, Campaign Legal Center, Washington, DC, for Plaintiff Jeffery Lichtenstein.

Christina R. Lopez, Christopher C. Sabis, Lisa K. Helton, William L. Harbison, Sherrard Roe Voight & Harbison, PLC, Nashville, TN, Ezra D. Rosenberg, Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Jonathan Diaz, Molly Danahy, Ravi Doshi, Campaign Legal Center, Washington, DC, for Plaintiffs The Memphis and West Tennessee AFL-CIO Central Labor Council, The Tennessee

State Conference of the NAACP, The Equity Alliance, Memphis A. Phillip Randolph Institute, Free Hearts.

Alexander Stuart Rieger, Andrew B. Campbell, Janet M. Kleinfelter, Tennessee Attorney General's Office, Nashville, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

### ELI RICHARDSON, UNITED STATES DISTRICT JUDGE

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 11, "Motion"). Via the Motion, Plaintiffs seek an injunction, pending final resolution of Plaintiffs' claims, with respect to Tenn. Code Ann. § 2-6-202(c)(3) (hereinafter referred to, consistent with Plaintiffs' nomenclature, as "the Law"), which provides: "A person who is not an employee of an election commission commits a Class E felony if such person gives an application for an absentee ballot to any person." In particular, Plaintiffs seek to enjoin Defendant Amy Weirich (who, unlike her two co-Defendants, has actual prosecutorial powers) from enforcing the Law and to enjoin Defendants Tre Hargett and Mark Goins

from taking actions they apparently are authorized to take with respect to the Law, namely "referring for prosecution or investigation, or participating in any prosecution or investigation, of any alleged violations of" the Law.[1] (Doc. No. 11-1 at 2).[2] In essence, therefore, Plaintiffs are asking the Court to preliminarily enjoin enforcement of this criminal prohibition, based on their purported likelihood of success in showing that the Law is violative of their First Amendment rights to free speech and association.[3]

For the reasons set forth below, the Motion is denied.

## PROCEDURAL BACKGROUND IN CASE NO. 374

The procedural history of a different lawsuit, Case No. 3:20-cv-00374, ("Case No. 374") brought in this Court by four of the five Plaintiffs herein, and still pending,[4] is relevant context in the instant case. In Case No. 374, the plaintiffs therein ("MPRI plaintiffs") initiated that case by filing a complaint (Case No. 374, Doc. No. 1, "MPRI original complaint") on May 1, 2020, against the same three persons who are Defendants in the present case.[5] On

---

**1.** Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document.

**2.** Plaintiffs also seek, via the Motion, to have this Court's order granting the requested preliminary injunction also state that the Law "is declared unconstitutional under the First and Fourteenth Amendments to the United States Constitution." (Doc. No. 11-1 at 2). As Plaintiffs must know, the Court cannot do so at this juncture. At this stage, the Court is concerned only with whether Plaintiffs are likely to succeed on their claims that the Law is unconstitutional under the First Amendment. Thus, in no event would the Court declare at this time that the Law *is* (as opposed to is ultimately *likely to be shown to be*) unconstitutional.

**3.** As Plaintiffs make clear, they are actually invoking the First Amendment as it is incorporated into the Fourteenth Amendment (and thereby applicable to state governments).

**4.** As its caption suggests, that case (*Memphis A. Phillip Randolph Institute, et al. v. Hargett et al.*, M.D. Tenn. Case No. 3:20-cv-00374), over which the undersigned has presided since its inception, had a lead plaintiff different from the lead plaintiff in the instant case. In reciting the relevant procedural history of Case No. 374, with some exceptions, the Court will forgo citing particular docket entries.

**5.** In each case, the three were sued in their official capacities only. Herein, when referred to in connection with Case No. 374, these

June 12, 2020, the MPRI plaintiffs filed an amended complaint (Case No. 374, Doc. No. 39, "MPRI amended complaint"), as well as a motion for a preliminary injunction (Case No. 374, Doc. No. 40, "MPRI motion") and a memorandum in support of the MPRI motion (Case No. 374, Doc. No. 43).

As they had in the Prayer for Relief in the MPRI original complaint (and MPRI amended complaint), MPRI plaintiffs requested in the MPRI motion preliminary injunctive relief with respect to, in pertinent part, Tenn. Code Ann. § 2-6-202(c)(4), which provides "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." The MPRI plaintiffs have not challenged, or sought any relief with respect to, the Law. Notably (and obviously), Tenn. Code Ann. § 2-6-202(c)(4) (hereinafter, "Paragraph (c)(4)"), though contained in the same code section as the Law, differs from the Law in two material ways: (1) it prescribes a misdemeanor rather than a felony; and (2) it prohibits (most people, including Plaintiffs and the MPRI plaintiffs) from giving to another person "an unsolicited request for application for absentee ballot" rather than "an application for an absentee ballot."[6]

The MPRI plaintiffs made clear why they (or at least four of the five of them who were organizational plaintiffs, i.e., the same four organizational plaintiffs who are

also plaintiffs in this case) would be injured by the enforcement of Paragraph (c)(4). In their briefing in support of the MPRI motion, the MPRI plaintiffs pointed to a document marked, in the Supplemental Declaration of Ravi Doshi (Case No. 374, Doc. No. 54-1) filed by the MPRI plaintiffs, as Exhibit 17 (Case No. 374, Doc. No. 54-2).[7] The MPRI plaintiffs likewise pointed to a printout, filed as Exhibit 5 to the Declaration of Ravi Doshi (Case No. 374, Doc. No. 40-2 at 133), of Defendant Hargett's website linking to this form.[8] MPRI plaintiffs then stated with no ambiguity, "It is precisely this *official* form that Organizational Plaintiffs seek to distribute." (Case No. 374, Doc. No. 54 at 17).

The Case No. 374 defendants filed a response in opposition to the MPRI motion on June 26, 2020, (Case No. 374, Doc. No. 46), wherein they asserted in pertinent part that the doctrine of laches should be applied to bar in its entirety the injunctive relief requested by the MPRI plaintiffs. After the MPRI plaintiffs filed a reply (Case No. 374, Doc. No. 54) in support of the MPRI motion on July 7, 2020, the Court issued an order agreeing in part with the Case No. 374 defendants; the Court denied the MPRI motion (based on laches) to the extent that it sought a preliminary injunction prior to the August 6 primary election, but not to the extent that it sought a preliminary injunction prior to the November 3 general election. Thus, the request for preliminary injunctive re-

---

three will be referred to as the "Case No. 374 defendants."

**6.** Herein, the concept of giving to another person, as encompassed within both the Law and Paragraph (c)(4), will generally be referred to as "distributing" or "distribution."

**7.** As the Court later explained, contrary to the MPRI plaintiffs' belief, Exhibit 17 was plainly

a *request*—an application—for an absentee ballot, not a *request for an application* for an absentee ballot.

**8.** As the Court later explained, the link clearly identifies the form as an "absentee ballot request form" and as one way to "request an absentee by-mail ballot."

lief in advance of and in connection with the general election remained pending.

Subsequently, with respect to the MPRI plaintiffs' request for a preliminarily injunction prior to the November 3 general election, the Court issued an order denying the MPRI motion insofar as it sought to preliminarily enjoin Paragraph (c)(4). Concisely recapped, the Court's reasoning for such denial essentially was that: (i) as explained by the MPRI plaintiffs themselves, they intended to distribute (unsolicited) only the above-described particular form ("Form"), which they believed constitutes a "request for [an] application for [an] absentee ballot" within the meaning of Paragraph (c)(4); (ii) the absence of an injunction prohibiting enforcement of Paragraph (c)(4) would irreparably injure the MPRI plaintiffs, if at all, only if enforcement of Paragraph (c)(4) would dissuade the MPRI plaintiffs from their plan to distribute the Form (unsolicited); (iii) the Form, however, is clearly not a "request for [an] application for [an] absentee ballot" within the meaning of Paragraph (c)(4), but rather an application for an absentee ballot within the meaning of the Law; (iv) the MPRI plaintiffs thus could not possibly suffer an injury from the non-enjoinment of Paragraph (c)(4), because the specified activity in which they sought to engage (unsolicited distribution of the Form), was not within the scope of the prohibition set forth in Paragraph (c)(4); and therefore (v) the MPRI plaintiffs could not possibly show the irreparable injury they were required to show in order to preliminarily enjoin the enforcement of Paragraph (c)(4).

Three days after the Court's August 11, 2020 issuance of that order, the MPRI plaintiffs promptly filed a motion to reconsider. The MPRI plaintiffs were convinced that the Court had made in that order a clear and fundamental error as to whether it was Paragraph (c)(4) or the Law that prohibits the conduct that the MPRI plaintiffs wished to undertake. The MPRI plaintiffs seemed to assume that the Case No. 374 defendants would readily, or at least necessarily, agree on this. But in fact the Case No. 374 defendants did no such thing, responding with the view that the Court had gotten it right and that the Form was indeed an application for an absentee ballot and thus covered by the Law and not Paragraph (c)(4). Agreeing with the MPRI defendants, in an order filed on August 21, 2020, the Court adhered firmly to its prior denial of the MPRI motion insofar as it sought to preliminarily enjoin enforcement of Paragraph (c)(4).

## PROCEDURAL BACKGROUND IN THE INSTANT CASE

As far as the Court can tell, the four organizational plaintiffs who brought Case No. 374 no longer are contending that the Form is within the scope of Paragraph (c)(4). Instead, (at least temporarily) accepting that their beef is with the Law rather than Paragraph (c)(4), the four organizational plaintiffs (together with one individual, lead plaintiff Lichtenstein) filed the instant action. In pertinent part, Plaintiffs allege in their complaint:

16. This November, in light of the ongoing COVID-19 pandemic, a record number of Tennesseans are expected to vote absentee in the presidential election.

17. In order to do so, absentee-eligible voters will first need to apply for an absentee ballot from their county election commission, and return the completed form on or before October 5, 2020.

18. The application to vote by mail is made publicly-available online to download and print. One version of the application is available from the Secretary of

State's website, and other versions, created by the State's various county election commissions and approved by the Secretary of State, are similarly available from the respective county election commissions' websites.

19. Once the voter has obtained a printed copy of the application, the voter "may have anyone the voter chooses . . . write out the voter's absentee voting by mail application except for the voter's signature or mark." Tenn. Code § 2-6-203.

(Doc. No. 1 at 7). After noting the criminal prohibition prescribed by the Law, Plaintiffs allege that "this criminal prohibition on the distribution of absentee ballot applications is an extraordinarily burdensome constraint on their ability to fully engage with voters and to encourage them to vote this Fall." (*Id.* at 8). Then, after describing the importance—in particular with respect to the upcoming November 3 general election—(i) to (the organizational) Plaintiffs of voter engagement efforts, and (ii) to voters of the option to vote absentee during the COVID-19 pandemic, Plaintiffs allege:

> In light of the COVID-19 pandemic and the shifting voter preference towards voting absentee, Plaintiffs will focus significant time and resources on organizing their members and communities, where they are eligible, to vote absentee. This will necessarily include discussing with voters the benefits of voting by mail, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were received, cast and counted. And, as a key part of this absentee voter engagement, Plaintiffs will, if permitted, provide potential absentee voters with

the blank absentee ballot applications that are available online from the state and county election commissions, so that the prospective voter may then complete and return to be added to the absentee voter rolls for the November 2020 election.[9]

(*Id.* at 9). Plaintiffs then allege essentially that they are prohibited from doing exactly this by the Law, which, they claim, chills their protected free speech and associational activities in violation of the First Amendment. (*Id.* at 10-12).

## PRELIMINARY INJUNCTION STANDARD

[1–3] Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). A preliminary injunction should be granted only if the movant carries his burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The court must consider and balance four factors in determining whether to afford such relief: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

---

**9.** As the record in Case No. 374 suggested, multiple county election commissions, as well as the office of the Secretary of State, made available via a link on its respective websites a blank form application for an absentee ballot.

[4–6] Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997)), they do not carry equal weight. Regarding the third factor, irreparable harm, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction."). Furthermore, "[a] finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Medical Exam'rs*, 225 F. 3d 620, 625 (6th Cir. 2000).

In deciding whether to grant the requested preliminary injunction, the Court makes its evaluation of these factors based on the current record. The Court does not intend to suggest that any of its findings herein are not subject to potential change at later stages in this case based on a changing record.

10. Defendants refer to Plaintiffs' "claims," as in plural. The Court will do likewise, even though the Complaint is styled as bringing just a single claim.

11. To promote clarity of analysis, the Court must pause to explain its terminology, which may differ substantially from the terminology used by cited cases or the parties herein. As the term is used herein by the undersigned, laches is "applicable" when a court rules that laches bars the particular equitable relief at issue. By contrast, laches is only "potentially applicable" when the court is not prohibited *ab initio* from applying laches by threshold considerations—such as laches being entirely supplanted by a particular statute of limitation or the fact that the kind of requested

## DISCUSSION

### I. The Court will not apply laches to bar consideration of the Motion

[7] Defendants assert initially that Plaintiffs' claims are barred by laches.[10] In its order denying the MPRI motion to the extent it sought a preliminary injunction as to Paragraph(c)(4), (Case No. 374, Doc. No. 55), the Court discussed at some length the often subjective nature of the trial court's decision whether to apply laches in a particular case. The Court reiterates that observation but need not dwell on it here, in part because, subjective or not, the sounder decision in this particular case is not particularly difficult to pronounce with some confidence.

[8–13] "In this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). Importantly, there is a threshold legal question, subject to *de novo* review, as to whether laches is even potentially applicable in the particular context at issue. *See Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).[11] Laches generally is potentially

relief at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches. *Chirco* actually used the phrase "is even applicable," without including "potentially"; in context, however, the phrase clearly was meant to mean *potentially* applicable as that term is used herein. Notably, even where laches is "potentially applicable" as the Court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds the existence of the two elements required by the Sixth Circuit. Where the terminology of Plaintiffs or Defendants, or of a cited case, for these concepts differs from the Court's, the Court generally will convert such terminology to the Court's terminology.

applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions. *See Obiukwu v. United States*, 14 F. App'x 368, 369 (6th Cir. 2001). As explained by another district court in this circuit, "[l]aches is an equitable doctrine[.]" *United States v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993) (citations omitted). And "[c]laims in equity, of course, invite equitable defenses, including laches." *Id.* at 369 n.2.

**[14, 15]** The Sixth Circuit is one of those courts that prescribes required elements of laches. Assuming that laches is potentially applicable, the "party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *City of Loveland*, 621 F.3d at 473. The first element is sometimes articulated in a somewhat different manner, *i.e.*, as unreasonable delay in asserting one's rights. *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015), and this is the formulation Defendants use.

**[16–18]** But even if the party can show both of the required elements of laches, the court is not required to apply laches; "dismissal under the laches doctrine 'is not mandatory and is appropriate only in the sound discretion of the court.'" *Stiltner v. Hart*, No. 5:13-CV-203-KKC-HAI, 2018 WL 3717209, at *1 (E.D. Ky. Jan. 24, 2018) (quoting *Towns v. Smith*, 395 F.3d 251, 256-57 (6th Cir. 2005)). In other words, where laches is potentially applicable, the

decision whether to apply it is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews "a district court's resolution of a laches question for an abuse of discretion." *Chirco*, 474 F.3d at 231 (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534, 76 S.Ct. 946, 100 L.Ed. 1387 (1956) ("'the [application] of laches is a question primarily addressed to the discretion of the trial court'" (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951))). Notably, from a review of Sixth Circuit case law as a whole, it appears implicit that the district court is vested with discretion both as to the determination of whether the two elements of laches exist [12] and to the subsequent decision (if it is reached) whether to apply them.

**[19]** The Court begins by noting that Defendants claim that Plaintiffs' "claims"—as opposed to just Plaintiffs' request for a preliminary injunction—are barred by laches. It is true that laches is potentially applicable to more than just Plaintiffs' request for a preliminary injunction; as noted, laches is potentially applicable to requests for equitable relief, which in the instant case means both Plaintiffs' request for preliminary injunctive relief as well as Plaintiffs' request for permanent injunctive relief. As a technical matter, the Court herein is constrained to address laches only as it relates to the former request, as that is the only request being adjudicated herein.[13]

---

12. Insofar as whether these elements exist is a question of fact, to say that the district court is vested with discretion as to this question is to say that the district court's answer will be upheld unless found on appeal to be clearly erroneous. *Am. Home Prod. Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1124 (6th Cir. 1973) ("As an issue of fact, a finding of laches cannot be disturbed unless it has been shown

to be clearly erroneous, and as a question addressed to the discretion of the District Court, it will not be disturbed unless an abuse of discretion has been shown." (citations omitted)).

13. The Court realizes, however, that by refusing to apply laches to the former request, it is telegraphing its view regarding the applicabil-

Given the procedural history set forth above, it is not hard to guess the circumstances that Defendants claim show unreasonable delay on Plaintiffs' part. Defendants point to the fact that the Law has been on the books for decades, and thus right there for the challenging all along. (Doc. No. 21 at 8-9). They also point to the fact that (four out of five) Plaintiffs initially challenged, in Case No. 374, Paragraph (c)(4) when they should have challenged the Law. And even that case, and in particular MPRI's motion filed in that case, was not filed promptly after the onslaught of the COVID-19 pandemic, (*id.* at 9-10), which is what Plaintiffs claim brought heightened importance to educating voters about absentee voting and distributing the Form. Moreover, when this was pointed out to Plaintiffs, they did not take immediate action to challenge the Law, (*id.* at 11), but instead responded first by doubling down on their incorrect assertion that the Form was within the scope of Paragraph (c)(4) such that it (and not the Law) was the criminal prohibition implicated by Plaintiffs' proposed conduct. These are all fair points; none of these are great facts for Plaintiffs on the issue of laches, especially with the November 3 general election continuously bearing down on the Court and the parties. But Plaintiffs, in reply, have some fair points of their own, including the relevant fact—and the Court does accept it as a fact—that "the delay caused by Plaintiffs' error was certainly not purposeful." (Doc. No. 37 at 4).

Ultimately, however, the Court need not decide whether Plaintiffs unreasonably delayed, because Defendants have not shown prejudice of the kind required to support the application of laches. *Depositors Ins. Co. v. Estate of Ryan*, 637 F. App'x 864,

871 (6th Cir. 2016) ("we need not contemplate whether the delay was 'inexcusable, negligent, or unreasonable[,]' because the [defendant] suffered no prejudice." (citation omitted)).

**[20, 21]**   As an element of laches, "prejudice" has a particular meaning. Seeking to articulate that meaning, Plaintiffs cite a district court opinion for the proposition that "prejudice" for purposes of laches means " 'administrative or logistical difficulties, confusion, disorganization, or expense which would be caused' " if the Court allowed Plaintiffs to bring a constitutional claim. (Doc. No. 37 at 6 (quoting *Michigan Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 682 (W.D. Mich. 2010))). That description is fine as far as it goes, but it is useful to clearly delineate the two kinds of cognizable prejudice in this context. As explained by one district court in this circuit:

A valid laches defense requires that plaintiff's unreasonable delay results in prejudice to the defendant. There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.

*Blake v. City of Columbus*, 605 F. Supp. 567, 571 (S.D. Ohio 1984) (citing *Tobacco Workers Int'l Union Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir. 1971)). In other words, "[l]ooked at more globally, prejudice in this context is normally either evidence-based or expecta-

---

ity of laches to the latter request; the argument for laches as to a permanent injunction is even weaker because the prejudice to Defendants (if it even exists at all) in that context

will be even more attenuated than it is now, because Defendants have much more time to prepare and react to the request for a permanent injunction.

tions-based." *Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008).[14]

Defendants assert prejudice in only a single respect. They claim that Plaintiffs' delayed, and thus emergency, request for a preliminary injunction has impaired their ability to fully prepare for and defend against Plaintiffs' claims, "including [via] the development of facts for the Court to assess in ruling on whether to grant Plaintiffs' request for preliminary injunctive relief." (Doc. No. 21 at 12). In particular, the delay has allegedly denied Defendants sufficient time to obtain the legislative history of the Law (which was passed in 1979). (*Id.*). Presumably, Defendants are claiming that they need to consult the Law's legislative history to be able to determine the Law's legislative purpose and then explain it to the Court.

**[22, 23]** The Court will accept *arguendo* that Defendants' claimed prejudice here is of a kind cognizable in the context of laches; it arguably is in the nature of impairment of Defendants' ability to timely obtain "evidence." Even so, however, the claimed prejudice is insufficient, for multiple reasons. First, the Court actually does not need to know, and Defendants need not rely on evidence of, the actual legislative purpose behind the Law. Under what is a sensible rule—not least because the particular legislative purpose(s) behind a statute often goes unstated by the legislature—a court is not limited to considering the *actual* purpose behind the statute being challenged; rather, it may consider any *plausible state interest.*[15] *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("Where there are plausible reasons for Congress' action, our inquiry is at an end.") (internal quotation marks omitted), *id.* at 315, 113 S.Ct. 2096 ("Moreover, because [the Supreme Court] never require[s] a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."). " 'In fact, whenever there exist plausible reasons for enacting a statute-whether or not those are the legislature's actual reasons for adopting the law—a court's inquiry is at an end.' " *Iacono v. Town Bd. Of Town of East Hampton*, No. 05-CV-3616(JS)(ETB), 2006 WL 8436041, at *3 (E.D.N.Y. Sept. 18, 2006) (quoting *Sag Harbor Port Assocs. v. Vill. of Sag Harbor*, 21 F. Supp. 2d 179, 185 (E.D.N.Y. 1998) (internal citations and quotations omitted)).

So Defendants would have needed the legislative history, if at all, only to see whether it disclosed the actual legislative purpose. But Defendants would not need to do this unless the legislative history disclosed an actual purpose that Defendants and their attorneys could not have thought up on their own as a plausible (whether or not actual) legislative purpose. Having appropriate respect for the professional ability of these persons, the Court is confident in saying that this was unnecessary because Defendants and their counsel were more than capable of determining any plausible reason to assert to the Court, without need to resort to the legislative history of the Law. So the only purported prejudice to which Defendants point actually is not prejudice at all.

**[24, 25]** Second, to the extent that Defendants imply expectations-based preju-

---

14. The concept of laches appears to be broader in the context of patent or trademark infringement claims, but obviously such claims are not present here.

15. This reality undercuts Defendants' position as to prejudice for purposes of laches, but it also obviously makes it easier for Defendants to justify the Law, as further indicated below.

dice from the delay, in the form of the prospect of having to scramble to make late changes to elections procedures if Plaintiffs were to receive preliminary injunctive relief, the implication is without merit. As Plaintiffs correctly note in contrasting the instant situation with those covered by the so-called *Purcell* doctrine,[16] an injunction against enforcement of the Law would not directly or perceptibly require Defendants, or anyone else, to scramble to revamp election procedures or do anything else. Instead, such an injunction would require only that Defendants *not* do something, *i.e.*, not do anything to enforce the Law. (Doc. No. 37 at 8). Enjoining enforcement of a criminal prohibition against distribution of legitimate state absentee-ballot applications would not, so far as the record shows, change the electoral process for the November 3 election to the State's detriment. *See Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (en banc) ("The injunction pending appeal sought by plaintiffs would not change the electoral process, it simply would enjoin enforcement of a legislative act that would criminalize the collection, by persons other than the voter, of legitimately cast ballots."). Notably, Defendants have not argued that such an injunction would indirectly, in some currently imperceptible fashion, cause such prejudice by opening the floodgates to the casting of more absentee ballots, or of questionable absentee ballots requiring attention, than the State is currently prepared to handle.

Defendants cite a district court case from Virginia that, citing only a 1982 case from the D.C. Circuit, states that prejudice can be inferred from the mere fact of delay. (Doc. No. 21 at 12). The Court is not convinced that this principle is embraced by the Sixth Circuit, and even if the Court *could* draw an inference of prejudice, it would decline to do so here because it has reasons to affirmatively believe (discussed above) that there was no prejudice.[17] Defendants cite another case from the same district court in Virginia, for the proposition that the greater the delay, the less the prejudice required to show laches. (*Id.*). The Court does not dispute that proposi-

---

**16.** As described appropriately by Plaintiffs, the *Purcell* doctrine "caution[s] courts to consider the practical effects on election administration in cases seeking relief close to an election" such as "strains on electoral administration and the possibility of voter confusion." (Doc. No. 37 at 7-8) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006)). As Plaintiffs imply, enjoining enforcement of the Law would merely put a stop to particular criminal prosecutions related to alleged violations of election procedures; it would not strain administration of election procedures or risk voter confusion—or at least not any voter confusion beyond the unexpected nature of the (surely welcome) news for voters that if any of them had violated or was interested in violating the Law, they would not be facing prosecution for any such violation.

The *Purcell* doctrine bears on whether a preliminary injunction should be issued under the factors for issuing a preliminary injunc-

tion, including the impact that the requested preliminary injunction would have on the public (which appears to be what the doctrine is most concerned with). The doctrine does not bear, at least not directly, on whether laches should be applied so as to defeat the motion for a preliminary injunction even before the preliminary injunction factors are reached. In other words, the doctrine does not bear directly on whether the defendants have suffered "prejudice," for purposes of laches, from any unreasonable delay by the plaintiffs. Nevertheless, where, as here, the concerns underlying the *Purcell* doctrine are absent, that eliminates one possible strain of prejudice the defendants might wish to claim.

**17.** By contrast, in the Virginia case, the court did not merely infer prejudice, but found the existence of actual (expectations-based) prejudice. *See Perry v. Judd*, 840 F. Supp. 2d 945, 954-55 (E.D. Va. 2012).

tion but concludes that it is inapplicable here, since there is no (or at most virtually no) prejudice.

Which brings the Court to the last point. Even if one assumes that Plaintiffs delayed unreasonably, and that there was at least *some* prejudice therefrom, the degree of such prejudice would be so minor that the Court in its discretion would decline to apply laches despite the existence of its two elements.

Accordingly, the Court will not apply laches to deny the Motion. Instead, the Court proceeds to entertain the Motion on its merits.

## II. **Plaintiffs fail to meet their burden to warrant the granting of the preliminary injunction sought via the Motion.**

A. *Plaintiffs lack a substantial likelihood of success on the merits*

**[26]** As suggested above, the first step in assessing the merits of the Motion is to assess the merits of Plaintiffs' claims. That is, the Court first determines whether Plaintiffs have a substantial likelihood of success on the merits of their claim that the Law violates their First Amendment rights to free speech and association. Plaintiffs' challenge to the Law is a facial one, even if Plaintiffs have indicated a willingness to agree to a more narrow stipulated preliminary injunction that protects Plaintiffs from the proscription of the Law as it applies specifically to their specific conduct. (Doc. No. 37 at 17 n.4 (indicating a lack of objection to an injunction that would "allow only the distribution of blank, not pre-filled, absentee ballot applications.")). Accordingly, the Court keeps in mind that Plaintiffs asserting a facial challenge ultimately "bear a heavy burden of persuasion," a factor to which the Court is

constrained "to give appropriate weight." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

1. Identifying the four options for the applicable test or framework: strict scrutiny pursuant to *Meyer-Buckley*; somewhat lesser scrutiny pursuant to *Meyer-Buckley*; rational-basis review; and the *Anderson-Burdick* framework.

**[27]** "Most constitutional analyses of a statute begin with an examination of the degree of scrutiny a statute will receive." *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012). That is true in this case, but the process of identifying the applicable degree of scrutiny in this case is rather involved compared to many other cases, for various reasons that reveal themselves below. Perhaps the main reason is that there is such a "bewildering array of standards to choose from." *Tenn. State Conference of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683, 701 (M.D. Tenn. 2019). The Court begins by laying out as clearly as possible the four options for the applicable standard (and/or "framework" or "test," as the terms are defined in the footnote below): the "exacting scrutiny" applicable because (according to Plaintiffs) the *Meyer-Buckley* standard is applicable; the rational-basis test potentially applicable because (according to Defendants) Plaintiffs' First Amendment rights are not implicated here; a test less demanding than strict scrutiny as is appropriate (according to Defendants) under the *Meyer-Buckley* standard even if Plaintiffs' First Amendment rights are implicated; and the *Anderson-Burdick* framework, whereby the applicable test is selected on a sliding scale, which conceivably could be applicable for either of two reasons.[18]

---

**18.** As set forth below, "exacting scrutiny" un-      der *Meyer-Buckley* actually entails strict scru-

Plaintiffs claim that the applicable standard (sometimes but not always called the "*Meyer-Buckley* framework" and herein called the "*Meyer-Buckley* standard")[19] is provided by *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) and *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). (Doc. No. 12 at 9). Plaintiffs correctly note that the *Meyer-Buckley* standard necessarily directs the court to apply "exacting scrutiny" of any restriction to which it is applicable. (*Id.*). They then assert that the *Meyer-Buckley* standard—and thus the exacting-scrutiny test it prescribes—is applicable to the Law. (*Id.*). Plaintiffs then equate "exacting scrutiny" with so-called "strict scrutiny," whereby a restriction such as the Law may be upheld only if it is narrowly tailored to a compelling government interest. (*Id.*); *see also id.* at 14 (asserting that the Law is subject to strict scrutiny).

Plaintiffs also claim that even if the *Anderson-Burdick* framework rather than the *Meyer-Buckley* standard were applicable, the result would be the same because (according to Plaintiffs) it would require "close" (by which they seem to mean "strict") scrutiny little different from the "exacting" scrutiny of the *Meyer-Buckley* test. (Doc. No. 12 at 17 n.12). In so claiming, Plaintiffs assume that the appropriate test to be selected under the *Anderson-Burdick* framework is the most demanding test because the Law regulates "core political speech." (*Id.*).

In response, Defendants first claim that nothing beyond rational-basis review of the Law is required, because (according to them), the distribution of absentee-ballot applications prohibited by the Law is not expressive conduct. (Doc. No. 21 at 15-17). Alternatively, they claim that if the "exacting scrutiny" to which *Meyer-Buckley* refers is applicable as Plaintiffs claim, it does not refer to a single test—and in particu-

***

tiny, and application of the *Anderson-Burdick* framework in this case in turn entails rational basis (or "rational basis (plus)") scrutiny.

**19.** *See, e.g., Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 811–13 (E.D. Mich. May 22, 2020) (referring to *Meyer-Buckley* "framework"); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 728 (M.D. Tenn. 2019) (referring to the "*Meyer-Buckley* standard"). Herein, the Court will use the term "*Meyer-Buckley* standard" because where it applies, it contemplates the application of a single test to the restriction being challenged on constitutional grounds. By contrast, in the Court's semantic conception, a "framework" contemplates the selection of a test from multiple options for a test; that is, where a "framework" is applicable, it identifies multiple possible tests and directs the Court to choose from among them. The *Anderson-Burdick* framework discussed below is just that: a "framework" in this sense.

The undersigned notes some seeming confusion as to whether the *Buckley* in "*Meyer-Buckley* standard" is intended to refer to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) [herein called "*Valeo*"] or to *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) [herein called "*Buckley*"], or to both. For the proposition that "core" political speech is entitled to the highest level of protection, *Meyer* prominently cited *Valeo* and *Buckley* prominently cited *Meyer*. It is actually rather unfortunate that these two cases had the same plaintiff's name, as it necessitates some explanation. The court in *League of Women Vote*rs, in using that term, clearly was referring to *Buckley* even though it also cited *Valeo*. But in *Priorities USA*, the court used the term when describing *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 316 (6th Cir. 1998), as applying the "*Meyer-Buckley* framework"; but *Toledo Area AFL-CIO Council* was decided before *Buckley* was even decided and discussed *Valeo* at length. For reasons it need not detail here, the Court is inclined to think that the more appropriate reference is to *Buckley* and not *Valeo*. In any event, the *Meyer-Buckley* standard referred to herein is articulated clearly enough in *Meyer* itself and is also consistent with principles enunciated by both *Buckley* and *Valeo*.

lar, not the maximally demanding test of strict scrutiny. (*Id.* at 21-22). Instead, Defendants claim, "exacting scrutiny" is a "sliding scale," *i.e.*, a framework for selecting a test. (*Id.* at 22). In so doing, Defendants accurately cite *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 414 (6th Cir. 2014), for the proposition that "exacting scrutiny" does not necessarily entail strict scrutiny, but rather involves a degree of scrutiny commensurate with the burden on the plaintiffs' First Amendment rights—which, Defendants imply, is not nearly severe enough here to warrant strict scrutiny if any such burden exists at all. Defendants here also accurately cite *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008), which, in addressing Ohio's restrictions on gathering signatures on election-related petitions, referred to "the 'sliding-scale' analysis outlined by the Supreme Court in *Meyer, Buckley*, and other decisions." *Id.* at 383.

There are several issues to be unpacked here, and if and when the Court is called upon to finally resolve Plaintiffs' claims on the merits (as opposed to opining on the likelihood of success on the merits, as the Court is doing herein), the Court may unpack them in even more detail. But for now, eight observations will suffice. The first is that the disagreement and confusion about the nature of *Meyer-Buckley*'s "exacting scrutiny" is understandable. To begin with, it is clear that the Supreme Court's intended meaning of "exacting scrutiny" varies depending on the context in which it uses the term, and the question here is what it means in the context of *Meyer-Buckley*.[20] Neither *Meyer* nor *Buckley* indicated that, as used in those cases, the term necessarily equated with "strict scrutiny." But the Supreme Court has since stated that "[i]n *Meyer*, we unanimously applied *strict scrutiny* to invalidate an election-related law." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n.10, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). And thus it has said, apparently referring at the end of the sentence to strict scrutiny, that "[w]hen a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347, 115 S.Ct. 1511. This leads to the second observation: where *Meyer-Buckley*'s "exacting scrutiny" does apply, this Court currently must equate it with strict scrutiny,[21] such

---

**20.** As one district court explained the conundrum last year:

The Court's application of the phrase "exacting scrutiny" has not always been exacting in its own right, leading to considerable confusion. Scholars have noted the Court has at times used "exacting scrutiny" and "strict scrutiny" interchangeably.... [But] however confusingly the Court has used "exacting scrutiny" in other contexts, it is understood that the term has a meaning all its own in the context of campaign finance disclosure requirements. In this context, the term connotes a standard of constitutional review that is less rigorous than strict scrutiny, one that simply requires the government to show "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."

*Washington Post v. McManus*, 355 F. Supp. 3d 272, 289 n.14 (D. Md.), *aff'd*, 944 F.3d 506 (4th Cir. 2019) (citations omitted). *See also 281 Care Comm. v. Arneson*, 766 F.3d 774, 783 n.7 (8th Cir. 2014) (noting that Supreme Court has used the term "exacting scrutiny" in many different contexts, sometimes equating it with strict scrutiny and sometimes with less-than-strict scrutiny).

**21.** As for why the *Meyer-Buckley* version of "exacting scrutiny" actually equates with strict scrutiny, one possibility is suggested by *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988):

Our cases indicate that as a *content-based* restriction on *political speech* in a *public forum*, § 22–1115 must be subjected to the most exacting scrutiny. Thus, we have required the State to show that the regulation

that a law subject to it violates the First Amendment unless it is narrowly tailored to serve an overriding (which surely here must mean "compelling") state interest.

And this leads to the third observation, which is that where a law is subject to the *Meyer-Buckley* standard, the law is not assessed via the *Anderson-Burdick* framework; there is no need to consult the *Anderson-Burdick* framework to determine the applicable test, because the *Meyer-Buckley* standard identifies the test: *Meyer-Buckley* "exacting scrutiny," a/k/a strict scrutiny.[22]

That is to say, the *Meyer-Buckley* standard is different from, and (where applicable) obviates, the *Anderson-Burdick* framework. The *Meyer-Buckley* standard is concerned specifically with restrictions on "core" political speech or expression.

*Meyer*, 486 U.S. at 420, 421-22, 425, 108 S.Ct. 1886; *Valeo*, 424 U.S. at 48, 58, 61, 96 S.Ct. 612. The situation (the kind of restriction) described in *Meyer* and *Buckley* is best conceptualized not as a point on a sliding scale of burdensomeness, but rather as one calling directly for a single, specific standard—namely, strict scrutiny—based on the kind of restriction involved.[23] In other words, when there is a restriction to which the *Meyer-Buckley* standard is applicable, the Court does not assess the severity of the burden involved, ask where on the sliding scale the burden falls, and then apply the highest-level scrutiny because it is a "severe burden"; rather, when such a burden is involved, the Court identifies it as a *Meyer-Buckley* kind of restriction and thus automatically applies strict scrutiny to it.[24] In other

is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.

*Id.* at 321, 108 S.Ct. 1157 (quotation marks omitted). In other words, perhaps *Meyer-Buckley* "exacting scrutiny" is not just garden-variety "exacting scrutiny," but rather the "*most* exacting scrutiny," *i.e.*, strict scrutiny. *See also Am. Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 992 (9th Cir. 2004) ("As a content-based limitation on core political speech, the Nevada Statute must receive the most 'exacting scrutiny' under the First Amendment." (quoting *McIntyre*, 514 U.S. at 346, 115 S.Ct. 1511)).

**22.** Hereinafter, the Court generally will refer to the test called for by the *Meyer-Buckley* standard as one of strict scrutiny, without reference to "exacting scrutiny."

**23.** This distinction may be nuanced, and in many cases it may be one without a difference. In particular, when restrictions of core political speech (and thus the *Meyer-Buckley* standard) are involved, the Court likely would find a "severe" burden on First Amendment rights for purposes of the *Anderson-Burdick* framework in any event. *Buckley*, 525 U.S. at 208, 119 S.Ct. 636 ("I suspect that when regulations of core political speech are at issue it makes little difference whether we

determine burden first because restrictions on core political speech so plainly impose a 'severe burden.' ") (Thomas, J., concurring). However, the distinction is of analytical significance and has been squarely implicated in this case, and so the Court is obliged to make it. Among other things, recognition of the distinction entails that Plaintiffs get two bites at the "highest-level scrutiny" apple—one (under *Meyer-Buckley*) based on the alleged core political speech at issue, and one (under *Anderson-Burdick*) based on the alleged severe burden on First Amendment rights allegedly existing irrespective of whether core political speech is at issue.

**24.** The Court believes that its conclusions in this paragraph are called for by both the majority opinion, and Justice Thomas's persuasive commentary on this issue in his concurring opinion, in *Buckley*. The majority reiterated *Meyer's* direct link between a restriction of "core political speech" and the highest level of scrutiny: "Precedent guides our review. In *Meyer* . . . , we struck down Colorado's prohibition of payment for the circulation of ballot-initiative petitions. Petition circulation, we held, is 'core political speech,' because it involves 'interactive communication concerning political change.' First Amendment protection for such interaction, we agreed, is 'at its zenith.' " *Buck-*

words, a restriction of the *Meyer-Buckley* type is a restriction on "core political speech." And when the restriction is of the *Meyer-Buckley* type, the highest-level scrutiny is applied because the burden is on "core political speech," whether or not the burden is "severe." By contrast, under the *Anderson-Burdick* framework, when the highest-level scrutiny is applied, it is applied because the burden is severe, whether or not the burden is on core political speech.

All of this suggests the next observation: the *Meyer-Buckley* standard is applicable only to restrictions on "core political speech." This in turn leads to the fifth observation: if the Law does not restrict "core political speech," then it is subjected to something else; one possibility is the *Anderson-Burdick* framework (which would result in the application of either rational-basis review, intermediate scrutiny, or strict scrutiny), and another (suggested by Defendants) is automatic application of rational-basis review on the (alleged) grounds that the Law does not restrict expressive conduct.

Seventh, although Defendants were well within their legitimate prerogative to cite *Deters* for the proposition that *Meyer* and *Buckley* prescribe a sliding-scale framework, the Court declines to accept that proposition, for three reasons. First, the Court believes that *Deters*' reference to *Meyer-Buckley* as a "sliding scale" framework is fairly characterized as dicta because *Deters*: (1) arguably assumed, rather than decided, this; (2) by referring to "other cases" and (as discussed below) citing only a Seventh Circuit case invoking the *Anderson-Burdick* framework, left open the possibility that it was referring primarily to the *Anderson-Burdick* framework as implicating a sliding scale; and (3) appeared to reach the same result (the application of the highest-level scrutiny to the prohibition at issue) it would have reached had it treated *Meyer* as not involving a sliding-scale framework.[25] Second, for the proposition that *Meyer-Buckley* prescribes a sliding-scale framework, *Deters* cited only *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006), which mentioned *Anderson* and *Burdick* but not *Meyer* or *Buckley*. Third, *Deters* elsewhere actually characterizes *Meyer* as positing a singular rule relating to one specific point on a scale rather than to a sliding scale with multiple points: "[w]hen a State places a severe or significant burden on a core political right, like here, it faces a 'well-nigh insurmountable' obstacle to justify it." 518 F.3d at 387

*ley*, 525 U.S. at 186-87, 119 S.Ct. 636 (citations omitted). Likewise, Justice Thomas noted, "When core political speech is at issue, we have ordinarily applied strict scrutiny without first determining that the State's law severely burdens speech. Indeed, in *McIntyre* [ ], the Court suggested that we only resort to our severe/lesser burden framework if a challenged election law regulates 'the mechanics of the electoral process,' not speech." *Buckley*, 525 U.S. at 207, 119 S.Ct. 636 (Thomas, J., concurring). As Justice Thomas further indicated, *Meyer* dictates that strict scrutiny is applied to a state regulation burdening core political speech—without regard to the severity of the burden—even if the burden on core political speech is only indirect. *Id.* at 207, 210, 226,

119 S.Ct. 636. But if the *Anderson-Burdick* framework is applicable, strict scrutiny may be selected from the "sliding scale" for the alternative, and conceptually distinct, reason that the regulation restriction imposes "severe burdens" on speech or association. *Id.* at 206, 119 S.Ct. 636 ("When considering the constitutionality of a state election regulation that restricts core political speech or imposes 'severe burdens' on speech or association, we have generally required [the state to satisfy strict scrutiny].").

**25.** *Deters* referred to the burden at issue not only as a "well-nigh insurmountable" one, but also as one requiring that the challenged restriction be narrowly tailored and advance a compelling state interest. 518 F.3d at 387.

(citing *Meyer*, 486 U.S. at 425, 108 S.Ct. 1886).[26] This characterization suggests that *Deters* did not actually conceive of *Meyer* and *Buckley* as prescribing a "sliding scale" analysis in the particular sense that Defendants suggest, *i.e.*, as dictating that the court determine the severity of the burden on the plaintiffs' rights and then adjust the state's resulting burden accordingly.

Finally, although Defendants accurately cited *Libertarian Party of Ohio* for the proposition that "exacting scrutiny" does not necessarily mean strict scrutiny, (Doc. No. 21 at 22), the Court must decline to accept that proposition because it is directly contrary to an on-point statement by the Supreme Court. Based on the cases cited by *Libertarian Party of Ohio*—at least two of which involved "exacting scrutiny" as it related to the context of election-related disclosures rather than the differ-

ent context of core political speech implicated by *Meyer*—[27] the Court discerns a possible reason why the court there described *Meyer-Buckley* exacting scrutiny in contradiction to what the Supreme Court has said, but in any event this Court must follow the Supreme Court's interpretation.[28]

**[28]**  So the Court concludes that there is no such thing as *Meyer-Buckley* scrutiny less than strict scrutiny. The *Meyer-Buckley* standard contemplates strict scrutiny only, which really should not come as a great surprise inasmuch as it applies only to something as protected as "core political speech." So the Court will summarize the parties' positions as they stand in light of this conclusion. Plaintiffs claim that the *Meyer-Buckley* standard (entailing strict scrutiny, as the Court has found) is applicable to the Law because it restricts core political speech. Defendants

---

**26.**  This statement from *Deters* appears inexact. Its pinpoint citation to *Meyer* is to a page that does not limit *Meyer*'s "exact scrutiny" standard to *severe* or *significant* burdens on core political (speech) rights; indeed, *Meyer*'s discussion completely omits any variant of the word "severe" and "significant." As suggested in a footnote herein, Justice Thomas appears to believe that there is no such separate category of "severe or significant" burdens on core political speech, because in his view all burdens on core political speech would automatically qualify as "severe." But whether described inexactly or not, *Meyer* was portrayed by *Deters* (at least in this particular place) as a separate rule relating specifically to restrictions on a "core" political right.

**27.**  In particular, the court cited *John Doe No. 1 v. Reed*, 561 U.S. 186, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010), dealing with required disclosure of referendum petitions, and *Valeo*, dealing with required campaign contribution disclosures. As noted above, one district court has touched on the dichotomy between at least the latter kind of contexts and other contexts:

[H]owever confusingly the Court has used "exacting scrutiny" in other contexts, it is

understood that the term has a meaning all its own in the context of campaign finance disclosure requirements. In this context, the term connotes a standard of constitutional review that is less rigorous than strict scrutiny, one that simply requires the government to show "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."

*Washington Post*, 355 F. Supp. 3d at 289 n.14 (citations omitted).

**28.**  Given the confusion surrounding the "exacting scrutiny" test, the Court understands why a different judge on this Court previously stated, "In order to survive the 'exacting scrutiny' of *Meyer* and *Buckley*, a law must, at least, be 'substantially related to important governmental interests.' " *League of Women Voters*, 400 F. Supp. 3d at 725 (quoting *Buckley*, 525 U.S. at 202, 119 S.Ct. 636). In fact, the undersigned agrees with this statement but would go further, adding that the Supreme Court has now clarified that the *Meyer-Buckley* standard does in fact require more than what *League of Women Voters* identified as the minimum, but not necessarily the maximum, required by *Meyer-Buckley*.

claim that rational-basis scrutiny applies because the Law does not restrict expressive conduct at all (let alone core political speech). Defendants claim, alternatively, that even if the Law is subject to "exacting scrutiny," it survives such scrutiny (an argument premised in part on the assumption, rejected by the Court, that "exacting scrutiny" can mean and in this case should mean something less than strict scrutiny).

Neither side advocated for a fourth option, *i.e.*, application of the *Anderson-Burdick* framework. But as discussed herein, it conceivably could be applicable in this case under either of two scenarios.

[29, 30] The Sixth Circuit recently described this framework and its potential applicability to the instant kind of constitutional challenge:[29]

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L.Ed.2d 714 (1974)). But this regulatory power is accompanied by significant risk, as laws that structure elections "inevitably affect[ ]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L.Ed.2d 547 (1983). To determine whether a state election law unduly bur-

dens these crucial constitutional rights, we:

must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S. Ct. 1564). This balancing test is referred to as the *Anderson-Burdick* framework.

Under the *Anderson-Burdick* framework, we first "determine the burden the State's regulation imposes on the plaintiffs' First Amendment rights." *Thompson v. Dewine*, 959 F.3d 804, 808 (6th Cir. 2020) (order) (per curiam). "[W]hen those rights are subjected to 'severe' restrictions," the regulation is subject to strict scrutiny and "must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S. Ct. 698, 116 L.Ed.2d 711 (1992)). But when those rights are subjected only to "reasonable, nondiscriminatory restrictions," the regulation is subject to rational-basis review because "the State's important regulatory interests are generally sufficient to justify" the restriction. *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S. Ct. 1564). "For cases between these extremes, we weigh the burden imposed by the State's regulation against 'the precise interests put

---

29. As discussed below, this framework is broadly applicable to challenges to "election

laws," which may include the Law.

forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (internal quotation marks omitted)).

*Hawkins v. DeWine*, 968 F.3d 603, 605-06 (6th Cir. 2020). There are three steps to a court's analysis under *Anderson-Burdick*. First, as noted above, the court must determine the burden at issue. "The next step under *Anderson-Burdick* is to 'consider the State's justifications for the restrictions.'" *Kishore v. Whitmer*, 972 F.3d 745, 750 (6th Cir. Aug. 24, 2020) (quoting *Schmitt v. LaRose*, 933 F.3d 628, 641 (6th Cir. 2019)). "'At the third step of *Anderson-Burdick* we assess whether the State's restrictions are constitutionally valid given the strength of its proffered interests.'" *Id.* at 751 (quoting *Schmitt*, 933 F.3d at 641).

As indicated above, the *Anderson-Burdick* framework has been described as a "sliding scale." *See Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006). The metaphor is derived from the fact that the amount of justification for a restriction varies—*i.e.*, slides—based on the relative importance of the interest being restricted. In short, under the *Anderson-Burdick* framework, the Court first has to select the applicable test on the sliding scale; only after the test has been selected can it be applied.

2. The Law does not restrict expressive conduct and thus is not within the scope of the First Amendment.

**[31]** In selecting the applicable legal principles for constitutional review of the Law, the Court begins by discussing what the Law does and does not prohibit. Superficially, this is easy to enunciate: the Law prohibits most persons, including

Plaintiffs, from distributing absentee-ballot applications. And it is safe to say that as written, this prohibition applies to absentee-ballot applications no matter their format or original source—that is, whether (i) mailed from a county election commission, (ii) printed out in PDF format from a link on the Secretary of State's website, (iii) printed out in PDF format from a link on a county election commission website, (iv) photocopied from an application of the type and origin set forth in (i) through (iii) above; or (v) otherwise created and obtained.

It is also easy to set forth a list of things that the Law does not prohibit any person or organization ("speaker") from doing:

1. (a) Saying orally or in writing (in any publication or medium, including on the Internet), whatever the speaker wants, to whomever to speaker wants, regarding the possibility and/or desirability of voting either generally or by mail in particular; and (b) distributing any such writing or publication to anyone in any manner the speaker desires.

2. (a) Saying orally or in writing (in any publication or medium, including on the Internet), whatever one wants, to whomever the speaker wants, regarding eligibility for, deadline for, or the procedure (mechanics and logistics of) for, registering to vote generally or applying to vote by mail in particular; and (b) distributing any such writing or publication to anyone in any manner the speaker desires.

3. (a) Saying orally or in writing (in any publication or medium, including on the Internet), whatever the speaker wants, to whomever the speaker wants, in favor of (or against) retaining, eliminating or

changing the eligibility requirements, deadlines for, or procedures for, voting either generally or by mail in particular; and (b) distributing any such writing or publication to anyone in any manner the speaker desires.

4. Posting on a website a link to an election commission website where an absentee-ballot application can be found (typically via a link from the election commission website).

5. Posting on a website information regarding how to make, and where to send, a request for an application for an absentee ballot.

6. Linking to official election commission websites containing information regarding how to make (and where to send) a request for an absentee-ballot application or how to complete an absentee-ballot application.

7. Handing out or posting online a copy of an absentee ballot-application with adequate "watermarks," stamps, and or interlineations (saying, for example, in light shaded gray, "Sample only, do not use") to distinguish it from an absentee-ballot application that actually could be submitted;[30] and (b) referring to such a copy in order to provide instructions on how to complete such an application.

8. (a) Encouraging anyone the speaker wishes to actually access the absentee-ballot online and then print an absentee-ballot application; and (b) inviting and encouraging any-

one the speaker wishes to come somewhere (an office or other location selected by the speaker) to access the application online and then print it out, collect it, and take it away oneself.

9. Assist anyone the speaker wishes in completing an absentee-ballot application.

10. More generally, saying, writing, or publishing anything about anything to anyone.

There may be additional or alternative ways to express what all is permissible as far as the Law is concerned. But the point is that however one slices it, the Law prohibits no spoken or written expression whatsoever and also leaves open a very wide swath of conduct, prohibiting just one very discrete kind of act.

What the Fifth Circuit said, in a case involving a challenge to certain Texas state restrictions on voter registration activities by third parties, is applicable here,

Here, [the plaintiffs] face a threshold problem. As the party invoking the First Amendment's protection, they have the burden to prove that it applies. *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n. 5, 104 S. Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984). In *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66, 126 S. Ct. 1297, 1310, 164 L.Ed.2d 156 (2006), the Supreme Court reiterated that the First Amendment protects speech as well as certain kinds of conduct. However, the Court went on to underscore that only conduct that is "inherently expressive" is entitled to First Amendment

---

**30.** Perhaps Plaintiffs would dispute that the Law permits this. But the Court is confident that is does. The Law does not prohibit a person from obtaining an absentee-ballot application and then adulterating it, and if an application is adulterated in a manner (such as that suggested above) in which it could not reasonably be accepted by election officials, then it cannot reasonably be considered an absentee-ballot application and is thus no longer within the letter (or even the spirit) of the Law.

protection. *Id.* at 66, 126 S. Ct. 1297. To determine whether particular conduct possesses sufficient "communicative elements" to be embraced by the First Amendment, courts look to whether the conduct shows an "intent to convey a particular message" and whether "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (internal quotation marks and citation omitted). Conduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea. *Rumsfeld*, 547 U.S. at 66, 126 S. Ct. at 1310.

*Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013).

**[32, 33]** The Court understands that laws that directly regulate only action or conduct—even if only to a very specific and narrow extent—could properly be deemed to restrict speech and thus be subject to review for being potentially violative of the First Amendment. Defendants concede as much, acknowledging, *inter alia*, that First Amendment protection " 'does not end at the spoken or written word.' " (Doc. No. 21 at 15 (quoting *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533)). Instead, "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments[.]' " *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)).

**[34, 35]** The distinction between conduct and speech in this context is relevant but not dispositive. The undersigned agrees that "conduct and speech can often be separated only in the eyes of the beholder and therefore First Amendment doctrines turning on the true 'essence' of an expressive event can provide no very certain guide to judicial decision." *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 47 (D.C. Cir. 1977). So it is not appropriate merely to label a restriction as one on "conduct" and for that reason reflexively deem it outside the scope of First Amendment scrutiny.

**[36, 37]** But on the other hand, plaintiffs do not establish First Amendment protection merely by labeling their conduct as "speech." *See United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Likewise, merely "combining speech and conduct [is not] enough to create expressive conduct." *Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297.

**[38]** So the court "must first determine whether [the prohibited conduct at issue] constitute[s] expressive conduct, permitting [plaintiffs] to invoke the First Amendment in challenging the restriction." *Johnson*, 491 U.S. at 403, 109 S.Ct. 2533 (quoting *Spence*, 418 U.S. at 409–411, 94 S.Ct. 2727).

**[39]** The Court also keeps in mind that the act of handing something out in particular, even though conduct, can qualify as protected speech. *See, e.g. McCullen v. Coakley*, 573 U.S. 464, 488, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) ("[H]anding out leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression; no form of speech is entitled to greater constitutional protection." (internal quotation marks and alteration omitted)). But as discussed below, whether such distribution actually is speech in a particular situation depends on what is being distributed, why it is being distributed, and how such distribution

would reasonably be perceived. Handing out leaflets that contain a political viewpoint qualifies as speech; handing out opiates to addicts lacking a prescription for them surely is not.

As Defendants note, the Supreme Court has stated:

> In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it."

*Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quoting *Spence*, 418 U.S. at 410–411, 94 S.Ct. 2727). The Court accepts on the present record that Plaintiffs do have an intent to convey, via distribution of absentee-ballot applications, a particularized message—which is, as Plaintiffs essentially have described it, "vote!" or "voting is important," or "consider voting by mail," or "vote by mail if that is the only practicable way for you to vote in light of COVID-19." (Doc. No. 12 at 11-12). But the question remains as to whether there is "a great likelihood" that someone to whom Plaintiffs might distribute an application for an absentee ballot ("potential recipient") would understand these messages from the act of distribution itself.

The issue is a fairly close one. And the Court is not predisposed to resolve close issues in favor of one side or the other, as each side's position is in support of an important objective. It is axiomatic that, from Plaintiffs' perspective, vindicating First Amendment rights is vital. But from Defendants' perspective, upholding the duly-enacted and longstanding laws of a sovereign state's elected representatives is also important because " '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion)).

The Court has to call it as it sees it, trying to place itself in the position of a hypothetical intended recipient, trying to objectively gauge whether there is a great likelihood that such a person would understand the message. In the undersigned's view, there is no such great likelihood. Although the undersigned would be hubristic to assert that he can pronounce the undeniably "right" answer on this issue, he believes that an intended recipient would understand the distribution to him or her as merely a means to carry out an otherwise-conveyed message (again, something like "vote!" or "voting is important" or "vote absentee" or "Consider voting absentee") rather than as a means for reiterating or emphasizing, or conveying something new about, that message. In other words, the intended recipient would not in all likelihood understand these messages from the mere act of being offered an absentee-ballot application.

Consider a hypothetical example from the past, which (though harkening back to a less peaceful manner of political engagement than the one Plaintiffs are talking about) serves to demonstrate this point. Imagine it is April 1775, in the days before Lexington and Concord, and a Massachusetts farmer has been talking to his neighbors in small gatherings, imploring them to take up arms to be prepared to stand against the redcoats of the British Army. Imagine that one day he provides a musket to one of the neighbors who lacks a functioning firearm. Perhaps the farmer intends by the handing of the musket to convey a message of sorts, something

along the lines of "I really mean it, ready yourself for armed conflict" or "these aren't just words; as you can see, I'm serious about this 'take up arms' business, and you should be, too." But from the perspective of the neighbor, the Court believes, the act of providing the musket likely would be seen not in this way but rather as simply as a means of enabling him to actually do what the farmer has been urging him to do. So too, the Court believes, with the absentee-ballot application; the recipient most likely would perceive it as mere means of facilitating the (absentee) voting the speaker has been encouraging.

This dovetails with the Court's next, and broader, point. The Supreme Court has extended First Amendment protection only to conduct that is inherently expressive. *Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297. People can and do disagree among themselves in many contexts about what is "inherent," but burning the American flag, for example, clearly qualifies as "inherently" expressive—which is why it was afforded First Amendment protection in *Johnson*. *See id.* (discussing *Johnson*); *Steen*, 732 F.3d at 391 (noting that as to the flag burning at issue in *Johnson*, "the conduct was the message"). But there are other actions that, if they are expressive at all, are expressive only because of the speech that accompanies the action. *See Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297.

Flag-burning is the former kind of action. Unless the flag-burner is following the Flag Code's admonition to respectfully destroy flags in untenable physical condition,[31] he or she would be widely and objectively understood to be expressing some kind of disapproval or protest of, or objection towards, the United States or the federal government; this is true even if he

or she says nothing at all. Distributing an absentee-ballot application is the latter kind of action; if unaware of any words accompanying such distribution, an observer would not have any particular reason to associate any specific message with the action of giving someone an absentee-ballot application. True, the observer conceivably could speculate that the distributor intends to convey the message(s) Plaintiffs indicate they wish to convey. But the observer could also speculate that the message is "please throw this away," or "what is this?" or "I don't understood this piece of paper and was hoping you could explain it to me," or "here is the application that the district court found in Case No. 374 to be an application for an absentee ballot, rather than a request for an application for an absentee ballot." And the observer perhaps could speculate that there is not really any discernable message at all. The Supreme Court has advised that if an observer cannot tell, without accompanying words, that the action conveys the message the plaintiff claims it conveys, then the action is not inherently expressive. *Id.* Such is the case here.

On this topic, Plaintiffs criticize Defendants' reliance on a series of cases that involved the delivery (to election offices) of *completed* absentee-ballot applications (and absentee ballots), as opposed to *blank* absentee-ballot applications. (Doc. No. 37 at 11). But from the Court's review of all these cases, this distinction does not eliminate their applicability. Plaintiffs claim that Defendants' cases are inapplicable because they involve only whatever message is entailed by the delivery of completed ballots *to election officials*, and not the message entailed here by the delivery of blank applications *to voters*. (*Id.*). But Plaintiffs ignore that the delivery of com-

---

**31.** "The flag, when it is in such condition that it is no longer a fitting emblem for display, should be destroyed in a dignified way, preferably by burning." 4 U.S.C. § 8(k).

pleted ballots to election officials is preceded by *collection* of those ballots from the voters who completed them; the expressiveness (or lack thereof) involved in the act of such collection, and the relationship between the alleged expressiveness and the message at issue (*e.g.*, "vote!"), is similar to that involved in (at least in-person) distribution of absentee-ballot applications. So these cases are applicable.

And at least two cases cited by Defendants stand for the proposition that this kind of collection from voters is not specifically expressive enough to be protected by the First Amendment. *See Feldman v. Arizona Sec'y of State's Office*, 840 F.3d 1057, 1084 (9th Cir. 2016) ("Unlike burning an American flag or wearing a military medal, ballot collection does not convey a message that would reasonably be understood by the viewer to be communicative. Rather, a viewer would reasonably understand ballot collection to be a means of facilitating voting, not a means of communicating a message.")[32] (citations and internal quotation marks omitted); *see also Steen*, 732 F.3d at 392 (concluding that collecting and delivering voter registration applications is "merely conduct" because "there is nothing inherently expressive"

about it). As the Fifth Circuit noted as of 2012, in what appears to remain true today, "[n]o circuit court has held that the actual receipt and delivery process is, itself, entitled to First Amendment protection." *Andrade*, 488 F. App'x at 898. And from the proposition that receipt and delivery of completed voter registration forms is not inherently expressive conduct, it is a small leap indeed to the proposition, which the Court accepts as indicated above, that delivery of blank absentee-voting application forms is not inherently expressive conduct.[33]

Arguing otherwise, Plaintiffs cite a series of inapplicable cases. The Court perceives not a single case cited by Plaintiffs in which the act of distributing absentee-ballot applications was treated as within the scope of the First Amendment.[34] As for the cases Plaintiffs do cite, the Court perceives only a single case involving the distribution of blank voting-related forms of any kind. Moreover, that case, *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), involved distribution of blank voter registration forms, which, if anything, would certainly be more inherently expressive than distribution of absentee-ballot applications.[35] But there the court seemed

---

**32.** If one were to review the somewhat involved case history of *Feldman*, one might wonder whether this opinion remains good law. It apparently does. *See Democratic Nat'l Committee v. Reagan*, 904 F.3d 686, 700 (9th Cir. 2018).

**33.** The Court makes short work of Plaintiffs' treatment of one of the cases, *Democracy North Carolina v. North Carolina State Board of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. Aug. 4, 2020), cited by Defendants for the proposition that collection of completed absentee-ballot applications is not expressive conduct. Plaintiffs in essence acknowledged that Defendants' citation was accurate, but then highlighted that the court "ruled that assisting voters in applying to vote absentee *is* expressive conduct[.]" (Doc. No. 37 at 12). This observation gets Plaintiffs nowhere be-

cause the Law in no way prohibits assisting voters in applying to vote absentee.

**34.** This may be because, at least according to Plaintiffs, distribution of absentee-ballot applications is not prohibited in other states, and perhaps courts have not had occasion even to touch on the extent to which the distribution of absentee-ballot applications is protected by the First Amendment. But the lack of precedent on point in their favor nevertheless does not help Plaintiffs here.

**35.** In the Court's view, there is a more ready association between messages supposedly conveyed by distributing voter registration forms—which presumably would be "register to vote" and "vote!"—than between the message(s) Plaintiffs claim are associated with

less to *decide* (under applicable legal principles) that such distribution was protected by the First Amendment than to assume it *arguendo* because the state-official defendants conceded the point for whatever reason. Certainly the Fifth Circuit there presented no analysis of the issue. *See id.* at 389. And even if it had decided the issue, the decision would have been dicta because the state did not even regulate the distribution of voter registration forms. *See id.*

As for the other cases cited by Plaintiffs, they miss the mark. Plaintiffs cite *Meyer* for the proposition that whether to cast an absentee ballot is a matter of societal concern that Plaintiffs have a right to discuss publicly. Actually, *Meyer* does not stand for any proposition whatsoever about absentee ballots. But more to the point (since the Court in any event agrees with the proposition), the proposition is irrelevant because the Law does not in any way whatsoever, directly or indirectly, prohibit any such discussion. Plaintiffs also cite *League of Women Voters*, 400 F. Supp. 3d at 723-24, for the proposition that "voter engagement," far from being mere speech, is core political speech. (Doc. No. 12 at 12). This broad proposition is unhelpful here, though, because the Law prohibits only distribution of absentee-ballot applications, not voter engagement more generally, and Plaintiffs must explain why *such distribution in particular* is speech.

Plaintiffs then cite a series of cases involving state statutes that regulate voter registration in various ways, mostly by limiting the manner in which (and by whom) voter registration drives are conducted. But these cases are inapplicable because they dealt with restrictions on interacting with potential voters. The Law is not remotely comparable; it does not restrict anyone from interacting with anyone about anything. To the extent that the one thing it *does* restrict—distributing absentee-ballot applications—is a (very limited) restriction on interacting with voters, Plaintiffs need to explain why *that particular restriction* is protected by the First Amendment. And the restriction is in fact very particular. Indeed, it is Plaintiffs themselves who noted—in a (not inappropriate) apparent attempt to impugn the Law—that the Law is unique in that no other state has imposed a restriction on the distribution of absentee-ballot applications.[36] (Doc. No. 12 at 3). It is this unique, very specific restriction with which Plaintiffs must deal. *See Andrade*, 488 F. App'x at 898–99 (finding "unpersuasive" the analyses of courts that have "broadly considered voter registration activities as protected activity generally, instead of drawing distinctions between the type of conduct and type of regulation at issue"). In *Andrade*, for example, the question to be "separately analyzed" was whether the restricted "physical receipt and delivery of completed voter registration applications [is] 'expressive conduct,'" and the Fifth Circuit found that it was not. *Id.* Likewise, as separately analyzed, the act of distrib-

---

distribution of absentee-ballot applications. This is true, in the Court's view, because (1) the message that it is important to register to vote is more recognized in our society than the notion that it is important to vote absentee in particular, and (2) the association between registering to vote and a voter registration form is better recognized than the association between voting absentee and an absentee-ballot application.

36. Ultimately, the fact that Tennessee stands alone in this regard does not affect the applicable legal analysis. And the Court notes that Tennessee's uniqueness does not necessarily suggest that Tennessee is wrong or unreasonable in this regard; it conceivably could mean that all other states are asleep at the proverbial switch, paying insufficient attention to a possible need for creative solutions to potential mischief caused by the distribution of absentee-ballot applications.

uting absentee-ballot applications is not expressive conduct.

Plaintiffs also cite a series of cases, in particular *Meyer*, dealing with laws that place certain restrictions on the circulation of ballot-initiative petitions. As suggested above, these cases are not helpful to the extent that they merely provide examples of one kind of voter-engagement activity not restricted by the Law. Such cases are similar to this case, it is true, to the extent that the restrictions in all these cases limited the ability to provide (or present) a voter with something; in those cases, it was a petition potentially to be signed by the voter, and in the instant case it is an absentee-ballot application. But the similarities end there. When a voter is presented with a petition for a potential signature, it is objectively clear that the presentation is conveying a political message. Indeed, experience shows that the very piece of paper that is the petition to be signed typically has a distinct political message—typically one in favor of political change rather than the status quo. It is this message to which a voter, by signing, expresses agreement. It is clear that by the very act of presenting the petition to a voter, the petition circulator is saying that the message is worthy and that the voter should visibly and tangibly support the message by doing something with the paper—namely, signing it. There is no other reasonable explanation for why the petition circulator is presenting the piece(s) of paper to the voter, and no reasonable alternative message that could be derived by the voter. Unlike with an absentee-ballot application, a reasonable voter would certainly understand that there is a message, that it is political one, and that it is reflected on the piece of paper itself; he or she would not speculate that the petition circulator's message is merely something like "please throw this away," or "I don't understood what to do with this petition

and was hoping you could explain that to me," or "here is a copy of that petition you might have heard about, just FYI in case you are interested."

[40] And more generally though no less importantly, the act of presenting a petition is inherently expressive, and expressive in a political way. The act of distributing an absentee-ballot application is not. The Fifth Circuit touched on this distinction, and the inaptness of the analogy to petition circulation, in a case involving a challenge to restrictions on the return to election officials of completed voter registration applications:

At oral argument, Appellees urged the court to draw a close parallel to the Supreme Court's reasoning in *Meyer*, 486 U.S. at 422, 108 S. Ct. 1886, finding that the circulation of initiative petitions was a matter involving the core political speech rights of the circulators under the First Amendment. The analogy is improper. *The circulation and submission of an initiative* petition is closely intertwined with the underlying political ideas put forth by the petition. *The petition itself is the protected speech.* Moreover, the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign. In the voter registration context, the underlying expressive conduct (encouraging democratic participation and voting) does not implicate a third-party's right to process the application. Voter registration applications are individual, not associational, and may be successfully submitted without the aid of another. Here, the actual expression is not being limited.

*Andrade*, 488 F. App'x at 898 n.13 (emphasis added).

Plaintiffs also rely here on the proposition that it is irrelevant that the Law

leaves open "more burdensome" avenues of expression, which do not justify the burden on expression that the Law (according to Plaintiffs) does impose. (Doc. No. 12 at 13). But to begin with, what remains open are not "more burdensome" avenues of getting out the message(s) Plaintiffs say they want to get out. The Law certainly makes it more burdensome for Plaintiffs to distribute absentee-ballot applications—to put such applications in voters' hands—but not more burdensome to get out their message to "vote!" or "consider voting by mail," or "vote by mail." More to the point, this proposition merely begs the very question it is intended to answer (in Plaintiffs' favor): does the Law actually burden First-Amendment-protected expression in the first place? The Court realizes that the question is not answered in the negative merely because other avenues of expression remain open, *see Meyer*, 486 U.S. at 424, 108 S.Ct. 1886, but even so, the question must be answered in the negative, an outcome not supported by the proposition advanced here.

Plaintiffs also claim that without being able to help voters by distributing absentee-ballot applications, "Plaintiffs' voter education and outreach communications loses their force." (*Id.*). But they fail to cite a case for the proposition that a speaker's conduct becomes protected merely because, without it, the speaker's communications "lose their force," whatever that means. If anything, the Supreme Court has indicated the opposite, using in *Rumsfeld* the example of an individual disapproving of the Internal Revenue Service. Surely a vocal tax protestor's public protestations that no one should pay federal income taxes "loses its force" if the protestor actually pays his or her own taxes. And yet that does not mean that that the federal tax code, in requiring that he or she pay income taxes in contradiction of her own

message, violates the First Amendment. *See Rumsfeld*, 547 U.S. at 66, 126 S.Ct. 1297.

[41, 42]  The Court does not deny that the Law might interfere to some extent with how Plaintiffs might like to encourage voting or that it poses an obstacle to their ultimate goal of getting absentee-ballot applications submitted. "But not every procedural limit on election-related conduct automatically runs afoul of the First Amendment. The challenged law must restrict political discussion or burden the exchange of ideas." *Steen*, 732 F.3d at 392 (emphasis omitted). The Fifth Circuit has explained the immateriality, in determining whether the First Amendment is implicated, of the fact that a restriction stands in the way of a plaintiff's goal (and in particular, the goal of getting people to vote):

> Here, Appellees offer a novel interpretation of the First Amendment. They contend that expressive activity, the promotion of voter registration in this case, is contingent upon the "success" factor of *actually registering voters*. While the First Amendment protects the right to express political views, nowhere does it guarantee the right to ensure those views come to fruition. To maintain otherwise would mean that a group seeking to discourage voting and voter registration would have the "right" to achieve its expressive goals by throwing the registration cards away.

*Id.* at 392 n.5. So the First Amendment does not entail a right to achieve the speaker's goals (no matter how laudable) or to seek to achieve them in any way the speaker desires. *See Andrade*, 488 F. App'x at 897 (rejecting the plaintiff's suggestion that they have "a First Amendment right not just to speak out or engage in 'expressive conduct' but also to succeed

in their ultimate goal regardless of any other considerations").

The question is not whether the Law conflicts with Plaintiffs' preferences for get-out-the vote *tactics* or stands to some extent in the way of Plaintiffs' *goal*. The question as to the applicability of the First Amendment, instead, is whether the Law restricts "expressive conduct," *i.e.*, as the Fifth Circuit put it, political discussion or the exchange of ideas. And the Law does not.

Plaintiffs also rely on the proposition that " 'the First Amendment protects [plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.' " *Deters*, 518 F.3d at 386 (quoting *Meyer*, 486 U.S. at 424, 108 S.Ct. 1886). But as just indicated, this proposition does not mean that the Plaintiffs get to decide what conduct they think would be the most effective means of advocating their message and thereby automatically obtain First Amendment protection for such means. Indeed, right after stating the quoted proposition, *Deters* noted that the plaintiffs "are not constitutionally guaranteed an endless variety of means." *Id.* The question here is whether the *particular* means at issue here—distributing absentee-ballot applications—is protected.

Plaintiffs, like many litigants, succumb to the temptation to rely on hyperbole. For example, they claim that "the State [seeks] to require Plaintiffs to convey its message through the medium of the Secretary of State." (Doc. No. 37 at 11). Respectfully, this is a substantial mischaracterization.

As Plaintiffs themselves have implied, citing *Deters*, distribution of absentee-ballot applications is in their view a *means* of getting out their *message*. Even if such means does have to be done through the medium of the Secretary of State, that does not change the fact that Plaintiffs' message—"vote!" "voting is important," "consider voting by mail," or "vote by mail"—absolutely does not have to be conveyed through the Secretary of State's office; rather, so far as the Law is concerned, it can be conveyed in every single way imaginable except by distributing absentee-ballot applications.

So after sifting through the issue at some length, the Court concludes that the conduct prohibited by the Law is not "speech" and thus is not within the scope of the First Amendment.

This means one of two things: either the Law automatically is subject to only rational-basis review because it does not impact speech, or it is subject to the *Anderson-Burdick* framework because it could be deemed "an election law" (even though it does not impact expressive speech). The latter option may seem strange, since one might think that no constitutional scrutiny (beyond the default rational-basis review) is necessary when the reviewing court has found that the plaintiffs' specific asserted constitutional interests do not exist. But it is not out of the question, given remarks from the Sixth Circuit about the applicability of *Anderson-Burdick* to "election laws" generally.[37]

---

37. For example, earlier this year, the Sixth Circuit stated:

In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court articulated a "flexible standard," *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059, for a court to evaluate "[c]onstitutional challenges to specific provisions of a State's election laws," *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. The *Anderson-Burdick* test may apply to First Amendment claims as well as to Equal Protection claims. *See Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). Although most—if not all—

[43]    The Court will conduct these two alternative analyses. But first, and next, the Court alternatively will address the scope of the review of the Law that would have been applicable had the Court found that it did implicate the First Amendment. "Importantly, simply labeling a challenge as one under constitutional guarantee such as free speech does not make strict scrutiny applicable." *Andrade*, 488 F. App'x at 895. Instead, the degree of scrutiny depends on whether the *Meyer-Buckley* standard is applicable and, if not, what is applicable instead.

3.  Alternatively, even if the Law were deemed to restrict speech to some extent, it does not restrict "core political speech" and thus would not be subject to the *Meyer-Buckley* standard and therefore not automatically subject to strict scrutiny by virtue of the *Meyer-Buckley* standard.

[44–46]    As indicated above, the *Meyer-Buckley* standard applies specifically to restrictions on "core" political speech or expression. *Meyer*, 486 U.S. at 420, 421-22, 425, 108 S.Ct. 1886; *Buckley*, 525 U.S. at 207, 119 S.Ct. 636) (describing *Meyer* as an example of the application of strict scrutiny to the indirect regulation of core political speech and then stating that "[e]ven where a State's law does not directly regu-

late core political speech, we have applied strict scrutiny without first determining that the State's law severely burdens speech.") (Thomas, J., concurring). "The Sixth Circuit [automatically] applies strict scrutiny to burdens on 'core political speech,' requiring that a burdensome provision be narrowly tailored to serve the overriding state interest." *Shickel v. Dilger*, No. 2:15-cv-155 (WOB-JGW), 2017 WL 2464998, at *10 (E.D. Ky. June 6, 2017) (citing *Gable v. Patton*, 142 F.3d 940, 945 (6th Cir. 1998), *aff'd in part, appeal dismissed in part*, 768 F. App'x 394 (6th Cir. 2019), and *aff'd in part, vacated in part and rev'd in part on other grounds*, 925 F.3d 858 (6th Cir. 2019); *see also Andrade*, 488 F. App'x at 895 (noting that "[s]trict scrutiny, the most severe test, is applied to 'core political speech,'" by virtue of *Meyer*).

[47]    In other words, the *Meyer-Buckley* standard automatically and necessarily requires strict scrutiny when it is applicable, but it is applicable only to regulation of core political speech and not just any political expression.

And whatever else one might say about the Law, it does not restrict core political speech. That the Court would so conclude may come as no surprise, since the Court has already found that the Law does not

---

of the cases considered by the Supreme Court and this court under the *Anderson-Burdick* test have involved laws that regulate the actual administration of elections, the rationales for applying the *Anderson-Burdick* test—ensuring that "the democratic processes" are "fair and honest," *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and "maintain[ing] the integrity of the democratic system," *Burdick*, 504 U.S. at 441, 112 S.Ct. 2059—resonate here, too. At bottom, the *Anderson-Burdick* framework is used for evaluating "state election law[s]," *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059, and a law restricting membership of the body that draws elector-

al lines could conceivably be classified as an "election law."
*Daunt v. Benson*, 956 F.3d 396, 406-07 (6th Cir. 2020). In general, the scope of the applicability of the *Anderson-Burdick* framework seems to be a source of confusion, dissatisfaction and/or potential change within the Sixth Circuit. *See Thompson v. Devine*, 959 F.3d 804, 808 n.2 (6th Cir. 2020). For this reason, despite its preliminary non-recognition of the alleged First Amendment interests asserted by Plaintiffs, the Court is loath to conclude for certain that *Anderson-Burdick* is inapplicable to the law at issue here, which well may be an "election law" for purposes of the applicability of *Anderson-Burdick*.

restrict First Amendment "speech" at all. And yet the basis for concluding that the Law does not restrict core political speech goes far beyond the premise that the Law does not restrict speech at all; there are specific reasons to conclude that even if it does restrict speech, the restricted speech would not be *core political* speech.

The dichotomy between core political speech and political expression entitled to less protection was illuminated by the Fourth Circuit last year in *Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019). There the court addressed a challenge to a state statute limiting access to Maryland's voter registration list ("the List"). The Court concluded that because the List was "intertwined with political speech," it was entitled to "some level of First Amendment protection" and thus the statute was subject to constitutional scrutiny. *Id.* at 252. It then referred to *Meyer*'s "heightened standard" of strict scrutiny review applicable to content-based restrictions on speech. *Id.* It then addressed what degree of scrutiny would be warranted, and in particular whether strict scrutiny would automatically be applied to the statute:

> We recognize that the close connection between [having access to] voter registration lists and political speech may, in some contexts, urge an application of strict scrutiny. But the purpose of the *Anderson-Burdick* test is to ensure that the courts carefully balance all the interests at stake, recognizing that "there is no substitute for the hard judgments that must be made." *See Anderson*, 460 U.S. at 789, 103 S. Ct. 1564. Additionally, our Court and the Supreme Court have each distinguished between laws that, on the one hand, regulate "pure speech," and those that, by contrast, are a step removed from direct acts of communication, with the latter receiving more flexible treatment. That distinction is particularly relevant in light of *Burdick*'s warning that "to subject every voting regulation to strict scrutiny" would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *See* 504 U.S. at 433, 112 S. Ct. 2059

*Id.* at 258 (some citations omitted). In other words, the statute's restriction on accessing the List was not a burden on "pure speech"—a term synonymous, as far as the Court can tell, with *Meyer*'s concept of "core political speech"—because it did not restrict direct acts of communication. Thus, although warranting constitutional scrutiny, the restriction did not warrant automatic strict scrutiny; instead, the *Anderson-Burdick* framework applied.

[48] Certain restrictions on political expression "lie closer to the edges than to the core of political expression[.]" *Schickel v. Dilger*, 925 F.3d 858, 869 (6th Cir. 2019) (quoting *FEC v. Beaumont*, 539 U.S. 146, 161, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003)). Where the restriction is one solely upon the giving of something from one person to another—in *Shickel* a campaign contribution, and in the instant case an absentee-ballot application—the reviewing court should assess whether the restriction hinders the "ability to discuss candidates or issues." *Id.* If it does not, *Schickel* indicates, the restriction may be "marginal," and not one affecting "core" political expression. *Id.*

That is the case with the Law: even if the Law is (contrary to the Court's conclusion above) properly viewed as imposing a restriction on speech, it is marginal and not particularly close to the "core" of political expression. The Court so concludes because, as discussed above, the Law does not in any way, shape or form hinder the ability to discuss candidates or issues—including any issue relating in any way to

voting generally, voting absentee, or applying to vote absentee.

"Moreover, although the Supreme Court has acknowledged that a person or party may express beliefs or ideas through a ballot, it has also stated that '[b]allots serve primarily to elect candidates, not as forums for political expression.'" *Schmitt*, 933 F.3d at 638 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997)). This downplaying of the expressive value of a cast ballot suggests that even if a voter is deemed to make a political expression via a cast ballot, it would not be "core" political expression. This suggestion tends to undermine the notion that any expressive conduct encouraging casting a particular kind of ballot (for example, an absentee ballot) is core political expression. If actually casting a ballot does not constitute expressive conduct arising to the level of core political speech, it is far from clear why expressive conduct suggesting the possibility or desirability of casting a ballot would arise to that level.

The Court's conclusion is not affected by the applicability (at least in Justice Thomas's view) of *Meyer-Buckley* automatic strict scrutiny to "indirect" regulation of core political speech.[38] The Law does not regulate "core" political speech even indirectly. In particular, it does not somehow indirectly regulate a message that (unlike whatever non-core message may be conveyed by the mere act of distributing an absentee-ballot application) is core political speech. By prohibiting the distribution of a specific kind of paper (absentee-ballot applications), the Law does not indirectly (or directly) restrict any underlying political message that is on the paper itself. Just as there is no inherent expressive message (and at the very most a message that is not a core political message) in distributing the application, there is no underlying political message on the application itself.[39]

By contrast, in the first example of indirect regulation of core political speech provided by Justice Thomas in *Buckley*—namely, *Meyer* itself—the message indirectly restricted was a political message. As Justice Thomas explained it, *Meyer* involved a Colorado statutory prohibition

---

**38.** The undersigned realizes that the line between "direct" and "indirect" is sometimes blurry, given the subjective nature of those adjectives and the fact that there is a continuum between them. But he endeavors herein to use them in the most objectively reasonable manner when characterizing a particular restriction as direct or indirect for purposes of the distinction Justice Thomas made in *Buckley*.

**39.** The only two possibly articulable messages conveyed by an absentee-ballot application are: (1) a message to voters, conveyed by election officials on a blank form, that "if you want to vote absentee, fill out this application, and if the completed application indicates that you are eligible to vote absentee, you will be sent an absentee ballot"; or (2) a message, to election officials from a voter, that "I would like to vote absentee and here's the information showing that I am eligible to do so and thus should receive a ballot." Neither

of these presents a political message, and certainly not one indicating a desire for political change, let alone a discussion of the merits of the proposed change. Regarding the latter alternative, even if a voter's expressed message of a desire to vote suggests "a desire for political change," the message on an absentee-ballot application is an expression of the desire to vote absentee as opposed to in person, and there is nothing about expressing a desire to vote *in a particular way* that suggests a desire for political change. Moreover, neither of these two conceivable messages would be a message of any of the *Plaintiffs*. Instead, by distributing absentee-ballot applications, Plaintiffs would be handling a document with someone else's speech, *i.e.*, the message of election officials or the (putative) message of a voter. And "[o]ne does not 'speak' in this context by handling another person's 'speech.'" *Steen*, 732 F.3d at 390.

on paying persons to circulate petitions for ballot initiatives. *Buckley*, 525 U.S. at 207, 119 S.Ct. 636. The "direct" regulation/restriction was placed, depending on how one looks at it, upon payment of petition circulators or upon paid circulation of petitions; it appears that the "indirect" regulation to which Justice Thomas alluded was, as the majority explained it, of the *quantity* of the messaging about the petition conveyed to citizens via petition circulators. *See Meyer*, 486 U.S. at 422-23, 108 S.Ct. 1886. But that messaging, unlike any messaging conveyed by blank absentee-ballot applications, was *political* messaging; the petition concerned (and surely itself contained in the space under which voters would sign) a political message. *See id.* at 421-22, n.4-5, 108 S.Ct. 1886. A similar analysis is applicable to the other example cited by Justice Thomas in *Buckley*, *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), where the messages indirectly restricted (via a $250 limitation on contributions in support of or against ballot initiatives) were *political* messages about ballot initiatives. *Id.* at 299, 102 S.Ct. 434.

Because the Law does not, directly or indirectly, restrict core political speech even assuming *arguendo* it restricts some speech,[40] the *Meyer-Buckley* standard is inapplicable, and thus strict scrutiny is not automatically applicable by virtue of *Meyer-Buckley*. That means either: (i) that, as the Court found above, the Law is subject to rational-basis scrutiny because it does not restrict expressive speech at all; or (ii) that the Law is subject to the *Anderson-Burdick* framework for one of the two reasons set forth below.

4. If the *Anderson-Burdick* framework is applicable, it calls for rational-basis review (or rational-basis "plus" review), which the statute passes.

[49] There are two scenarios under which the *Anderson-Burdick* framework could be deemed applicable. As noted above, it arguably could be applicable automatically merely because the law is an "election law," even though (as the Court has found) the Law does not restrict expressive activity.

Even if not automatically applicable for that reason, the *Anderson-Burdick* framework would be applicable assuming *arguendo* (contrary to the Court's conclusion above) that the Law does restrict expressive activity but does not go so far as to restrict core political speech. In that case, the *Anderson-Burdick* framework, rather than automatic strict scrutiny under the *Meyer-Buckley*, standard would be applicable. This was the scenario in one recent case:

> Although the court finds assisting voters in filling out ballot request forms is subject to the First Amendment, the *Anderson-Burdick* balancing test, instead of strict scrutiny, likely applies. *See Thompson*[, 959 F.3d at 811] (applying the *Anderson-Burdick* balancing test

---

**40.** One of the cases cited by Plaintiffs suggests an alternative reason why strict scrutiny under *Meyer-Buckley* is inapplicable to the Law. In *American Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183 (D.N.M. 2010), the court rejected the application of strict scrutiny under *Meyer* and *Buckley* to the challenged law, which restricted voter registration by third parties. *Id.* at 1211-12. The court explained that "[t]he statute at issue in *Meyer v. Grant* directly regulated the condi-

tions under which the plaintiffs could interact with members of the public regarding an issue of political concern. In contrast to the law in *Meyer v. Grant*, [the challenged New Mexico law] does not directly limit the number of voices with which the Plaintiffs may speak." *Id.* at 1212. In this regard, the Law is like the New Mexico law challenged in *Herrera*; it does not restrict the number of voices with which Plaintiffs may speak.

to Ohio's requirements for collecting signatures for ballot initiatives, which burdened the plaintiffs' First Amendment rights).

*Democracy N. Carolina*, 476 F.Supp.3d at 223–24.[41] The Sixth Circuit seems to accept the general applicability of *Anderson-Burdick* to laws that place some burden on First Amendment rights (but not on "core political speech"). *See Thompson*, 959 F.3d at 808, n.2 (6th Cir. 2020).[42]

For example, in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006), the plaintiff political party alleged that certain Ohio election regulations and policy "imposes an unconstitutional burden on its First and Fourteenth Amendment rights of free association . . . ." *Id.* at 582. The Sixth Circuit resolved the plaintiff's claim by "[f]ollowing the analytical framework set forth by the Supreme Court in *Anderson* [ ]." *Id.* The nature of the plaintiff's claim (that Ohio's rules effectively prevented it from gaining access to the general election ballot in the twelve months preceding a presidential election) was certainly different from Plaintiffs' claims in this case, but that does not impair the applicability of *Anderson-Burdick* to Plaintiffs' instant claims, which likewise allege an unconstitutional burden on their First and Fourteenth Amendment rights of free association.

Also, in *Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014), the plaintiff political party challenged Tennessee's "requirements [for] organizations seeking to be recognized as political parties on the state's ballots." *Id.* at 539. The plaintiffs "argue[d] that these requirements effectively bar them from appearing on Tennessee's general-election ballot, in violation of their First Amendment rights to expression and political association." *Id.* The Sixth Circuit assessed these claims under *Anderson-Burdick* because "[t]he Supreme Court articulated the contemporary standard for evaluating constitutional challenges to a state's election laws in *Anderson* [ ], and again in *Burdick* [ ]." *Id.* at 545-46. Again, the nature of the plaintiff's claims was undeniably different from the nature of Plaintiffs' instant claims, but that should not impair the applicability of *Anderson-Burdick* to Plaintiffs' claims; after all, both cases unquestionably involved "constitutional challenges [based on the same constitutional rights] to a state's election laws . . . ." *Id.*

So it behooves the Court to conduct an analysis under the *Anderson-Burdick* framework, as such would be applicable to the Law if: (1) the Law burdens speech to some extent but the *Meyer-Buckley* standard is inapplicable because the Law does not restrict core political speech; or (2) the

---

41.  Likewise, in *Herrera*, the court applied the *Anderson-Burdick* framework after rejecting the plaintiff's claim that, under *Meyer* and *Buckley*, "because the challenged third-party voter-registration law burdens fundamental rights, the [c]ourt should subject their First–Amendment claims to strict scrutiny rather than to the *Anderson v. Celebrezze* analysis." *Herrera*, 690 F. Supp. 2d at 1211–12. The court reasoned that "[t]he statute at issue in *Meyer v. Grant* directly regulated the conditions under which the plaintiffs could interact with members of the public regarding an issue of political concern. In contrast to the law in *Meyer v. Grant*, [the challenged New Mexi-

co law] does not directly limit the number of voices with which the Plaintiffs may speak." *Id.* at 1212.

42.  *Thompson* is concerned specifically with the burden imposed by ballot-initiative requirements, but in places it strongly implies (albeit with some seeming disapproval) that under current Sixth Circuit law the *Anderson-Burdick* framework applies generally to restrictions on First Amendment rights imposed by election laws. *Thompson*, 959 F.3d at 808 & n.2.

Law is necessarily subject to *Anderson-Burdick*—rather than automatic rational-basis review—merely by virtue of its being an "election law" even if the Law does not burden speech at all (as the Court has found above).

The Court begins by assessing the burden imposed by the Law upon Plaintiffs' First Amendment rights. It will likely come as no surprise that the Court finds the burden light, given that the Court has already found that the Law does not implicate Plaintiffs' First Amendment rights. But even if the Court had found otherwise, the Court could and would find a light burden, under either of two alternative theories.

**[50]** As indicated above, the burden is considered light if the plaintiffs' "rights are subjected only to 'reasonable, nondiscriminatory restrictions.' " *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564). The Court first notes that the definition of "non-discriminatory" in this context appears elusive. But from the case law, the Court has concluded that the Law likely is non-discriminatory in this sense. The Law applies across the board to everybody (except for the tiny segment of the Tennessee population that works for election commissions). It is possible that the term could encompass concerns about *viewpoint* discrimination, but the Court has been unable to confirm that. And in any event, any possible viewpoint discrimination fostered by the Law is only of the mildest and most general possible kind; at most, the Law

could be viewed as discriminating against the message, supposedly conveyed by expressive conduct, that voting is important or that voters should vote, or vote absentee or at least consider voting absentee. The Court has considerable difficulty fathoming that such considerations could properly take the Law out of the "non-discriminatory" bucket.

The Court next notes that the concept of "reasonable" in this context is not well defined and not likely subject to a helpful definition anyway, given the subjective nature of the term. But whatever its full scope, the term presumably correlates with narrowness; the more narrow the restriction, the more reasonable it is.[43] Here, the restriction is quite narrow; even if Plaintiffs' alleged expressive message is restricted to some extent by the Law, the Law's reach is quite narrow, leaving open every possible avenue of oral or written expression and every possible action save one (distribution of applications for absentee ballots). It also appears that the reasonableness of a restriction correlates with the breadth of its applicability; the broader the applicability of the restriction, the more "reasonable" it is. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 631 (6th Cir. 2016) (noting Sixth Circuit "precedent recognizing that broadly applicable and non-discriminatory laws are presumed to pass constitutional muster"). That is, the general applicability of a restriction tends to show both that it is reasonable and that it is non-discriminatory. And such a showing is not undercut by the mere fact that

---

**43.** One might be tempted to say that a restriction is not reasonable if it is not in furtherance of a legitimate state interest or is not rationally related to that interest. But that would be to put the cart before the horse; under the *Anderson-Burdick* framework, those considerations are not even reached until a determination is made that the rational-basis test applies—a determination that could be

made only if the restriction is found not reasonable in the first place. And in any event, if a legitimate state interest, or rational relationship, is found lacking, the restriction will fail the rational-basis test anyway, meaning it ultimately did not matter that the restriction received the lowest possible scrutiny despite being "unreasonable" in this sense.

the restriction may negatively impact a significant number of voters. *See id.* Thus, the Court concludes that the Law imposes a reasonable, non-discriminatory restriction.

In that case, "the regulation is subject to rational-basis review because the State's important regulatory interests are generally sufficient to justify the restriction." *Hawkins*, 968 F.3d at 606 (internal quotation marks omitted). Notably, the language after the "because" in the prior sentence is not actually phrased as a description of the rational-basis test but rather as a general statement about certain outcomes upon application of the test. The rational-basis test actually requires both more and less than what this language indicates; it is satisfied by state regulatory interests that are merely legitimate (even if not "important"), but it requires a rational relationship between that interest and the restriction imposed.[44] *See Bowman v. United States*, 564 F.3d 765, 776 (6th Cir. 2008) ("Under the rational-basis test, the question is whether the regulation at issue is rationally related to legitimate government interests." (internal quotation marks omitted)).

Operating under the assumption that when the Sixth Circuit says rational-basis review it means it, the Court will apply rational-basis review. But it will do so with a twist; it will require rational-basis "plus," *i.e.*, that the state's interests be "important" rather than merely legitimate, since some Sixth Circuit opinions imply that "important state interests" are what is required in this context.

**[51, 52]**  The Court is aware, however, that for the reasons indicated above, a colorable argument could be made that the law is not both reasonable and non-discriminatory. It is therefore worth noting that rational-basis review can be indicated even without resort to the rubric of "reasonable, non-discriminatory restrictions." If a burden is "minimal," then rational-basis review is appropriate. *See Ohio Council 8 American Federation of State v. Husted*, 814 F.3d 329, 334 (6th Cir. 2016) (deeming an Ohio law "constitutional because at most it minimally burdens the plaintiffs' rights to freedom of expression and association, and because the state's interest is sufficient to outweigh that minimal burden."). To be sure, cases like *Ohio Council 8* sometimes refer also to the non-discriminatory nature of the law when affixing the burden, but they eschew reliance on "reasonable[ness]" and rely primarily on the minimal nature of the burden. And in considering whether a burden is minimal, as opposed to "modest," the Court should consider whether the activity restricted by the challenged law can otherwise be broadly engaged in. *See Ohio Democratic Party*, 834 F.3d at 631-32. More specifically, in dubbing a burden "minimal," the court may specifically rely on the fact that even with the burden in place, the plaintiffs have "many other opportunities to … educate voters." *Ohio Council 8*, 814 F.3d at 335. Such is the case here; as the Law does not foreclose to

---

44. One may correctly perceive that in this context, as in the second context below, the Sixth Circuit does not really mean that the rational-basis test applies, and that instead the "advances important state interests" test applies. If so, the test has a single express requirement (an important state interest), but there may nevertheless be an implied second requirement that the restriction have some

relationship to the state interest; otherwise, why would that state interest even be deemed to count in favor of the state vis-à-vis the restriction? The problem is that courts know how to expressly state a second part of a constitutional test if in fact one exists; they do it all the time, including with the rational-basis test.

Plaintiffs any avenue whatsoever—other than the sheer act of distributing absentee-ballot applications—to educate voters about absentee voting (or indeed anything else), any burden it imposes on Plaintiffs' First Amendment rights is minimal.

Where a law is minimally burdensome, it appears that the Sixth Circuit does not apply the rational-basis test *per se*, but instead asks whether the State has an important interest in the restriction; the latter test has been described as "akin to" (as opposed to the same as) the rational-basis test and as "a less-searching examination closer to rational basis" than to strict scrutiny. *See id.* at 335. The Court construes this as counseling the application, in an abundance of caution, of the same "rational-basis plus" approach suggested above.[45]

As for the State's interests in the restriction, Defendants assert two: preventing voter confusion and protecting the integrity of elections. The former interest is plainly important. *E.g., Libertarian Party of Ohio*, 462 F.3d at 587 (referring to "the important state interest in avoiding voter confusion" (citing *Timmons*, 520 U.S. at 363-64, 117 S.Ct. 1364)). So is the latter. *See e.g., Lubin v. Panish*, 415 U.S. 709, 718, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (referring to "the important and legitimate interest" of maintaining the integrity of elections"); *Schmitt*, 933 F.3d at 641 (" 'The State's interest in preserving the integrity of the electoral process is un-

doubtedly important.' " (citation omitted)).[46] Moreover, the Court notes that the state's interest in election integrity appears especially acute in the area of absentee ballots. *See, e.g., Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1069 (9th Cir. 2020) (Bybee, J., dissenting) (" 'Absentee ballots remain the largest source of potential voter fraud.' " (quoting the recommendation of the bi-partisan Carter-Baker Commission on Federal Election Reform)). Plaintiffs do not overtly assert an absence of important state interests, and any such assertion would be without merit anyway.

[53, 54]  To the extent that Plaintiffs imply a purported lack of empirical evidence to justify the importance of the State's interests at this time, such an implication is unwarranted. As noted in a case cited by Plaintiffs themselves, (Doc. No. 12 at 12 n.10),

"It is well established that, in the election context, there is no need for an 'elaborate, empirical verification of the weightiness of the State's asserted justifications.' " *Florida State Conference of N.A.A.C.P. v. Browning*, 2008 WL 2567204, at *12, [569 F.Supp.2d 1237, 1251](N.D. Fla. June 24, 2008) (quoting *Timmons*, 520 U.S. at 364, 117 S. Ct. 1364 (additional citation omitted)); *accord Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) ("Legislatures . . .

---

45. The Court does so knowing that some cases, including one cited by Plaintiffs on another topic, (Doc. No. 12 at 12 n.10), happen to describe the lowest level of scrutiny under the *Anderson-Burdick* framework solely in terms of classic rational-basis review. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 701 (N.D. Ohio 2006) ("[U]nder rational basis review, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").

46. The Supreme Court has noted the importance of two interests closely related to those asserted by Defendants, namely, counting only the votes of eligible voters and orderly administration and accurate recordkeeping. *See Crawford*, 553 U.S. at 196, 128 S.Ct. 1610. Surely a state likewise has an important interest in counting only a single vote for each eligible voter and thus in ensuring at most one absentee ballot per voter.

should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . .").

For example, in *Crawford*, the Supreme Court recently upheld Indiana's voter ID law despite the fact that there was "no evidence of any such fraud actually occurring in Indiana at any time in its history." *Crawford*, 128 S.Ct. at 1619. The Court premised this conclusion upon the fact that the threat posed by voter fraud was obvious because "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters [,] . . . the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.* As the Court observed, "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Id.*

*League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1324 (S.D. Fla. 2008). And as the Sixth Circuit noted in rejecting a challenge to an Ohio law (S.B. 238) that shortened the period of early voting (whether in person or by mail):

We agree . . . with the Supreme Court that legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro*, 479 U.S. at 195, 107 S.Ct. 533. Requiring that a "[s]tate's political system sustain some level of damage before the legislature could take corrective action" is neither practical, nor constitutionally compelled. *Id.*₈ Again, we note that S.B. 238 is minimally burdensome and facially non-discriminatory, and is therefore not violative of equal protection if it advances "important regulatory interests." *Ohio*

*Council*, 814 F.3d at 338. Ohio's proffered interests of preventing voter fraud, increasing voter confidence by eliminating appearances of voter fraud, and easing administrative burdens on boards of elections are undoubtedly "important regulatory interests," *see Crawford*, 553 U.S. at 194–96, 128 S.Ct. 1610 (Stevens, J., op.). The State's interests thus provide ample justification. We hold that plaintiffs have failed to establish their "heavy constitutional burden" of demonstrating that S.B. 238 is unconstitutional. *Ohio Council*, 814 F.3d at 338.

*Ohio Democratic Party*, 834 F.3d at 634–35.

Plaintiffs do specifically take issue with the relationship between the Law and the asserted state interests. Plaintiffs correctly note that Defendants did an underwhelming job of explaining in their brief how the Law advances these interests and instead took up space talking about other safeguards not even relevant here. And, presuming that strict scrutiny of the Law is required, Plaintiffs also assert that Defendants have not shown that the Law is, as required by strict scrutiny, narrowly tailored to meet those interests. But of course the Court has found that the Law is subject only to "rational-basis (plus)" review, which is an extremely deferential standard, *Bowman*, 564 F.3d at 775-76, one that is "forgiving" if not entirely malleable. *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 20, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (Scalia, J., concurring in part).

Assuming as they do that this test is not applicable, Plaintiffs do not specifically assert that the rational-basis (plus) test is not satisfied. In any event, as explained below, it is in fact satisfied because there is a rational relationship, *i.e.*, a plausible connection, *id.*, between the Law and the asserted state interests.

In his declaration, Defendant Goins explains the connection by stating that the Law

helps prevent voter fraud and confusion and preserves the integrity of the ballot box, such as by helping ensure that the voter initiated the request for an application, that the application provided is the correct approved form, that the application is not pre-filled in any way by non-election officials, that it is clear to the voter who is providing the application and that it is being provided by the government, and that the application will not be accompanied by any additional or misleading instructions not provided by the election commissions or the Coordinator of Elections.

(Doc. No. 21-1 at 3). He also provides a recent example in Tennessee (among other examples from other states) of how distribution of absentee-ballot applications can impair the integrity of the absentee-ballot application (and thus the election) process and foster voter confusion:

In connection with the August 2020 Primary and General Elections, there was an example of election irregularities and problems in Madison County, Tennessee[;] someone mass mailed out some registered voters copies of applications for absentee ballots, which contained already prefilled portions—such as which party's primary election the voter was choosing to vote in, which was not necessarily the voter's party of choice, and the asserted reason for requesting an absentee ballot.

(Id. at 6). And, in an apparent reference to absentee-ballot applications, he refers to "potentially misleading or confusing mass mailings sent by non-governmental entities." (Id.). As he explains, the confusion can arise from the recipient's mistaken belief that the mailing is from the government and/or that the form *must* be com-

pleted and returned. (Id.). In fact, under Tennessee law, not surprisingly no one is ever required to complete and return the form, and if a person does do, they likely will be (perhaps even unwittingly) locked in to vote by mail, when they perhaps never had an intention to vote absentee.

As Defendant Goins further explains, a voter could receive applications to vote absentee from multiple different non-governmental sources. (Id. at 7). When this happens, the possibility exists (and has actually been realized in some cases, Goins indicates) of a voter returning multiple applications, causing administrative problems for local election commissions. (Id.). In Defendant Goins' view, the Law is intended to and does address these threats of voter confusion and threats to election integrity. The Court finds that Defendants, via Defendant Goins' declaration, have easily established a plausible connection between prohibiting the distribution of absentee-ballot requests and both increasing election integrity and decreasing voter confusion. Among other things, there is a rational basis to believe that by prohibiting everyone (other than election commission employees) from distributing absentee-ballot applications, the State can: (a) increase the integrity of the absentee ballot process by, among other things, better ensuring that an absentee-ballot application is being submitted by someone who truly wants to submit the application, that the applicant does not miss out on voting absentee (and perhaps, as a direct result, voting at all) due to misleading addressing or other information provided by a distributor, and that the applicant is not mistakenly provided by election officials with multiple absentee ballots; and (b) decrease the risk of voter confusion arising from, among other things, voters' receipt of (i) applications mistakenly believed by some recipients to be from election officials, (ii) applications from multiple distributors, or (iii) incorrect

addressing or other information from the distributor regarding absentee voting.

Defendants did not expressly delve into a more nefarious possibility that could be addressed by the Law. Unscrupulous distributors (which is not at all to say Plaintiffs) with an agenda can do (that is to say, offer) things in conjunction with providing a voter an absentee-ballot application that can cast serious doubt on the integrity of that voter's particular vote. The Court will leave it at that, except to say that there is plausible connection between preventing such attacks on election integrity and criminalizing distribution of absentee-ballot requests.

Plaintiffs attack Defendant Goins' declaration largely on grounds that, whatever their value under a strict scrutiny standard, gain Plaintiffs no traction in refuting the required mere plausible connection between the Law and the State's asserted interests. (Doc. No. 13-14). For example, Plaintiffs fault Defendant Goins for not explaining why the Law's criminal prohibition is necessary to ensure that the application provided is the correct official form. (*Id.* at 13-9 (citing Doc. No. 21-1 at ¶4)). But the question now is not whether the Law's provisions are necessary, but rather whether they are plausibly connected to the State's interest. Plaintiffs also fault Defendant Goins for not explaining why it is important that an absentee-ballot not be distributed with additional, non-official instructions. (*Id.*). Respectfully, it seems clear to the Court why the State would deem the exclusion of such instructions both important and connected to the State's asserted interests: they could be wrong, misleading, and (given their being received together with the official state absentee-ballot application) mistaken for official instructions. The State would natu-

rally consider preventing any such result important and, to reduce the risk of this occurring, could reasonably consider the exclusion of any instructions to be important.[47]

To the extent Plaintiffs would have the Law fail for lack of hard evidence (as opposed to the possibility of) its effectiveness in meeting the State's asserted goals, that is unwarranted. The Sixth Circuit has noted the

> Supreme Court's hesitation to scrutinize [a] regulation's fraud-fighting effectiveness, and thus has indicated that emphasis should be placed not an actual evidence of fraud-fighting effectiveness but rather on a state's goal of reducing potential voter fraud as an "important regulatory interest . . . sufficient to justify the minimal burden identified in this case.

*Ohio Democratic Party*, 834 F.3d at 634.

It is true that, by 2020 if not before, the State could have chosen to pursue its asserted interests with less restrictive means. For example, it could have prohibited the distribution only of absentee-ballot applications mailed by election commissions (rather than printed from the Internet), or only of (partially or completely) filled-in (rather than blank) applications, or only of particular quantities of applications. And the State could have chosen to make exceptions to the prohibition in the Law, such that the Law expressly permitted, for example, distribution of an absentee-ballot application to a spouse or parent or child, or indeed any one-on-one distribution. But such possibilities are not relevant here. As the Ninth Circuit explained in a case involving restrictions on absentee ballots:

---

**47.** Notably, though, the Law does not prohibit in any way whatsoever the distribution of    instructions (good or bad) for completion of an absentee-ballot application.

For similar reasons, we reject Feldman's argument that the district court erred in not considering whether Arizona's "goals could have been achieved through less burdensome means." Neither the Supreme Court nor we have required a state to prove there is no less restrictive alternative when the burden imposed is minimal. *Burdick* expressly declined to require that restrictions imposing minimal burdens on voters' rights be narrowly tailored. *See* 504 U.S. at 433, 112 S.Ct. 2059. Consistent with *Burdick*, we upheld in *Public Integrity Alliance[, Inc. v. City of Tucson]* an election restriction (ward-based primary elections) that furthered the interest of "ensuring local representation by and geographic diversity among elected officials" by ensuring that "the candidates nominated in a given ward actually have the support of a majority of their party's voters in that ward," even though other less-restrictive means such as candidate-residency requirements could achieve the same broader purpose. 836 F.3d [1019] at 1028 [ (9th Cir. 2016) ]. Similarly, in *Arizona Green Party [v. Reagan]*, we rejected the argument that the state must "adopt a system that is the most efficient possible" such that later deadlines could be set, in light of the "de minimis burden" imposed by the existing deadlines. 838 F.3d [983] at 992, 2016 WL 5335037, at *7 [ (9th Cir. 2016) ]. As the district court found, H.B. 2023 establishes a chain-of-custody for absentee ballots that furthers Arizona's stated interests of reducing fraud and promoting public confidence, even though other, less restrictive, laws may achieve the same broader purpose.

*Feldman*, 840 F.3d at 1083. It is likewise not relevant that, in the minds of some, the Law could be not only narrower, but also otherwise simply better. The Court realizes that some may think if the restriction

does exist, it should not be enforceable by a felony conviction. But the manner in which the restriction is enforced is not here at issue; instead, the scope of and justification for the restriction is at issue. The Court also realizes that the Law could have been repealed once the State made absentee-ballot applications available online; repealment could be a nod to the notion that by placing the application online, the State was conceding that it had traded its ability to track and control absentee-ballot applications in return for its citizens' increased convenience of greater access to absentee-ballot applications. But to say that the Tennessee legislature could have taken one or more of these possible tacks, or otherwise done things differently than it has done them, is not to say that it was constitutionally required to do so.

If some Tennesseans think that the Law is too broad, or enforced too harshly, or out of step with the Internet era, they should seek to persuade their legislators to amend or repeal the Law. But the Court does not sit as a super-legislature, deciding whether it likes the law and then determining whether to enjoin enforcement of the law accordingly. *See Griffin v. Roupas*, No. 02 C 5270, 2003 WL 22232839, at *8 (N.D. Ill. Sept. 22, 2003), *aff'd*, 385 F.3d 1128 (7th Cir. 2004) (holding that "the Illinois legislature's decision to restrict absentee voting is a reasonable exercise of their power to regulate elections. Plaintiffs should be lobbying Illinois' legislature for the reform they seek."). The Court would not presume to tell any such Tennesseans that they are wrong.

Yet, our task (especially with respect to burdensome laws) is neither to craft the "best" approach, nor "to impose our own idea of democracy upon the Ohio state legislature." *Libertarian Party*, 462 F.3d at 587; *see also Crawford*, 553 U.S. at 196, 128 S.Ct. 1610 (Stevens, J., op.)

("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). Rather, we simply call balls and strikes and apply a generous strike zone when the state articulates legitimate and reasonable justifications for minimally burdensome, non-discriminatory election regulations. Given the weight afforded to State measures targeting potential fraud (even without evidentiary support) in *Crawford*; and given the Court's hesitation to scrutinize the regulation's fraud-fighting effectiveness, we accept Ohio's goal of reducing potential voter fraud as an "important regulatory interest" sufficient to justify the minimal burden identified in this case.

*Ohio Democratic Party*, 834 F.3d at 633–34 (footnotes omitted).

[55] The Court certainly understands Plaintiffs' point about the disconnect between (a) Defendants' apparent suggestion that it is important to limit absentee-ballot applications to one per voter and (b) the reality that the State has essentially obviated such system of controls by placing the absentee-ballot application online. As suggested above, this disconnect might counsel concerned citizens and legislators to take a look at whether the Law still makes good policy sense, at least in its current form. It might also counsel them to ask whether warnings about distributing the application should be included on the ballot and perhaps otherwise better publicized, since people today naturally tend to think of documents publicly available online, and printable, as being fungible and legally transferrable.[48] And indeed, surely a lot of

the transferring of absentee-ballot applications printed from the Internet would be transferred without any bad faith or knowledge of any illegality, or any resulting confusion or harm to the integrity of the election. But again, that is a question of possible overbreadth, which is not the question here. The question is whether the Law is rationally related to the State's asserted interests. And it is, because it is certainly plausible that there would be—or already have been—instances of distribution in violation of the Law (or of distribution that would have occurred in violation of the Law absent the deterrence provided by the Law) fostering voter confusion and/or impairing the integrity of the election. And this is all the rational-basis test requires.[49]

5. If rational-basis review is automatically applicable because the Law does not implicate the First Amendment, the Law passes rational-basis review.

Because, as noted above, there is a "bewildering array" of possible standards/tests/frameworks to apply here, *see Tenn. State Conference of N.A.A.C.P.*, 420 F. Supp. 3d at 701, the Court has addressed a variety of scenarios, depending on whether the Law implicates the First Amendment. If (contrary to the Court's conclusion) it does, the Court has concluded that rather than the *Meyer-Buckley* standard, the *Anderson-Burdick* framework applies and in turn calls for rational basis (plus) review. But if (as the Court concluded) the Law does not implicate the First Amendment, then the Court has concluded that either (i) the *Anderson-Bur-*

---

**48.** Constitutional issues regarding fair notice of the criminality of proscribed conduct are cognizable not under the First Amendment, but rather under the Due Process Clause, which Plaintiffs have not invoked to challenge the Law.

**49.** *Naturally, it would be a closer question whether the Law satisfies intermediate scrutiny under Anderson-Burdick. But this is a question the Court need not reach.*

*dick* standard applies because the Law is an "election law," and, in the Court's view, calls for rational-basis (plus) review; or (ii) rational-basis review applies automatically, irrespective of the *Anderson-Burdick* framework because "if the conduct is found to be non-expressive and therefore unprotected, the statute will be scrutinized for its 'rational basis.' " *Andrade*, 488 F. App'x at 895–96 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n. 27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (explaining that if the law does not implicate a specific constitutional right, such as freedom of speech, then rational-basis review applies)). In summary, the Court has evaluated various paths to the identification of the test applicable to the Law, and it has concluded that the two options are rational basis (plus) and rational basis

Having addressed the first test possibly applicable (rational-basis plus), the Court now proceeds to the other possible test, rational basis. The procession is an easy one. Rational basis is the easier of the two standards to meet, as it requires merely a "legitimate," rather than "important," state interest. So since the Law satisfies rational basis (plus), it satisfies rational basis, as it is rationally related to a legitimate state interest.

### B. *The other preliminary injunction factors collectively cut against Plaintiffs.*

[56]  It seems fair to say that the Court analyzed the first preliminary injunction factor at length. But based on the outcome of that analysis—the conclusion that Plaintiffs lack a substantial likelihood of success on the merits—the remaining factors can be addressed in short order. The Court need not reinvent the wheel. What the Sixth Circuit said about these factors recently, in vacating a district court's injunction enjoining certain Ohio ballot-access laws, applies equally to the Tennessee law at issue here:

In short, Ohio is likely to prevail on the merits—and that's the most important part of this analysis. Still, the remaining three preliminary injunction factors favor Ohio, too.

. . .

First, irreparable harm. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3, 183 L.Ed.2d 667 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, J., in chambers)). So "[u]nless the statute is unconstitutional, enjoining a 'State from conducting [its] elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm [the State].' " *Thompson*, 959 F.3d at 812 (quoting *Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2324, 201 L.Ed.2d 714 (2018)). Because we've already found that Ohio is likely to prevail on the merits here, it would cause the State irreparable harm if we blocked it from enforcing its constitutional ballot access laws.

Next, the balance of the equities. "When analyzing the balance of equities, '[the Supreme] Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.' " *Kishore*, [972] F.3d [745], 2020 WL 4932749, at *4 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, —— U.S. ——, 140 S. Ct. 1205, 1207[, 206 L.Ed.2d 452] (2020) (per curiam)). Ohio will soon print ballots for overseas and military voting. Ohio Rev. Code Ann. § 3509.01(B)(1). Because "federal courts are not sup-

posed to change state election rules as elections approach," this factor also favors Ohio. *Thompson*, 959 F.3d at 813.

Finally, the public interest. It's in the public interest that we give effect to the will of the people "by enforcing the laws they and their representatives enact." *Id.* at 812. So all four preliminary injunction factors favor Ohio.

Finally, we note that the Federal Constitution gives states, not federal courts, "the ability to choose among many permissible options when designing elections." *Id.* We don't "lightly tamper" with that authority. *Id.* Instead, the power to adapt or modify state law to changing conditions—especially during a pandemic—rests with state officials and the citizens of the state.

So while federal courts can sometimes enjoin unconstitutional state laws, we can't engage in "a plenary re-writing of the State's ballot-access provisions." *Esshaki* [*v. Whitmer*], 813 F. App'x [170] at 172 [ (6th Cir. 2020) ]. Instead, "[t]he Constitution grants States broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices." *Clingman v. Beaver*, 544 U.S. 581, 586[, 125 S.Ct. 2029, 161 L.Ed.2d 920] (2005) (citations omitted).

We don't have the power to tell states how they should run their elections. If we find a state ballot-access requirement unconstitutional, we can enjoin its enforcement. *See, e.g., Esshaki*, 813 F. App'x at 172. But otherwise, "state and local authorities have primary responsibility for curing constitutional violations." *Hutto v. Finney*, 437 U.S. 678, 687 n.9[, 98 S.Ct. 2565, 57 L.Ed.2d 522] (1978); *Esshaki*, 813 F. App'x at 172 (holding that it "was not justified" for a

district court to extend the deadline to file signed petitions and order the state to accept electronic signatures).

So when the district court here ordered Ohio to accept electronically signed and witnessed petitions and extended the deadline for submitting petitions, it overstepped its bounds. It effectively rewrote Ohio's constitution and statutes and "intrude[d] into the proper sphere of the States." *Missouri v. Jenkins*, 515 U.S. 70, 131[, 115 S.Ct. 2038, 132 L.Ed.2d 63] (1995) (Thomas, J., concurring); *see Thompson*, 959 F.3d at 812 ("[T]he district court exceeded its authority by rewriting Ohio law with its injunction."). Federal courts don't have this authority.

*Thompson v. Dewine*, —— F. App'x ——, 2020 WL 5542883, at *6–7 (6th Cir. Sept. 16, 2020) (alphanumeric section separators omitted).

As implied above, the Court need not belabor these points. In light of the Court's conclusion regarding Plaintiffs' (lack of) likelihood of success on the merits, the other factors fall against Plaintiffs, just as they fell against the plaintiffs in *Thompson*. They cut against Plaintiffs for the same reasons, with one caveat. As the Court noted above, Defendants have not shown (or really even argued) that enjoining enforcement of the Law would result in "prejudice" for purposes of the laches analysis. That is, Defendants have not shown that such enjoinment would directly require the State to do anything or would upset the State's expectations related to the administration of the upcoming election; nor have Defendants shown any indirect effects that would upset the State's expectations or current preparations.

[57] This all begs the question of whether this reflects an absence of harm to the State that should count against the State for purposes of the "balance of the

equities" preliminary injunction factor. Is this case unlike *Thompson*, where the balance of the equities tipped in Ohio's favor because the injunction there would have changed the election rules on the eve of the election? The Court answers each of these related questions in the negative. Laches is concerned with a particular kind of evidence-based or expectations-based prejudice, as discussed above. But the aspect of the balance of the equities to which *Thompson* referred is something different; the concern expressed there was not with how a late change in the rules might be *harmful* to the state by forcing it to scramble; instead, the concern expressed seems to be that it would be *inequitable* (harkening back to the very moniker for this factor) to change the rules on the state so late. In other words, the concern seems to be not with harm (in the form of logistical and administrative burdens, for example, that might indicate laches-style prejudice) but rather with *fairness*. As expressed, the notion is that (irrespective of prejudice) it is simply unfair to the state to force it to change its elections rules (heretofore recognized as lawful) on the proverbial eve of the election based on one preliminary result of a lawsuit. Here, even though it is a criminal statute rather than some administrative provision regulating the mechanics of elections, the Law would seem to qualify as "an election law" for obvious reasons. And so *Thompson* does suggest that the balance of the equities favors Defendants even though enjoining the Law has not been established as a source of laches-style prejudice.

## CONCLUSION

It may be that as a general matter, one side of the current political divide opposes the Law and the other side supports the Law. But that does not make the Law either a Republican law or a Democratic law. When the Law was enacted in its original form (in 1979), it was passed by a legislature in which the Democrats held a substantial majority in both houses and was signed into law by a Republican governor. When it was amended for the only time (in 1994), it was passed by a legislature in which the Democrats held a substantial majority in both house and signed into law by a Democratic governor. And today, the Law is defended by a Republican state attorney general serving under a Republican governor. In this sense, the Law has a history of bi-partisanship (or non-partisanship), and it is the law neither of Republicans nor of Democrats. It is the law of the State of Tennessee. The duty of this Court is to determine whether the Law violates Plaintiffs' First Amendment rights. Partisanship (heretofore apparently lacking regarding the Law in any event) has nothing to do with it.

"The role of this court is not to impose [its] own idea of democracy upon the [Tennessee] state legislature; rather, [it] must limit our analysis to whether the restrictions imposed [by the Law] fits within the outer limits of what the First Amendment requires." *Libertarian Party of Ohio*, 462 F.3d at 587.

Here, the Court "can find in this [Law] nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments." *See Jenness v. Fortson*, 403 U.S. 431, 440, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). For this reason, the first preliminary injunction factor cuts sharply against Plaintiffs, and, largely as a result, the rest do also.

Accordingly, the Motion (Doc. No. 11) is DENIED.

IT IS SO ORDERED.

